2: 06cv

**RECEIVED**

UNITED STATES DISTRICT COURT 2006 AUG -8 P 3: 55

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

\* \* \* \* \* \* \* \* \* \* \* \* \*

MAY'S DISTRIBUTING CO. INC.,

    Plaintiff,

vs.

TOTAL CONTAINMENT, INC., ET AL.,

Defendants

\* \* \* \* \* \* \* \* \* \* \* \* \*

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

Civ. Action No. 2:06 cv 702-

Judge _____

JURY TRIAL REQUESTED

<u>NOTICE OF REMOVAL</u>

TO:   **THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF ALABAMA**

       United States Courthouse
       Montgomery, Alabama

    Now come Petitioners, Dayco Products, LLC ("Dayco"), and Mark IV Industries,

Ltd., who, through undersigned counsel, pursuant to 28 U.S.C. §§1332, 1441, 1446 and

1453, hereby give notice that they have removed this civil action from the Circuit Court of

Bullock County, Alabama, to the United States District Court for the Middle District of

Alabama based upon the Class Action Fairness Act of 2005 and the commencement of a

new class action through the filing of the Fourth Amended Complaint. In support of this

Notice of Removal, Petitioners state as follows:

**Plaintiff's State Court Allegations**

1.

May's Distributing Company, Inc. ("Plaintiff"), individually and as a class representative filed this putative class action on behalf of all gas station owners similarly situated, on January 3, 2003 in State Court, seeking damages for an allegedly defective pipe installed as part of an underground fuel tank storage system in 1998.

2.

In the original complaint and subsequent amendments, Plaintiff also named as defendants Total Containment, Inc. ("TCI"), Oil Equipment Company, Inc., Cleveland Tubing, Inc., Parker Hannifin Corporation, Ticona Polymers, Inc., Atofina Chemicals, Inc., Elf-Atochem North America, Inc., and Underwriters Laboratories, Inc. Each of these subsequent amendments related to the specific fourth generation of Enviroflex flexible pipe system contracted for in 1997 and installed in 1998 in Montgomery, Alabama. Plaintiff alleged that he discovered this pipe system was defective in 2002. Plaintiff sought certification of a class of gas station owners who suffered similar damages as Plaintiff due to an alleged defect causing leakage in a type of underground fuel tank storage system designed, sold and/or installed by TCI.

3.

Plaintiff's original and amended complaints sought certification of a nationwide class of gas station owners who had similarly allegedly defective pipe arising out of the "same facts constituting the wrongful conduct of defendants." Plaintiff averred that the class of consumers of the same TCI flexible pipe as found at Plaintiff's station numbered in the thousands. *See* Third Amended Complaint at ¶23-26, attached as Exhibit A.

4.

Discovery was conducted on the type of pipe system at issue in the case. After lengthy discovery, it was determined that Petitioners were not involved in the manufacture, design, sale or installation of the particular 1998 hose installed by TCI at Plaintiff's business. Petitioners accordingly filed a motion for summary judgment, which is currently pending in the State District Court. *See* Petitioners' Motion for Summary Judgment, attached as Exhibit B.

5.

After the close of discovery, on July 13, 2006, Plaintiff filed and served upon all Defendants a Fourth Amended Complaint and Class Definition commencing an entirely new class action seeking certification of a nationwide class of gas station owners in the 50 states and Puerto Rico who installed all generations of Enviroflex hose as well as all other products including Omniflex and Monoflex pipe (two other products of Petitioners) over a seven year time period from 1990 to 1997. The Fourth Amended Complaint also enlarged the class beyond gas station owners with leaking flexible pipe systems to suggest that defects were present in any gas station with the flexible pipe system, regardless of whether there were leaks. Plaintiff avers that the newly commenced class action includes "tens of thousands" of class members. *See* Fourth Amended Complaint at ¶31, attached as Exhibit C.

6.

Pursuant to 28 U.S.C. § 1446 (b), this Notice of Removal is timely filed within thirty (30) days of receipt of the Fourth Amended Complaint and Class Definition which

commences a new class action not arising out of the same facts as the previous complaint. Pursuant to 28 U.S.C. §1453(b), this removal is proper although brought more than one year after the original suit was filed.

## Removal Under the Class Action Fairness Act

7.

This removal is brought under the Class Action Fairness Act of 2005. *See* 28 U.S.C. §§1332, 1441, 1446, 1453. The Fourth Amended Complaint seeks certification of a class involving facts substantially different from the previous complaint. Petitioners were not on notice of the nature of the claims and allegations in the Fourth Amended Complaint and would be unfairly prejudiced by allowing the Fourth Amended Complaint to relate back to the prior complaint. Accordingly, a new class action has been commenced and removal is permitted under the Class Action Fairness Act.

8.

At the time of filing Plaintiff's Complaint, defendant Dayco Products, LLC was and is now a Delaware corporation with its principal place of business in the State of Michigan. Defendant Mark IV Industries, Inc. was and is now a Delaware corporation with a principal place of business in the state of New York.

9.

Plaintiff is an Alabama corporation with its principal place of business in Alabama. Based on the foregoing, there is complete diversity of citizenship between Plaintiff and the properly joined defendant. Accordingly, minimal diversity exists, as defined in that act at 28 U.S.C. §1453(b) and 1332. Plaintiff seeks certification of a class of gas station owners in all fifty states and Puerto Rico.

**The Amount in Controversy**

10.

The amount in controversy exceeds $5,000,000, exclusive of costs and interest and is therefore proper in this Court under 28 U.S.C. §1332(c)(2).

11.

Although Plaintiff pleads no specific amount of damages, Plaintiff seeks certification of a class of tens of thousands of gas station owners seeking the costs of equipment and labor for replacement of the allegedly defective systems, lost profits, as well as other damages. If successful as a class action, the sums required to replace the pipe at each gas station will exceed $5,000,000. Although Petitioners oppose this amount, Plaintiffs in another case seeking replacement of Enviroflex pipe have requested $116,000 to replace pipe at one station. They further seek $6,800,000 for replacement of Enviroflex pipe in 68 stations. Accordingly, "tens of thousands" of class members in this case would reach an amount in controversy in excess of $5,000,000, exclusive of interest and costs.

**The Fourth Amended Complaint Does Not Relate Back to the Prior Complaint, Thereby Commencing a New Suit**

12.

This case is being removed under the Class Action Fairness Act. *See* 28 U.S.C. §§1332, 1441, 1446 and 1453. The Fourth Amended Complaint drastically changed the nature of the class action in such a way that it cannot relate back to prior complaints. Petitioners were not on prior notice of the extent of the class action proposed in the prior complaints and would be unfairly prejudiced if the new complaint were to relate back to the prior one.

13.

The original complaint and subsequent amended complaints involved a leakage of Enviroflex pipe system contracted for and installed in 1998. This product was the fourth generation of Enviroflex pipe. Discovery on this case was conducted and completed on July 31, 2006 to determine what type of pipe was referred to in the complaint as defective. Pursuant to discovery and based upon the years at issue in the case, it was determined that Petitioners did not manufacture this particular hose. The putative class representative testified that the hose manufactured by Petitioners at his other stations was not defective.

14.

In the Fourth Amended Complaint, after discovery revealed that Petitioners were not involved in any way in the manufacture or installation of the allegedly leaky fourth generation Enviroflex pipe at issue in the case—contracted for in 1997, installed in 1998 and alleged to be defective in 2002—Plaintiff now alleges claims of defective pipe beyond the 1997 pipe, to include all generations of Enviroflex pipe manufactured between 1990 and 1997, as well as other types of pipe products including Monoflex and Omniflex (two other products manufactured by Petitioners). This drastically expands and changes the lawsuit and does not relate in any way to the claims originally at issue in the case. The previous suit involved a 1997 contract for fourth generation Enviroflex hose installed in 1998. The Fourth Amended Complaint involves potentially every generation and all other pipe products manufactured by Petitioners, which includes more than thirteen different types of pipe, with component parts and materials manufactured by scores of different companies. Instead of a claim for one type of hose (not manufactured by Petitioners) installed in 1998, as was litigated up until this point, this new lawsuit alleges that each

version of each type of Petitioners' pipe (Enviroflex, Omniflex and Monoflex) are defective and that Petitioners are responsible for the allegedly defective design of subsequent generations of TCI flex pipe with which they had no involvement. The allegations now suggest that over 13 different varieties of pipes manufactured between 1990 and 1997 are allegedly defective not because they leaked fuel, but because they "permeated" vapor and liquid. These claims are entirely new and do not relate back to any prior complaint.

15.

The flexible pipe manufactured by Petitioners is comprised of five layers. The seven-year period proposed by Plaintiffs in this new class action would encompass a number of different manufacturers and suppliers of the pipe layers. The flexible pipe also comes in different sizes and was manufactured by at least two different manufacturing plants. Each type of flexible pipe would have been tested separately and would have a different test history. Each type of pipe would also have a specific coupling and fitting, designed and manufactured by various manufacturers over the seven-year period.

16.

As nothing in the previous complaints put Petitioners on notice that the suit would involve any flexible pipe other than the specific fourth generation Enviroflex pipe in Plaintiff's gas stations, it is unfairly prejudicial to allow this new complaint to relate back. The parties completed discovery in the case, relying upon Plaintiff's representations that the allegedly defective fourth generation Enviroflex hose was installed at a gas station in Montgomery in 1998. It is grossly unfair to allow the Plaintiff to amend the complaint to

add claims based upon numerous different products manufactured by Petitioners and other

Defendants other than the one referred to in the previous complaints.

## **Other Matters**

17.

Pursuant to 28 U.S.C. §1446, a copy of this Notice of Removal is being filed with

the Clerk for the Circuit Court of Bullock County, Alabama. *See* Exhibit D.

18.

Petitioners reserve the right to amend or supplement this Notice of Removal.

19.

This action is removable pursuant to 28 U.S.C. §1441(a) because Petitioners are

removing this action to the District Court of the United States for the district and division

embracing the place where the action is pending.

20.

Pursuant to 28 U.S.C. §1453(b), the consent of other defendants is not required.

21.

None of the exceptions to the Class Action Fairness Act enumerated in 28 U.S.C.

§1332 apply.

22.

Pursuant to 28 U.S.C. §1446(a), a copy of all process, pleadings and orders are

attached as Exhibit E.

23.

Petitioners request a trial by jury on all issues.

**WHEREFORE,** Petitioners Dayco Products, LLC and Mark IV Industries, Ltd. hereby remove the action now pending against them in the Circuit Court of Bullock County, Alabama, bearing docket number 03-02, to this Honorable Court.

Respectfully submitted,

Brian Mosholder (MOS-018)

OF COUNSEL:

Carpenter, Ingram & Mosholder, LLP
4121 Carmichael Road, Suite 303
Montgomery, AL 36106
Telephone: (334) 213-5600

# C E R T I F I C A T E

I hereby certify that a copy of the above and foregoing Notice of Removal has been served upon all counsel of record and the Circuit Court of Bullock County, Alabama by placing same in the United States mail, postage prepaid and properly addressed, this *8th* day of August 2006.

**ATTORNEYS FOR PLAINTIFF:**

Lynn Jinks
Christy Crow
JINKS, DANIEL & CROW, LLC
P.O. Box 350
Union Springs, AL 36089

Russell Jackson Drake
Nicola Thompson Drake
WHATLEY DRAKE & KALLAS, LLC
P.O. Box 10647
Birmingham, AL 35202-0647

Wesley L. Laird
LAIRD, BAKER & BLACKSTOCK
501 North Main Street
Opp, AL 36467

L. Cooper Rutland, Jr.
RUTLAND AND BRASWELL, LLC
208 North Prairie Street
Union Springs, AL 36089

**ATTORNEYS FOR TICONA POLYMERS, INC.**

Alan T. Rogers
Balch & Bingham, LLP
P.O. Box 306
Birmingham, AL 35201-0306

Paul A. Clark
Balch & Bingham, LLP
P.O. Box 78
Montgomery, AL 36101

Paul M. O'Conner, III
Seth A. Moskowitz
Jon Avins
KASOWITZ, BENSON, TORRES
& FRIEDMAN
1633 Broadway
New York, NY 10019-6799

Walter B. Calton
P.O. Box 696
Eufaula, AL 36072-0696

**ATTORNEYS FOR CLEVELAND TUBING, INC.**

James H. McLemore
Capell & Howard
P.O. Box 2069
Montgomery, AL 36102

T. Harold Pinkley
MILLER & MARTIN, LLP
1200 First Union Tower
150 Fourth Avenue North
Nashville, TN 37219

Lynda M. Hill
James Williams
MILLER & MARTIN, PLLC
Suite 1000, Volunteer Bldg.
832 Chattanooga, TN 37402

**ATTORNEYS FOR DAYCO
PRODUCTS, INC. AND MARK
IV INDUSTRIES, LTD.**

Kimberly W. Sayoc
LIPPES, SILVERSTEIN, MATHIAS
& WEXLER
700 Guaranty Building
28 Church Street
Buffalo, NY 14202-3950

L. Shane Seaborn
Myron C. Penn
PENN & SEABORN, LLC
P.O. Box 688
Clayton, AL 36106

**ATTORNEYS FOR
UNDERWRITERS LABORATORIES,
INC.**

Walter E. McGowen
GRAY, LANGFORD, SAPP,
MCGOWAN, GRAY & NATHANSON
P.O. Box 830239
Tuskegee, AL 36083-0239

Charles Donald Marshall, III
John Olinde
Brent Arnold Talbot
Robert S. Rooth
CHAFFE, McCALL, PHILLIPS, TOLER
& SARPY
2300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163

ATTORNEY FOR PETITIONERS

IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

FILED IN OFFICE

JAN 03 2003

CLERK-REGISTER, BULLOCK CO., ALA.

| | | |
|---|---|---|
| May's Distributing Company, Inc., individually and as class representative of all those gasoline station owners similarly situated, | * * * | |
| **Plaintiff** | * | |
| vs. | * | CV - 03- _02_ |
| Total Containment, Inc., Oil Equipment Company, Inc., and Fictitious Defendants A through Z, those individuals, partnerships, corporations, sole proprietorships, or other entities whose identities are unknown at the present time but whose names will be substituted by amendment when ascertained, | * * * * * * | |
| **Defendants** | * | |

## COMPLAINT

### Parties and Jurisdiction

1. Plaintiff May's Distributing Company, Inc. (hereinafter referred to as "May's") is a corporation incorporated under the laws of the state of Alabama with its principle place of business being at 102 Martin Luther King Blvd., Union Springs in Bullock County, Alabama. Plaintiff operates a business that distributes oil and gasoline products and operates convenience stores and retail gasoline stations, including convenience stores and gasoline stations in Bullock County, Alabama. May's brings this suit individually and on behalf of all those retail gasoline station owners similarly situated.

2. Defendant Total Containment, Inc. (hereinafter referred to as "TCI") is a foreign corporation believed to be incorporated under the laws of the State of Pennsylvania. TCI does business in the State of Alabama. TCI sells and distributes underground flexible pipe and sump pump systems for use at gasoline stations.

3. Defendant Oil Equipment Company, Inc. (hereinafter referred to as "OEC") is a corporation incorporated under the laws of the state of Alabama with its principle place of business at 511 North 11th Street, Birmingham, Jefferson County, Alabama 35203. OEC installs

1

underground flexible pipe and sump pump systems for use at gasoline stations.

4. Fictitious defendants A through F are those individuals, partnerships, sole proprietorships, corporations, or other entities which designed the underground flexible pipe and sump pump systems or which designed some of the components of the underground flexible pipe and sump pump systems. Fictitious defendants G through M are those individuals, partnerships, sole proprietorships, corporations, or other entities which manufactured the underground flexible pipe and sump pump systems or which manufactured some of the components of the underground flexible pipe and sump pump systems.

5. The amount in controversy is greater than the minimum jurisdictional limits of this court.

## Statement of Facts

6. In 1997, May's contracted with OEC to install flexible underground pipes and sump pump systems distributed by TCI and designed and manufactured by Fictitious Defendants A through M at its convenience store and gas station.

7. The pipe to be installed was TCI's flexible pipe and sump pump systems. This system was designed, manufactured, sold, and distributed to catch leaking or spilled fuel utilizing a pipe within a pipe. If the inner pipe fails, the outer pipe is to prevent a leak into the ground.

8. OEC installed the pipe and sump pump system distributed by TCI and designed and manufactured by Fictitious Defendants A through M as specified by the contract.

9. On or about September 5, 2002, May's discovered that the flexible pipe and/or sump pump systems are defective. OEC inspected and tested the pipe system and discovered that the flexible pipe and/or sump pump systems had failed and that it had multiple leaks and multiple holes including leaks and holes in the inner pipe and the outer pipe and/or the sumps.

## Class Action Allegations

10. The Plaintiff alleges herein that the class of plaintiffs it represents is so numerous that joinder of all members of the class is impracticable.

11. The Plaintiff alleges there are questions of law and fact common to the class as is alleged in more detail within the body of this Complaint.

12. The Plaintiff alleges that its claims as representative of the class are typical of the claims of the class and that it will fairly and adequately protect the interest of the class.

13. Said Plaintiff further alleges that the prosecution of separate actions by individual

2

members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the defendants herein.

## Count One - Negligence

14. All prior paragraphs are restated herein.

15. OEC had a duty to properly install the pipe and negligently installed the pipe and sump pump system.

16. As a proximate result of said negligence, the pipes and/or sump pump systems failed and leaked and Plaintiff May's will be caused to replace and repair said pipes and/or sump pump systems, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the pipe system, the cost of cleanup of any spills, and other costs associated therewith.

Wherefore, the premises considered, Plaintiff demands judgment against defendant OEC for such compensatory damages as the evidence supports and a jury awards, plus costs of suit.

## Count Two - Wantonness

17. All prior paragraphs are restated herein.

18. OEC wantonly installed the pipe and sump pump system.

19. As a proximate result of said wantonness, the pipe and sump pump system failed and leaked.

20. As a proximate result of said wantonness, the pipes and/or sump pump systems failed and leaked and Plaintiff May's will be caused to replace and repair said pipes and/or sump pump systems, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the pipe system, the cost of cleanup of any spills, and other costs associated therewith.

Wherefore, the premises considered, Plaintiff demands judgment against defendant OEC for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

## Count Three - Breach of Warranty of Fitness for a Particular Purpose and Merchantability

21. All prior paragraphs are restated herein.

22. TCI and fictitious defendants A through M was a merchant with respect to the flexible pipe and sump pump system complained of and sold the pipe in question to plaintiff. The pipe was designed, manufactured, and sold for the purpose of containing gasoline, a product that is inherently explosive and dangerous, and was used by plaintiff solely for the purpose for which it was intended.

23. The pipe and sump pump system was defective and unmerchantable. Said pipe and sump pump system failed and had holes and leaks in it and said pipe and sump pump system no longer will contain fuel, therefore, it is no longer fit for the purpose for which it was designed, manufactured, and sold.

24. As a proximate result of this defect, Plaintiff May's pipes and/or sump pump systems failed and leaked and Plaintiff May's will be caused to replace and repair said pipes and/or sump pump systems, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the pipe system, the cost of cleanup of any spills, and other costs associated therewith.

Wherefore, the premises considered, Plaintiff demands judgment against defendants TCI and fictitious defendants A through M and OEC for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

## Count Four - Misrepresentation

25. All prior paragraphs are restated herein.

26. Prior to entering into the contract to install the flexible pipe and sump pump system, Defendant TCI and fictitious defendants A through M innocently, negligently, wantonly, willfully, oppressively, maliciously, or intentionally represented falsely that its flexible pipe and sump pump system was the state of the art underground pipe system for petroleum fuel. TCI and fictitious defendants A through M further represented that it was designed to contain fuel products under pressure and was designed to be installed at convenience stores and gas stations to connect the fuel pumps with the underground storage tanks. TCI and fictitious defendants A through M further represented that this pipe would not fail or leak for at least thirty years and that in the event that the inner pipe did leak, the outer pipe would contain the fuel and prevent any spill into the ground.

27. Plaintiff detrimentally relied on these representations in entering into the contract and in causing the flexible pipe and sump pump system to be installed.

4

28. As a proximate result of said misrepresentation, the pipes and/or sump pump systems failed and leaked and Plaintiff May's will be caused to replace and repair said pipes and/or sump pump systems, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the pipe system, the cost of cleanup of any spills, and other costs associated therewith.

Wherefore, the premises considered, Plaintiff demands judgment against defendant TCI and fictitious defendants A through M for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

### Count Five - Suppression of Material Facts

29. All prior paragraphs are restated herein.

30. Defendant TCI and fictitious defendants A through M knew or should have known that the flexible pipe and sump pump system would fail, thereby causing fuel leakage and that said pipes, if already installed, should be replaced.

31. Defendant TCI and fictitious defendants A through M wantonly, willfully, oppressively, intentionally, and/or maliciously concealed this fact to the detriment of Plaintiff and failed to notify plaintiff of its superior knowledge.

32. As a proximate result of said suppression of facts, the pipes and/or sump pump systems failed and leaked and Plaintiff May's will be caused to replace and repair said pipes and/or sump pump systems, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the pipe system, the cost of cleanup of any spills, and other costs associated therewith.

Wherefore, the premises considered, Plaintiff demands judgment against defendant TCI and fictitious defendants A through M for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

### Count Six - Deceit

33. All prior paragraphs are restated herein.

34. Defendant TCI and fictitious defendants A through M had knowledge that the flexible pipe and sump pump system was not fit for the purpose it was designed and being sold for at the time it was distributed for sale to Plaintiff. Defendant TCI further knew or should have known that if said pipe was installed that it would fail and cause the Plaintiff to suffer damages.

35. With such knowledge, defendant TCI and fictitious defendants A through M wantonly, willfully, intentionally, oppressively, or maliciously concealed these facts from the

installer, OEC, and Plaintiff, and from the marketplace as a whole, and sold this pipe with reckless disregard for the rights of others.

36. As a proximate result of said deceit, the pipes and/or sump pump systems failed and leaked and Plaintiff May's will be caused to replace and repair said pipes and/or sump pump systems, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the pipe system, the cost of cleanup of any spills, and other costs associated therewith.

Wherefore, the premises considered, Plaintiff demands judgment against defendant TCI and defendants A through M for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

## Count Seven - Negligent and/or Wanton Design

37. All prior paragraphs are restated herein.

38. Defendant TCI and Fictitious Defendants A through F negligently and/or wantonly designed the flexible pipe and sump pump system.

39. As a proximate result of said negligence and/or wantonness and/or defect, the pipes and/or sump pump systems failed and leaked and Plaintiff May's will be caused to replace and repair said pipes and/or sump pump systems, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the pipe system, the cost of cleanup of any spills, and other costs associated therewith.

Wherefore, the premises considered, Plaintiff demands judgment against defendant TCI and fictitious defendants A through F for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

## Count Eight - Negligent and/or Wanton Manufacturing

40. All prior paragraphs are restated herein.

41. Defendant TCI and Fictitious Defendants G through M negligently and/or wantonly manufactured the underground flexible pipe and sump pump system that was sold to plaintiff.

42. As a proximate result of said negligence and/or wantonness and/or defect, the pipes and/or sump pump systems failed and leaked and Plaintiff May's will be caused to replace and repair said pipes and/or sump pump systems, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the pipe system, the cost of cleanup of any spills, and other costs associated therewith.

Wherefore, the premises considered, Plaintiff demands judgment against defendant TCI

and fictitious defendants A through M for such compensatory damages as the evidence supports
and a jury awards, a separate amount in punitive damages, plus costs of suit.

## Count Nine - Negligent and/or Wanton Distribution of a Dangerous Product

43. All prior paragraphs are restated herein.

44. Defendant TCI and Fictitious Defendants G through M knew or should have known
that if the underground flexible pipe and sump pump system failed that it would create a
hazardous and dangerous condition to the environment that could potentially harm the ecosystem
and even humans and would require a clean up.

45. Defendant TCI and Fictitious Defendants G through M negligently and/or wantonly
distributed this product into the marketplace where it was purchased by plaintiff. The pipe was
defective.

46. As a proximate result of said negligence and/or wantonness and/or defect, the pipes
and/or sump pump systems failed and leaked and Plaintiff May's will be caused to replace and
repair said pipes and/or sump pump systems, and will suffer damages therefrom, including, but
not limited to, the cost of replacement of the pipe system, the cost of cleanup of any spills, and
other costs associated therewith.

Wherefore, the premises considered, Plaintiff demands judgment against defendant TCI
and fictitious defendants A through M for such compensatory damages as the evidence supports
and a jury awards, a separate amount in punitive damages, plus costs of suit.

## Count Ten - Strict Liability

47. All prior paragraphs are restated herein.

48. This is a count for strict liability under Alabama's Extended Manufacturer's Liability
Act.

49. TCI and fictitious defendants A through M designed, manufactured, sold, and/or
distributed into the marketplace a defective product, flexible pipe and sump pump system used by
plaintiff.

50. TCI and fictitious defendants A through M knew or should have known how the
flexible pipe and sump pump system would be used by plaintiff, i.e. for the containment of
gasoline and the movement of gasoline from his storage tanks to his pumps.

51. TCI and fictitious defendants A through M could have reasonably anticipated or
should have known that if the flexible pipe and sump pump system failed, it would cause injury to

property or person, even when used for the purpose for which it was intended.

52. TCI and fictitious defendants A through M are strictly liable for its defective product.

53. As a proximate result of said defect, the pipes and/or sump pump systems failed and leaked and Plaintiff May's will be caused to replace and repair said pipes and/or sump pump systems, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the pipe system, the cost of cleanup of any spills, and other costs associated therewith.

Wherefore, the premises considered, Plaintiff demands judgment against defendant TCI and fictitious defendants A through M for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

Wesley L. Laird (LAI005)
**Attorney for Plaintiff**
**Laird, Baker & Blackstock, LLC**
**501 North Main Street**
**Opp, Alabama 36467**
**334-493-9716**
**Fax: 334-493-9715**

L. Cooper Rutland, Jr. (RUT010)
**Attorney for Plaintiff**
**Rutland and Braswell, LLC**
**208 North Prairie St.**
**Union Springs, AL 36089**
**334-738-4770**
**Fax: 334-738-4774**

**Plaintiff demands trial by struck jury.**

**Attorney for Plaintiff**

8

IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

FILED IN OFFICE

JUL 0 1 2003

CLERK-REGISTER, BULLOCK CO., ALA.

| | | |
|---|---|---|
| May's Distributing Company, Inc., individually and as class representative of all those gasoline station owners similarly situated, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | Civil Action No. 03-02 |
| vs. | ) ) | |
| Total Containment, Inc., Oil Equipment Company, Inc., Dayco Products, Inc., Mark IV Industries, Ltd. Parker Hannifin Corporation, Ticona Polymers, Inc., Shell Chemical, LP, Cleveland Tubing, Inc., and Fictitious Defendants A through FF, those individuals, partnerships, corporations, sole proprietorships, or other entities whose identities are unknown at the present time but whose names will be substituted by amendment when ascertained, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

### Parties

1.      Plaintiff May's Distributing Company, Inc. (hereinafter referred to as "May's") is a corporation incorporated under the laws of the state of Alabama with its principle place of business being at 102 Martin Luther King Blvd., Union Springs in Bullock County, Alabama. Plaintiff operates a business that distributes oil and gasoline products and operates convenience stores and motor fuel dispensing facilities, including convenience stores and motor fuel dispensing facilities in Bullock County, Alabama. May's brings this suit individually and on behalf of all those motor fuel dispensing facility owners similarly situated in the United States.

2.      Defendant Total Containment, Inc. (hereinafter referred to as "TCI") is a foreign corporation incorporated under the laws of the State of Pennsylvania. TCI does business in the State of Alabama. TCI manufactures, sells and distributes underground thermoplastic flexible pipe and sump systems (hereinafter referred to as "flexible pipe") for use at motor fuel dispensing facilities.

3.      Defendant Oil Equipment Company, Inc. (hereinafter referred to as "OEC") is a

corporation incorporated under the laws of the state of Alabama with its principle place of business at 511 North 11th Street, Birmingham, Jefferson County, Alabama 35203. OEC installs flexible pipe for use at motor fuel dispensing facilities.

4.    Defendant Dayco Products, Inc. ("Dayco") is a foreign corporation incorporated under the laws of Delaware. Dayco does business in the State of Alabama. Dayco designs, manufactures, sells and distributes component parts of flexible pipe which were provided and/or sold to TCI.

5.    Defendant Mark IV Industries, Ltd. ("Mark IV") is a foreign corporation incorporated under the laws of Canada. Mark IV does business in the State of Alabama directly and/or indirectly. Mark IV is a successor entity to Defendant Dayco Products, Inc.

6.    Defendant Parker Hannifin Corporation ("Parker Hannifin") is a foreign corporation incorporated under the laws of Ohio. Parker Hannifin does business in the State of Alabama. Parker Hannifin presently is a successor entity to Defendant Dayco Products, Inc.

7.    Defendant Ticona Polymers, Inc. ("Ticona") is a foreign corporation incorporated under the laws of Delaware. Ticona does business in the State of Alabama directly and/or indirectly. Ticona designs, manufactures, sells and distributes component parts of flexible pipe which were provided and/or sold to TCI.

8.    Defendant Shell Chemical, LP ("Shell") is a foreign corporation incorporated under the laws of Delaware. Shell does business in the State of Alabama. Shell designs, manufactures, sells and distributes component parts of flexible pipe which were provided and/or sold to TCI.

9.    Defendant Cleveland Tubing, Inc. ("Cleveland") is a foreign corporation incorporated under the laws of Tennessee. Cleveland does business in the State of Alabama. Cleveland designs, manufactures, sells and distributes component parts, specifically the secondary containment pipe) of flexible pipe which were provided and/or sold to TCI.

10.    Fictitious defendants A through F, whether singular or plural, are those individuals, partnerships, sole proprietorships, corporations, or other entities which designed the underground thermoplastic flexible pipe and sump systems or the components thereof which were manufactured, sold and/or distributed by TCI (hereinafter referred to as the "TCI flexible pipe product").

11.    Fictitious defendants G through M, whether singular or plural, are those individuals, partnerships, sole proprietorships, corporations, or other entities which manufactured, sold and/or distributed the TCI flexible pipe product.

12.    Fictitious defendants N through R, whether singular or plural, are those individuals, partnerships, sole proprietorships, corporations or other entities which marketed, supplied and/or distributed the TCI flexible pipe product.

13.     Fictitious defendants S through Z, whether singular or plural, are those individuals, partnerships, sole proprietorships, corporations or other entities which designed, manufactured, marketed, supplied and/or distributed liner thermoplastics or other materials used by all defendants (including fictitious defendants).

14.     Fictitious defendants AA through FF, whether singular or plural, are those individuals, partnerships, sole proprietorships, corporations, or other entities which are responsible for any or all of the liabilities of defendants (including fictitious defendants) named herein.

## Jurisdiction and Venue

15.     This Court has jurisdiction of this case pursuant to § 12-11-30 of the Code of Alabama.

16.     Defendants do business directly, indirectly and/or by agent in Alabama, including in this Circuit.

17.     Venue is proper in this Court pursuant to Rule 82, Ala.R.Civ.P. and Code of Alabama § 6-3-7.

## Statement of Facts

18.     In 1997, May's contracted with OEC to install underground thermoplastic flexible pipes and sump systems distributed by TCI and designed and manufactured by one or more of the following defendants:  Dayco; Mark IV, Parker Hannifin; Ticona; Shell; Cleveland; and/or Fictitious Defendants A through Z at its convenience store and gas station

19.     The pipe to be installed was TCI flexible pipe. The TCI flexible pipe was designed, manufactured, marketed, sold, and distributed as a product that safely retains fuel, utilizing a pipe within a pipe system for added protection.

20.     OEC installed the TCI flexible pipe as specified by the contract.  On or about September 5, 2002, May's discovered that the TCI flexible pipe is defective.  OEC inspected and tested the TCI flexible pipe and discovered that its properties had changed in that it permitted permeation of fuel outside the barriers of the TCI flexible pipe, and that it failed to retain its shape and rigidity, by elongation, swelling and other defects.

21.     Plaintiff May's suffered damages as a result of the defective TCI flexible pipe.

## Class Action Allegations

22.     The Plaintiff brings this action, under Alabama common law and statutes, individually and on behalf of a class of similarly situated persons located throughout the United States.

23.     The class is so numerous that joinder of all members of the class is impracticable.  Because of the wide use of flexible pipe and sump systems at motor fuel dispensing facilities over a substantial period of time in the United States, Plaintiff believes there are thousands of members of the class.

24.    There are questions of law and fact common to the class.  The principal common issues for the Class are:

    a.    Whether the TCI flexible pipe is defective;

    b.    Whether the components of the TCI flexible pipe are defective;

    c.    Whether the defendants knew or should have known that the TCI flexible pipe was defective;

    d.    Whether the defendants knowingly sold a defective product;

    e.    Whether the conduct of the defendants was fraudulent;

    f.    Whether the conduct of the defendants constituted negligence, recklessness and/or wantonness in regard to the class;

    g.    Whether defendants negligently, recklessly and/or wantonly designed, manufactured and/or marketed TCI flexible pipe;

    h.    Whether defendants failed to adequately inspect or test the TCI flexible pipe;

    i.    Whether defendants failed to give warnings or to give adequate warnings regarding the limitations of the TCI flexible pipe;

    j.    Whether defendants made an express warranty(ies) concerning TCI flexible pipe;

    k.    Whether the defendants breached an express warranty(ies) regarding the TCI flexible pipe;

    l.    Whether the defendants breached an implied warranty(ies) regarding the TCI flexible pipe.

25.    The claims of the plaintiff are typical of the claims of the class and the plaintiff will fairly and are based on and arise out of the same facts constituting the wrongful conduct of the defendants.

26.    Plaintiff will adequately protect the interest of the class.  To that end, plaintiff has retained counsel experienced in class action litigation.  Neither plaintiff nor its counsel have any interest which might cause them not to vigorously pursue this action.

27.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the defendants herein.

28.    A class action is superior to any other available method, if there is any, for the fair and efficient adjudication of this controversy.

29.    There will be no difficulty in the management of this action as a class action.

**Count One –Negligence**
**(against Defendant OEC)**

30.    Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

31.    OEC had a duty to properly install the TCI flexible pipe and negligently installed the said TCI flexible pipe.

32.    As a proximate result of said negligence, the TCI flexible pipe failed and Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, and other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendant OEC for such compensatory damages as the evidence supports and a jury awards, plus costs of suit.

**Count Two –Wantonness**
**(against Defendant OEC)**

33.    Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

34.    OEC wantonly installed the TCI flexible pipe.

35.    As a proximate result of said wantonness, the TCI flexible pipe failed.

36.    As a proximate result of said wantonness, the TCI flexible pipe failed and Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, and other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendant OEC for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

**Count Three -Breach of Warranty of Fitness for a Particular Purpose**
**and Merchantability**
**(against all Defendants except OEC)**

37.    Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

38.    Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants A through Z were merchants with respect to the TCI flexible pipe complained of and sold the pipe in question to plaintiff. The TCI flexible pipe was designed, manufactured, and sold for the purpose of containing gasoline, a product that is inherently explosive and dangerous, and was used by plaintiff solely for the purpose for which it was intended.

39.    The TCI flexible pipe was defective and unmerchantable. Said TCI flexible pipe failed by leaking, permeating fuels, failing to retain its properties including (but not limited to) shape, rigidity and permeation. Said TCI flexible pipe no longer will contain fuel, therefore, it is no longer fit for the purpose for which it was designed, manufactured, and sold.

40.    As a proximate result of this defect, Plaintiff May's TCI flexible pipe failed and leaked and Plaintiff May's will be caused to replace and repair said product, and will suffer

damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe system, the cost of cleanup of any spills, and other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants A through FF for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

### Count Four –Misrepresentation
### (against all Defendants except OEC)

41.     Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

42.     Prior to entering into the contract to install the TCI flexible pipe, Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants A through Z innocently, negligently, wantonly, willfully, oppressively, maliciously, or intentionally represented falsely that the TCI flexible pipe was the state of the art underground pipe system for petroleum fuel. TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants A through Z further represented that the TCI flexible pipe was designed to contain fuel products under pressure and was designed to be installed at motor fuel dispensing facilities to connect the fuel pump with the underground storage tanks. TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants A through Z further represented that the TCI flexible pipe would not fail or permeate fuels (or otherwise leak) for at least thirty years and that in the event that the inner pipe did leak, the outer pipe would contain the fuel and prevent any spill into the ground.

43.     Plaintiff detrimentally relied on these representations in entering into the contract and in causing the TCI flexible pipe to be installed.

44.     As a proximate result of said misrepresentation, the Plaintiff May's suffered damage as the TCI flexible pipe failed and leaked. Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, and other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants A through FF for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

### Count Five  Suppression of Material Facts
### (against all Defendants except OEC)

45.     Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

46.     Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants A through Z knew or should have known that the TCI flexible pipe would fail, thereby causing fuel leakage and that said TCI flexible pipe, if already installed, should be replaced.

47.    Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants A through Z wantonly, willfully, oppressively, intentionally, and/or maliciously concealed this fact to the detriment of Plaintiff and failed to notify Plaintiff of their superior knowledge.

48.    As a proximate result of said suppression of facts, the Plaintiff May's suffered damages as said TCI flexible pipe failed and leaked.  As a proximate result, Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, and other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants A through FF for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

### Count Six –Deceit
### (against all Defendants except OEC)

49.    Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

50.    Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants A through Z had knowledge that the TCI flexible pipe was not fit for the purpose it was designed and being sold for at the time it was distributed for sale to Plaintiff. Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants A through Z  further knew or should have known that if said TCI flexible pipe was installed that it would fail and cause the Plaintiff to suffer damages.

51.    With such knowledge, defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants A through Z wantonly, willfully, intentionally, oppressively, or maliciously concealed these facts from the installer, OEC, and Plaintiff, and from the marketplace as a whole, and sold the TCI flexible pipe with reckless disregard for the rights of others.

52.    As a proximate result of said deceit, the TCI flexible pipe failed and leaked and Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, and other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants A through FF for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

### Count Seven –Negligent and/or Wanton Design
### (against all named Defendants except OEC and Fictitious Defendants A – F, AA - FF)

53.    Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

54. Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and Fictitious Defendants A through F negligently and/or wantonly designed the TCI flexible pipe.

55. As a proximate result of said negligence and/or wantonness and/or defect, the TCI flexible pipe failed and leaked and Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, and other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants A through F, and AA through FF, for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

### Count Eight – Negligent and/or Wanton Manufacturing
**(against all named Defendants except OEC and Fictitious Defendants G – M, AA-FF)**

56. Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

57. Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and Fictitious Defendants G through M negligently and/or wantonly manufactured the TCI flexible pipe that was sold to plaintiff.

58. As a proximate result of said negligence and/or wantonness and/or defect, the TCI flexible pipe failed and leaked and Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, and other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants G through M and AA through FF for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

### Count Nine – Negligent and/or Wanton Distribution of a Dangerous Product
**(against all named Defendants except OEC and Fictitious Defendants N - R, AA-FF)**

59. Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

60. Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and Fictitious Defendants N through R knew or should have known that if the TCI flexible pipe failed that it would create a hazardous and dangerous condition to the environment that could potentially harm the ecosystem and even humans and would require a clean up.

61. Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and Fictitious Defendants N through R negligently and/or wantonly distributed this product into the marketplace where it was purchased by Plaintiff. The TCI flexible pipe was defective.

62.    As a proximate result of said negligence and/or wantonness and/or defect, the TCI flexible pipe failed and leaked and Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, and other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants N through R, and AA through FF, for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

## Count Ten -Strict Liability
### (against all named Defendants except OEC and Fictitious Defendants A -FF)

63.    Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

64.    This is a count for strict liability under Alabama's Extended Manufacturer's Liability Doctrine ("AEMLD").

65.    TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland, and fictitious defendants A through Z designed, manufactured, sold, and/or distributed into the marketplace a defective product, the TCI flexible pipe used by plaintiff.

66.    TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland, and fictitious defendants A through Z knew or should have known how the TCI flexible pipe would be used by plaintiff, i.e. for the containment of gasoline and the movement of gasoline from his storage tanks to his pumps.

67.    TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants A through Z could have reasonably anticipated or should have known that if the TCI flexible pipe failed, it would cause injury to property or person, even when used for the purpose for which it was intended.

68.    TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants A through Z are strictly liable for the defective product, the TCI flexible pipe.

69.    As a proximate result of said defect, the TCI flexible pipe failed and leaked and Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, all other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendant TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Shell, Cleveland and fictitious defendants A through FF for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY**

Attorneys for Plaintiff:

_____
Wesley L. Laird (LAI005)
Laird, Baker & Blackstock, LLC
501 North Main Street
Opp, Alabama 36467
(334) 493-9715

_____
L. Cooper Rutland, Jr. (RUT010)
Rutland and Braswell, LLC
208 North Prarie Street
Union Springs, AL  36089
(334) 738-4770

OF COUNSEL:

Russell Jackson Drake  (DRA006)
Vivian Vines Campbell (CAM061)
Whatley Drake, LLC
2323 Second Avenue North
P.O. Box 10647
Birmingham, AL  35202-0647
(205) 328-9576

Ronald W. Russell
Capouano, Beckman & Russell
560 South McDonough Street
Montgomery, AL  36103
(334) 834-4874

James M. Cawley Jr.
DeHay & Elliston LLP
3700 Buffalo Speedway Suite 1000
Houston, Texas 77098
(713) 626-0126

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon the following counsel by placing a copy of same in the U.S. Mail on this the 1st day of July, 2003.

Neil R. Clement, Esq.
Adams and Reese/Lange Simpson
2100 3rd Avenue North, Suite 1100
Birmingham, Alabama   35203

J. Ross Forman, Esq.
Wilson F. Green, Esq.
Ronald W. Farley, Esq.
Burr & Forman
3100 SouthTrust Tower
420 North 20th Street
Birmingham, Alabama   35203

Of Counsel

## IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

May's Distributing Company, Inc.,
individually and as class representative of )
all those gasoline station owners similarly )
situated, )
        )
         Plaintiff, )
        )
        vs. )       Civil Action No.03-02
        )
Total Containment, Inc., )
Oil Equipment Company, Inc., )
Dayco Products, Inc., )
Mark IV Industries, Ltd. )
Parker Hannifin Corporation, )
Ticona Polymers, Inc., Shell Chemical, LP, )
Cleveland Tubing, Inc., )
and Fictitious Defendants A through FF, )
those individuals, partnerships, )
corporations, sole proprietorships, or other )
entities whose identities are unknown at )
the present time but whose names will be )
substituted by amendment when ascertained, )
        )
        Defendants. )
        )

## PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT

1.     Plaintiff May's Distributing Company, Inc. (hereinafter referred to as "May's") adopts and incorporates herein, as set out here in full, Paragraphs 1 through 69 of Plaintiff's First Amended Complaint.

2.     Defendant Atofina Chemicals, Inc. ("Atofina") is a foreign corporation incorporated under the laws of Pennsylvania. Atofina does business in the State of Alabama directly and/or indirectly. Atofina designs, manufactures, sells and distributes component parts of flexible pipe including, but not limited to, a resin known as Kynar, which was provided and/or sold to TCI.

3.     Defendant Elf-Atochem North America, Inc. ("Elf-Atochem") is a foreign corporation incorporated under the laws of Pennsylvania. Elf-Atochem does business in the State of Alabama directly and/or indirectly. Elf-Atochem is the parent company of Defendant Atofina.. Elf-Atochem designs, manufactures, sells and distributes component parts of flexible pipe including, but not limited to, a resin known as Kynar, which was provided and/or sold to TCI.

4.    Defendant Underwriters Laboratories, Inc. ("UL") is a foreign corporation incorporated under the laws of Delaware.  UL does business in the State of Alabama directly and/or indirectly.  UL issued certifications of TCI's flexible pipe.

Attorneys for Plaintiff:

L. Cooper Rutland, Jr. (RUT010)
Rutland and Braswell, LLC
208 North Prarie Street
Union Springs, AL  36089
(334) 738-4770

**OF COUNSEL:**

RUTLAND & BRASWELL, LLC
208 North Prairie Street
Union Springs, Alabama 36089

Lynn W. Jinks, III
Christy Crow
JINKS, DANIEL & CROW, LLC
Post Office Box 350
Union Springs, Alabama 36089

Russell Jackson Drake
Vivian Vines Campbell
WHATLEY DRAKE, LLC
Post Office Box 10647
Birmingham, Alabama   35202

Ronald W. Russell
Joel K. Gregg
CAPOUANO, BECKMAN & RUSSELL, LLC
560 South McDonough Street
Montgomery, Alabama 36103

Wesley L. Laird
LAIRD, BAKER & BLACKSTOCK, LLC
501 North Main Street
Opp, Alabama 36467

Nicola Thompson Drake
Attorney At Law
1827 1st Avenue North, Suite 210

2

Birmingham, AL 35203

James M. Cawley, Jr.
DEHAY & ELLISTON, LLP
3700 Buffalo Speedway, Suite 1000
Houston, TX 77098

## PLEASE SERVE DEFENDANTS VIA CERTIFIED MAIL AS FOLLOWS:

Atofina Chemicals, Inc.
CSC Lawyers Incorporating Service
150 S. Perry Street
Montgomery, AL 36104

Elf-Atochem North America, Inc.
2000 Market Street
Philadelphia, PA 19103

Underwriters Laboratories, Inc.
2000 Interstate Park Drive, Suite 204
Montgomery, AL 36109

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon the following counsel by placing a copy of same in the U.S. Mail on this the ____ day of _____, 2004

Attorney for Defendant Oil Equipment Company, Inc.
Neil R. Clement, Esq.
ADAMS & REESE/LANGE SIMPSON
2100 3rd Avenue North, Suite 1100
Birmingham, Alabama 35203

Attorneys for Defendant Total Containment, Inc.
J. Ross Forman, Esq.
Wilson F. Green, Esq.
Ronald W. Farley, Esq.
BURR & FORMAN
3100 SouthTrust Tower
420 North 20th Street
Birmingham, Alabama 35203

Attorneys for Defendant Ticona Polymers, Inc.
Alan T. Rogers, Esq.
BALCH & BINGHAM, LLP
Post Office Box 306
Birmingham, Alabama 35201-0306

Paul A. Clark, Esq.
BALCH & BINGHAM, LLP
Post Office Box 78
Montgomery, Alabama 36101

Paul M. O'Connor III, Esq.
KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP
1633 Broadway
New York, New York  10019-6799

Walter B. Calton, Esq.
Attorney At Law
Post Office Box 696
Eufala, Alabama  36072-0696

Attorneys for Defendant, Parker Hannifan Corporation
William H. Brooks, Esq.
LIGHTFOOT, FRANKLIN & WHITE, LLC
400 20th Street North
Birmingham, Alabama  35203

William McCandless
DENARDIS, MCCANDLESS & MILLER, P.C.
70 Macomb Place, Suite 200
Mt. Clemons, Michigan  48043

Attorneys for Defendant Cleveland Tubing, Inc.
James H. McLemore, Esq.
CAPELL & HOWARD, P.C.
150 South Perry Street (36104)
Post Office Box 2069
Montgomery, Alabama 36102-2069

4

T. Harold Pinkley, Esq.
MILLER & MARTIN, LLP
1200 One Nashville Place
150 Fourth Avenue North
Nashville, Tennessee 37219

Attorney for Defendants Dayco Products, Inc. and Mark IV Industries, Ltd.
Kimberly W. Sayoc, Esq.
LIPPES SILVERSTEIN MATHIAS
& WEXLER, LLP
700 Guaranty Building
28 Church Street
Buffalo, New York   14202-3950

L. Shane Seaborn
Myron C. Penn
PENN & SEABORN, LLC
Post Office Box 688
Clayton, Alabama 36106

Joseph T. Carpenter Esq.
Nathan C. Prater
CARPTENTER, PRATER, INGRAM
& MOSHOLDER, LLP
303 Sterling Centre
4121 Carmichael Road
Montgomery, AL  36106

_____
Of Counsel

# IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

| | |
|---|---|
| May's Distributing Company, Inc., individually and as class representative of all those gasoline station owners similarly situated,<br><br>       Plaintiff,<br><br>       vs.<br><br>Total Containment, Inc.,<br>Dayco Products, Inc.,<br>Mark IV Industries, Ltd.<br>Parker Hannifin Corporation,<br>Ticona Polymers, Inc., Underwriters Laboratories, Inc., Cleveland Tubing, Inc., and Fictitious Defendants A through FF, those individuals, partnerships, corporations, sole proprietorships, or other entities whose identities are unknown at the present time but whose names will be substituted by amendment when ascertained,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)       Civil Action No.03-02 |

## PLAINTIFF'S THIRD AMENDED COMPLAINT

### Existing Parties

1.    Plaintiff May's Distributing Company, Inc. (hereinafter referred to as "May's") is a corporation incorporated under the laws of the state of Alabama with its principle place of business being at 102 Martin Luther King Blvd., Union Springs in Bullock County, Alabama. Plaintiff operates a business that distributes oil and gasoline products and operates convenience stores and motor fuel dispensing facilities, including convenience stores and motor fuel dispensing facilities in Bullock County, Alabama. May's brings this suit individually and on behalf of all those motor fuel dispensing facility owners similarly situated in the United States.

2.    Defendant Total Containment, Inc. (hereinafter referred to as "TCI") is a foreign corporation incorporated under the laws of the State of Pennsylvania. TCI does business in the State of Alabama. TCI manufactures, sells and distributes underground thermoplastic flexible pipe and sump systems (hereinafter referred to as "flexible pipe") for use at motor fuel dispensing facilities.

3.    Defendant Dayco Products, Inc. ("Dayco") is a foreign corporation incorporated

1

under the laws of Delaware. Dayco does business in the State of Alabama. Dayco designs, manufactures, sells and distributes component parts of flexible pipe which were provided and/or sold to TCI.

4.      Defendant Mark IV Industries, Ltd. ("Mark IV") is a foreign corporation incorporated under the laws of Canada. Mark IV does business in the State of Alabama directly and/or indirectly. Mark IV is a successor entity to Defendant Dayco Products, Inc.

5.      Defendant Parker Hannifin Corporation ("Parker Hannifin") is a foreign corporation incorporated under the laws of Ohio. Parker Hannifin does business in the State of Alabama. Parker Hannifin presently is a successor entity to Defendant Dayco Products, Inc.

6.      Defendant Ticona Polymers, Inc. ("Ticona") is a foreign corporation incorporated under the laws of Delaware. Ticona does business in the State of Alabama directly and/or indirectly. Ticona designs, manufactures, sells and distributes component parts of flexible pipe which were provided and/or sold to TCI.

7.      Defendant Cleveland Tubing, Inc. ("Cleveland") is a foreign corporation incorporated under the laws of Tennessee. Cleveland does business in the State of Alabama. Cleveland designs, manufactures, sells and distributes component parts, specifically the secondary containment pipe) of flexible pipe which were provided and/or sold to TCI.

10.      Fictitious defendants A through F, whether singular or plural, are those individuals, partnerships, sole proprietorships, corporations, or other entities which designed the underground thermoplastic flexible pipe and sump systems or the components thereof which were manufactured, sold and/or distributed by TCI (hereinafter referred to as the "TCI flexible pipe product").

11.      Fictitious defendants G through M, whether singular or plural, are those individuals, partnerships, sole proprietorships, corporations, or other entities which manufactured, sold and/or distributed the TCI flexible pipe product.

12.      Fictitious defendants N through R, whether singular or plural, are those individuals, partnerships, sole proprietorships, corporations or other entities which marketed, supplied and/or distributed the TCI flexible pipe product.

13.      Fictitious defendants S through Z, whether singular or plural, are those individuals, partnerships, sole proprietorships, corporations or other entities which designed, manufactured, marketed, supplied and/or distributed liner thermoplastics or other materials used by all defendants (including fictitious defendants).

14.      Fictitious defendants AA through FF, whether singular or plural, are those individuals, partnerships, sole proprietorships, corporations, or other entities which are responsible for any or all of the liabilities of defendants (including fictitious defendants) named herein.

**Additional Party**

4.      Through this Third Amended Complaint, Plaintiff substitutes Defendant Underwriters Laboratories, Inc. ("UL") as Ficticious Defendant AA.   UL is a foreign corporation incorporated under the laws of Delaware.   UL does business in the State of Alabama directly and/or indirectly.   UL issued certifications of TCI's flexible pipe.

**Jurisdiction and Venue**

15.      This Court has jurisdiction of this case pursuant to § 12-11-30 of the <u>Code of Alabama.</u>

16.      Defendants do business directly, indirectly and/or by agent in Alabama, including in this Circuit.

17.      Venue is proper in this Court pursuant to Rule 82, Ala.R.Civ.P. and <u>Code of Alabama</u> § 6-3-7.

**Statement of Facts**

18.      In 1997, May's contracted to install underground thermoplastic flexible pipes and sump systems distributed by TCI and designed and manufactured by one or more of the following defendants: Dayco; Mark IV, Parker Hannifin; Ticona; and Cleveland Tubing, Inc.; and/or Fictitious Defendants A through Z at its convenience store and gas station

19.      The pipe to be installed was TCI flexible pipe. The TCI flexible pipe was designed, manufactured, marketed, sold, and distributed as a product that safely retains fuel, utilizing a pipe within a pipe system for added protection.

20.      Prior to TCI flexpipe being marketed and sold, it was inspected and certified as safe for its intended use by Defendant Underwriters Laboratories ("UL").

20.      On or about September 5, 2002, May's discovered that the TCI flexible pipe is defective. The installer inspected and tested the TCI flexible pipe and discovered that its properties had changed in that it permitted permeation of fuel outside the barriers of the TCI flexible pipe, and that it failed to retain its shape and rigidity, by elongation, swelling and other defects.

21.      Plaintiff May's suffered damages as a result of the defective TCI flexible pipe.

**Class Action Allegations**

22.      The Plaintiff brings this action, under Alabama common law and statutes, individually and on behalf of a class of similarly situated persons located throughout the United States.

23.      The class is so numerous that joinder of all members of the class is impracticable.  Because of the wide use of flexible pipe and sump systems at motor fuel

3

dispensing facilities over a substantial period of time in the United States, Plaintiff believes there are thousands of members of the class.

24. There are questions of law and fact common to the class. The principal common issues for the Class are:

a. Whether the TCI flexible pipe is defective;
b. Whether the components of the TCI flexible pipe are defective;
c. Whether the defendants knew or should have known that the TCI flexible pipe was defective;
d. Whether UL diligently tested and inspected the flexpipe before providing a certification that it met standards and was safe for use for its intended purpose;
e. Whether the defendants knowingly sold a defective product;
f. Whether the conduct of the defendants was fraudulent;
g. Whether the conduct of the defendants constituted negligence, recklessness and/or wantonness in regard to the class;
h. Whether defendants negligently, recklessly and/or wantonly designed, manufactured and/or marketed TCI flexible pipe;
i. Whether defendants failed to adequately inspect or test the TCI flexible pipe;
j. Whether defendants failed to give warnings or to give adequate warnings regarding the limitations of the TCI flexible pipe;
k. Whether defendants made an express warranty(ies) concerning TCI flexible pipe;
l. Whether the defendants breached an express warranty(ies) regarding the TCI flexible pipe;
m. Whether the defendants breached an implied warranty(ies) regarding the TCI flexible pipe.

25. The claims of the plaintiff are typical of the claims of the class and are based on and arise out of the same facts constituting the wrongful conduct of the defendants.

26. Plaintiff will adequately protect the interest of the class. To that end, plaintiff has retained counsel experienced in class action litigation. Neither plaintiff nor its counsel has any interest which might cause them not to vigorously pursue this action.

27. The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the defendants herein.

28. A class action is superior to any other available method, if there is any, for the fair and efficient adjudication of this controversy.

29. There will be no difficulty in the management of this action as a class action.

## Count One –Negligence

30.     Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

31.     Each defendant had a duty to ensure that TCI flexpipe was designed, manufactured, tested, inspected and certified in a manner that rendered the pipe safe for its intended use and each defendant failed in their duties.

32.     As a proximate result of the defendants' negligence, the TCI flexible pipe failed and Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, and other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants for such compensatory damages as the evidence supports and a jury awards, plus costs of suit.

## Count Two –Wantonness

33.     Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

34..    Each defendant wantonly failed in fulfilling its duty to ensure that TCI flexpipe was designed, manufactured, tested, inspected and certified in a manner that rendered the pipe safe for its intended use and each defendant failed in their duties.

35.     As a proximate result of defendants' wantonness, the TCI flexible pipe failed.

36.     As a proximate result of said wantonness, the TCI flexible pipe failed and Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, and other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

## Count Three -Breach of Warranty of Fitness for a Particular Purpose and Merchantability

### (Against Each Defendant Except Underwriters Laboratories)

37.     Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

38.     Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, and Cleveland and fictitious defendants A through Z were merchants with respect to the TCI flexible pipe complained of and sold the pipe in question to plaintiff. The TCI flexible pipe was designed, manufactured, and sold for the purpose of containing gasoline, a product that is inherently explosive and dangerous, and was used by plaintiff solely for the purpose for which it was intended.

39.    The TCI flexible pipe was defective and unmerchantable. Said TCI flexible pipe failed by leaking, permeating fuels, failing to retain its properties including (but not limited to) shape, rigidity and permeation. Said TCI flexible pipe no longer will contain fuel, therefore, it is no longer fit for the purpose for which it was designed, manufactured, and sold.

40.    As a proximate result of this defect, Plaintiff May's TCI flexible pipe failed and leaked and Plaintiff May's will be caused to replace and repair said product, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe system, the cost of cleanup of any spills, and other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc. and fictitious defendants A through F for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

## Count Four –Misrepresentation

41.    Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

42.    Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc., UL and fictitious defendants A through Z innocently, negligently, wantonly, willfully, oppressively, maliciously, and/or intentionally represented falsely that the TCI flexible pipe was the state of the art underground pipe system for petroleum fuel. Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc., UL and fictitious defendants A through Z further represented that the TCI flexible pipe was designed to contain fuel products under pressure and was designed to be installed at motor fuel dispensing facilities to connect the fuel pump with the underground storage tanks. Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc., UL and fictitious defendants A through Z further represented that the TCI flexible pipe would not fail or permeate fuels (or otherwise leak) for at least thirty years and that in the event that the inner pipe did leak, the outer pipe would contain the fuel and prevent any spill into the ground.

43.    Plaintiff detrimentally relied on these representations in entering into a purchase contract for TCI flex pipe and in causing the TCI flexible pipe to be installed.

44.    As a proximate result of said misrepresentation, the Plaintiff May's suffered damage as the TCI flexible pipe failed and leaked. Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, and other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc., UL and fictitious defendants A through Z for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

## Count Five  Suppression of Material Facts

45.    Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

46.    Defendants Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc., UL and fictitious defendants A through Z knew or should have known that the TCI flexible pipe would fail, thereby causing fuel leakage and that said TCI flexible pipe, if already installed, should be replaced.

47.    Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc., UL and fictitious defendants A through Z wantonly, willfully, oppressively, intentionally, and/or maliciously concealed this fact to the detriment of Plaintiff and failed to notify Plaintiff of their superior knowledge.

48.    As a proximate result of said suppression of facts, the Plaintiff May's suffered damages as said TCI flexible pipe failed and leaked.  As a proximate result, Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, and other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc., UL and fictitious defendants A through Z for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

## Count Six –Deceit

49.    Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

50.    Defendants Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc., UL and fictitious defendants A through Z had knowledge that the TCI flexible pipe was not fit for the purpose it was designed and being sold for at the time it was distributed for sale to Plaintiff. Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc., UL and fictitious defendants A through Z further knew or should have known that if said TCI flexible pipe was installed that it would fail and cause the Plaintiff to suffer damages.

51.    With such knowledge, defendants Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc., UL and fictitious defendants A through Z wantonly, willfully, intentionally, oppressively, or maliciously concealed these facts from the installer and Plaintiff, and from the marketplace as a whole, and sold the TCI flexible pipe with reckless disregard for the rights of others.

52.    As a proximate result of said deceit, the TCI flexible pipe failed and leaked and Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, and other costs associated therewith.

7

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc., UL and fictitious defendants A through Z for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

**Count Seven –Negligent and/or Wanton Design**
**(against all named Defendants except Underwriters Laboratories and Fictitious AA - FF)**

53.    Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

54.    Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing, Inc. and Fictitious Defendants A through F negligently and/or wantonly designed the TCI flexible pipe.

55.    As a proximate result of said negligence and/or wantonness and/or defect, the TCI flexible pipe failed and leaked and Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, and other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc. and fictitious defendants A through F, for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

**Count Eight – Negligent and/or Wanton Manufacturing**
**(against all named Defendants except Underwriters Laboratories and Fictitious AA - FF)**

56.    Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

57.    Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc. and Fictitious Defendants G through M negligently and/or wantonly manufactured the TCI flexible pipe that was sold to plaintiff.

58.    As a proximate result of said negligence and/or wantonness and/or defect, the TCI flexible pipe failed and leaked and Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, and  other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc. and fictitious defendants G through M for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

**Count Nine – Negligent and/or Wanton Distribution of a Dangerous Product**
**(against all named Defendants except Underwriters Laboratories and Fictitious AA - FF)**

59.    Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

60.    Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing

and Fictitious Defendants N through R knew or should have known that if the TCI flexible pipe failed that it would create a hazardous and dangerous condition to the environment that could potentially harm the ecosystem and even humans and would require a clean up.

61.    Defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing and Fictitious Defendants N through R negligently and/or wantonly distributed this product into the marketplace where it was purchased by Plaintiff. The TCI flexible pipe was defective.

62.    As a proximate result of said negligence and/or wantonness and/or defect, the TCI flexible pipe failed and leaked and Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, and other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing and fictitious defendants N through R, for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

## Count Ten -Strict Liability

### (against all named Defendants except Underwriters Laboratories and Fictitious AA - FF)

63.    Plaintiff adopts and incorporates the allegations of all prior paragraphs herein.

64. This is a count for strict liability under Alabama's Extended Manufacturer's Liability Doctrine ("AEMLD").

65.    TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc., and fictitious defendants A through Z designed, manufactured, sold, and/or distributed into the marketplace a defective product, the TCI flexible pipe used by plaintiff.

66.    TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc., and fictitious defendants A through Z or should have known how the TCI flexible pipe would be used by plaintiff, i.e. for the containment of gasoline and the movement of gasoline from his storage tanks to his pumps.

67.    TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc., and fictitious defendants A through Z could have reasonably anticipated or should have known that if the TCI flexible pipe failed, it would cause injury to property or person, even when used for the purpose for which it was intended.

68.    TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc., and fictitious defendants A through Z are strictly liable for the defective product, the TCI flexible pipe.

69.    As a proximate result of said defect, the TCI flexible pipe failed and leaked and Plaintiff May's will be caused to replace and repair said TCI flexible pipe, and will suffer

damages therefrom, including, but not limited to, the cost of replacement of the TCI flexible pipe, the cost of cleanup of any spills, all other costs associated therewith.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants TCI, Dayco, Mark IV, Parker Hannifin, Ticona, Cleveland Tubing Inc., and fictitious defendants A through Z for such compensatory damages as the evidence supports and a jury awards, a separate amount in punitive damages, plus costs of suit.

## PLAINTIFF DEMANDS TRIAL BY STRUCK JURY

Respectfully Submitted,

_(signature)_

Lynn W. Jinks, III
Christy Crow

**OF COUNSEL:**
JINKS, DANIEL & CROW, LLC
Post Office Box 350
Union Springs, Alabama 36089

Russell Jackson Drake
Nicola Thompson Drake
WHATLEY DRAKE, LLC
2323 Second Avenue North
P.O. Box 10647
Birmingham, AL 35202-0647
(205) 328-9576
Facsimile (205) 328-9669

Wesley L. Laird (LAI005)
LAIRD, BAKER & BLACKSTOCK, LLC
501 North Main Street
Opp, Alabama 36467

L. Cooper Rutland, Jr. (RUT010)
RUTLAND AND BRASWELL, LLC
208 North Prairie Street
Union Springs, AL 36089

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon the following counsel by placing a copy of same in the U.S. Mail on this the 29th day of September, 2005.

Attorney for Defendant Oil Equipment Company, Inc.
Neil R. Clement, Esq.
ADAMS & REESE/LANGE SIMPSON
2100 3rd Avenue North, Suite 1100
Birmingham, Alabama  35203

Attorneys for Defendant Total Containment, Inc.
J. Ross Forman, Esq.
Wilson F. Green, Esq.
Ronald W. Farley, Esq.
BURR & FORMAN
3100 SouthTrust Tower
420 North 20th Street
Birmingham, Alabama  35203

Attorneys for Defendant Ticona Polymers, Inc.
Alan T. Rogers, Esq.
BALCH & BINGHAM, LLP
Post Office Box 306
Birmingham, Alabama 35201-0306

Paul A. Clark, Esq.
BALCH & BINGHAM, LLP
Post Office Box 78
Montgomery, Alabama 36101

Paul M. O'Connor III, Esq.
KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP
1633 Broadway
New York, New York  10019-6799

Walter B. Calton, Esq.
Attorney At Law
Post Office Box 696
Eufaula, Alabama 36072-0696

Attorneys for Defendant, Parker Hannifan Corporation
William H. Brooks, Esq.
LIGHTFOOT, FRANKLIN & WHITE, LLC
400 20th Street North
Birmingham, Alabama  35203

William McCandless
DENARDIS, MCCANDLESS & MILLER, P.C.
70 Macomb Place, Suite 200
Mt. Clemons, Michigan   48043

Attorneys for Defendant Cleveland Tubing, Inc.
James H. McLemore, Esq.
CAPELL & HOWARD, P.C.
150 South Perry Street (36104)
Post Office Box 2069
Montgomery, Alabama 36102-2069

T. Harold Pinkley, Esq.
MILLER & MARTIN, LLP
1200 One Nashville Place
150 Fourth Avenue North
Nashville, Tennessee 37219

<u>Attorney for Defendants Dayco Products,</u>
<u>Inc. and Mark IV Industries, Ltd.</u>
Joseph T. Carpenter Esq. (CAR038)
Nathan C. Prater
CARPTENTER, PRATER, INGRAM &
MOSHOLDER LLP
303 Sterling Centre
4121 Carmichael Road
Montgomery, AL 36106

Kimberly W. Sayoc, Esq.
LIPPES SILVERSTEIN MATHIAS &
WEXLER LLP
700 Guaranty Building
28 Church Street
Buffalo, New York   14202-3950

L. Shane Seaborn
Myron C. Penn
PENN & SEABORN, LLC
Post Office Box 688
Clayton, Alabama 36106

Of Counsel

12

IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

| | |
|---|---|
| MAY'S DISTRIBUTING COMPANY, INC., ET AL., | ) <br> ) <br> ) |
| Plaintiffs , | ) <br> ) |
| | )      Civil Action No.**03-02** |
| vs. | ) <br> ) |
| TOTAL CONTAINMENT, INC., ET AL., | ) <br> ) |
| Defendants. | ) |

FOURTH AMENDED COMPLAINT AND CLASS DEFINITION

Parties

1.     Plaintiff, May's Distributing Company, Inc. ("May's") is an Alabama with its principle place of business at 102 Martin Luther King Blvd., Union Springs, Bullock County, Alabama. May's Distributing Company, Inc. distributes oil and gasoline products and operates convenience stores and motor fuel dispensing facilities, in Montgomery and Union Springs Alabama. May's brings this suit individually and on behalf of all similarly situated motor fuel dispensing facility owners.

2.     Defendant, Total Containment, Inc. ("TCI") is a Pennsylvania corporation which did business in the State of Alabama at all times relevant to this lawsuit, but has since gone bankrupt. TCI manufactured, sold and distributed defectively designed and tested underground thermoplastic flexible pipe ("Enviroflex pipe" or "flex pipe") for use in TCI-designed gas conveying systems at motor fuel dispensing facilities.

3.     Defendant, Dayco Products, Inc. ("Dayco") designed, and from 1990 to 1997 manufactured, the part of the flex pipe at issue here—the primary inner pipe (of a layered pipe design)—sold as part of the "Enviroflex, Omniflex and Monoflex Systems" for the conveyance of gasoline from underground storage tanks to the consumer at the dispenser.

4.     Defendant, Mark IV Industries, Ltd. ("Mark IV") is a Canadian corporation doing business in the State of Alabama. Mark IV is the parent company of Defendant, Dayco Products, Inc.

5.     Defendant, Ticona Polymers, Inc. ("Ticona") is a Delaware corporation doing business in the State of Alabama. Ticona supplies a polymer used in the manufacture of the flex pipe.

6.     Defendant, Cleveland Tubing, Inc. ("CTI") is a Tennessee corporation doing business in the State of Alabama. CTI manufactured component parts of the flexible pipe sold

by TCI, including but not limited to the primary inner pipe (of a layered design) from 1990 through 1999.

7.    Defendant, Underwriters Laboratories, Inc. ("UL") is a Delaware corporation doing business in the State of Alabama. UL developed a testing protocol for the primary hose which carries gasoline from the underground storage tank to the consumer at the pump. UL then gave the flex pipe its "UL Listing," certifying that the flex pipe had passed its safety and efficacy testing.

## Jurisdiction and Venue

8.    This Court has jurisdiction of this case pursuant to § 12-11-30 of the <u>Code of Alabama.</u>

9.    Defendants do business directly, indirectly or by agent in Alabama, including in this Circuit.

10,    Venue is proper in this Court pursuant to Rule 82, Ala.R.Civ.P. and <u>Code of Alabama</u> § 6-3-7.

## Statement of Facts

11.    In 1988, Defendants TCI and Dayco began developing the flexible hose at issue here to be used in TCI's Enviroflex Retractable Double Wall Piping System ("Enviroflex System"), Omniflex Direct Bury Coaxial Piping System ("Omniflex System") and the Monoflex Piping System ("Monoflex System") for conveying gasoline from underground storage tanks to the customer at the gas dispenser. These systems were different from the steel pipe and fiberglass systems then on the market, as the piping used was flexible and easier to install and replace if necessary.

12.    The most important element in each of the TCI gas conveyance systems is the primary pipe that contacts the gasoline as it is conveyed to the dispenser. Dayco was responsible for the design and material selection of a number of similar primary pipes and manufactured them as well, until ending its relationship with TCI in 1997. The three systems—Enviroflex, Monoflex and Omniflex—employ a variety of sizes and thicknesses of primary pipe, but the materials of the pipe are the same and each is defective.

13.    To increase sales of the Enviroflex system, particularly to major oil companies, it was necessary to obtain a "UL listing" from Defendant, UL, certifying the safety and efficacy of the gasoline-carrying flex pipe. Obtaining the listing was a high priority for Dayco and TCI.

14.    The entire gas conveying systems—including all the sumps and component parts—were not tested or certified by UL as safe and effective. Instead, only the primary pipe which conveys the gasoline was tested. This was done to hasten obtaining the UL Listing.

15.    UL designed and conducted tests that set an extremely low threshold for the safety and quality of the flex pipe. UL's testing allowed pipe that is highly permeable to gas

2

and susceptible to degradation and elongation problems caused by exposure to moisture and gasoline to pass and be certified as "UL Listed."

16.    For example, instead of tolerating no permeation of gas through the gas conveying inner pipe at all—a zero permeation standard—the standard was increased to 1%. Ignoring the real world realities that a gas station and its gasoline conveyance system will be exposed to moisture and to gasoline, UL allowed just the inner layer of the gas conveying pipe—not the outer layer—to be tested for resistance to gas. UL's testing contemplated that not only would the pipe never be touched by spilled gasoline, but that it would not be affected by gasoline vapors—even though the pipe is, by UL's standards, allowed to permeate at such a high rate.

17.    UL relied heavily on members of industry to develop its testing and standards for the gas conveying flex pipe. This reliance included taking the advice of an Industry Advisory Group with regard to testing and permeation levels. It also included having regular contact with manufacturers such as Dayco. Employees of Dayco visited UL, criticized UL's proposed testing programs and provided UL with "tips" on how to properly conduct testing.

18.    Dayco continued to be heavily involved in the development of various generations of various sizes of the TCI primary pipe used to convey the gasoline—each generation based on the same design. Dayco contracted with Cleveland Tubing, Inc. to manufacture the inner part of the defective primary pipe at issue in this case. CTI relied heavily on Dayco in setting up its manufacturing process for the TCI primary pipe. Dayco provided CTI with supervision, advice, and tips on the manufacturing process. Furthermore, CTI manufactured the TCI primary inner pipe for Dayco through 1997. CTI provided Dayco with defective inner pipes and experienced ongoing problems with quality assurance and performance. Dayco accepted the poor quality inner pipes and incorporated them in the primary hose nonetheless. Dayco failed to adequately supervise CTI to ensure that CTI was providing an inner pipe that would be free of defects and safe for the environment. CTI continued to manufacture TCI primary pipe through 1999.

19.    Between 1990 and 1997 the plastics and polymers Dayco selected varied, but each was defective from its inception because the materials chosen were highly permeable and unsuitable for the application of carrying gasoline. The reason for these plastics variations was that Dayco and TCI were in the business of selling a product that they knew was defective, yet, they continued to pocket profits as they attempted to find a design and materials that would actually contain and carry gasoline.

20.    One variation in materials was made when TCI and Dayco realized that the outer covering of the first generation of its primary pipe was not compatible with alcohol, which was detrimental to the integrity of the pipe when used with the many gasoline products containing alcohol.

21.    Another polymer switch was made because the polyester urethane outer cover of the pipe was subject to degradation from water in the environment and also microbial attack. The generation of pipe which was not resistant to moisture was so defective that TCI began a program to replace all that type of pipe. This "voluntary" pipe replacement program caused finger-pointing between TCI and Dayco regarding who was to blame and who was to pay.

22.    The voluntary replacement program dealt with, by TCI and Dayco's estimation, 3800 gas stations around the country and would cost $21 Million. Some, but not all of those gas stations had this early generation of primary pipe replaced. The major oil companies' stations like Exxon and Southland were made a priority by TCI and Dayco for replacement, but Mom and Pop operations were not a priority and did not have the defective pipe replaced.

23.    Despite any variations in the plastics chosen for the various generations of TCI primary piping, there is one constant—that the plastic materials chosen were defective and unsafe for the intended application of conveying gasoline. These plastics were overly permeable to gasoline and hydrocarbon liquids and gases. Since the layered pipe design did not provide any pathway for hydrocarbons to escape the entire primary pipe is susceptible to softening, swelling and losing its integrity. Soil humidity, liquids and gases cause plasticization—weakening—of the materials chosen by Dayco to build the primary pipe. This weakening leads to significant changes in the dimensional stability of the pipe. It also leads to pipe breaches. Polyurethane and polyethylene, the primary materials for the covers of the primary pipe, are known to be attacked by microbial bacterial. This microbial attack and hydrolysis can lead to pipe breaches. Thermoplastics such as those used in the primary pipe exhibit viscoelasticity—creep and stress relaxation. These properties lead to breaches of the plastic. The layered design of the primary pipe exacerbates modes of failure related to stress because the interlayer regions can act as crack initiators. Finally, when two or more plastics with varying thermal properties are joined together such as in the TCI primary pipe, changes in the environment temperature can lead to delamination of the layers.

24.    Even brand new TCI primary pipe has failed from the standpoint of its high permeability and its inherent defects in material selection. TCI, UL and Dayco's failure to take into account the environment in which the pipe would be conveying gasoline exacerbates the defective nature of the pipe and causes more serious failures such as microbial attack, hydrolysis, softening, weakening, changing of dimension, and delamination.

25.    In 2000, state regulators of underground storage tanks in Mississippi and Florida noticed increasing numbers of reported failures in flexible piping systems, particularly TCI's primary pipe, and made their findings public, including beginning a database to track the serious, reported leaks.

26.    Two of three gasoline distributing facilities owned and operated by Plaintiff, have or had, TCI primary pipe installed. The Montgomery gas station's TCI flex pipe was installed in 1997 and replaced periodically from 1997 until 2005, at which time it was re-fitted. The Union Springs TCI pipe was installed in 1994 and additional TCI pipe was installed in Union Springs in an upgrade in 1997. The Union Springs station has some TCI pipe under the concrete, even after the upgrade in 1997, but the Montgomery station had so many serious leaks, requiring repair, that all of the TCI pipe was removed.

27.    The four serious leaks at the Montgomery station alerted May's that the defective TCI primary pipe was failing in the ways that state regulators had warned about. The installer inspected and tested the TCI flexible pipe and discovered that, in addition to its inherent defect of allowing permeation of gas, that the pipe had failed to retain its shape and rigidity, by elongation, swelling and other defects, and had experienced rupture sufficiently sized to cause major leaks. May's has since had all that TCI primary pipe removed from its Montgomery station and that pipe is stored in its warehouse.

4

28.    Plaintiff May's suffered damages as a result of the defective TCI flexible pipe, including being forced to shut down the gas dispensers to allow repair work, and having gas pipe contractors seen at its store, causing damage to Plaintiff's reputation for providing high quality, unadulterated gasoline. Plaintiff was damaged by being forced to shut down its entire Montgomery gas distributing operation for a period of time sufficient to facilitate replacing all the defective TCI pipe.

29.    Members of the putative class who own and operate gas stations with TCI flex pipe are damaged in that the pipe's high permeation rate allows a constant escape of gas and gas vapors. Members of the putative class with the first generation of TCI flex pipe have been damaged in that they may have been left out of TCI and Dayco's voluntary pipe replacement program, therefore leaving pipe that even Defendants admit is defective, in the ground and posing a risk of environmental contamination and lost profits. Members of the putative class have been damaged in that they need to stop operations at their gas stations and convenience stores and replace the defective TCI flex pipe with pipe that is not constantly permeating gas and gas vapors. Such a total pipe replacement is costly in terms of paying a contractor to tear up the concrete to install new pipe, as well as in lost profits.

## Class Action Allegations

30.    The Plaintiff brings this action individually and on behalf of a class of those similarly situated entities and persons in the United States and Puerto Rico who own retail gasoline operations that use TCI pipe to convey gasoline from the underground storage tank to the dispenser.

31.    The class is so numerous that joinder of all members of the class is impracticable. TCI and Dayco's own estimation of the number of gas stations using just the initial generation of the pipe they admit is defective is 3800. In addition, after TCI sold the initial generation of pipe it admits is defective and needs to be replaced, sales of additional generations of TCI flex pipe, which is also defective, continued. The U.S. EPA reports that there are 257,143 regulated underground storage tanks. This figure represents the tanks in the ground—not the number of retail gas stations. Because of the wide use of flex pipe of various brands at motor fuel dispensing facilities over a substantial period of time in the United States, Plaintiff believes there are tens of thousands of members of the class.

32.    There are questions of law and fact common to the class, including,

- Whether all the various generations of primary pipe are defectively designed;

- Whether Defendants TCI, Dayco and CTI breached their duty to Plaintiff and the class to design, manufacture and sell a gasoline conveying hose that was safe for the environment and suitable for its intended use;

- Whether Dayco breached its duty to Plaintiff and the class to select materials for the various generations of primary hose that would be suitable to conveying gasoline;

- Whether CTI breached its duty to the class to manufacture components of the various generations of primary pipe that are consistent and not defective;

- Whether Dayco negligently supervised CTI and then negligently accepted and used defective CTI components in the manufacture of the various generations of primary pipe;

- Whether Dayco and UL breached their duty to Plaintiff and the class to adequately inform themselves about the real world conditions the flex pipe would operate under before undertaking the duties they did to design, test and certify the primary gas conveying pipe;

- Whether UL breached its duty to Plaintiff and the class to conduct testing that adequately ensures the safety and efficacy of the primary pipe for holding and conveying gasoline; and

- Whether the conduct of each defendant was negligent.

33.     The claims of the Plaintiff are typical of the claims of the putative class and are based on and arise out of the same facts constituting the negligent conduct of the defendants.

34.     The Plaintiff will adequately protect the interest of the class and has no interests antagonistic to any putative class member.  Plaintiff's counsel is experienced in class action litigation, will vigorously pursue the litigation, has no conflicts which would impede counsels' adequacy and has the resources necessary to successfully litigate the action.

35.     The prosecution of separate actions by individual members of the putative class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the Defendants.

36.     A class action is superior to any other available method for the fair and efficient adjudication of this controversy.

37.     There will be no difficulty in the management of this action as a class action. The sole cause of action in this complaint is based on negligence.  The law of the fifty (50) states is consistently the same for negligence except three (3) states recognize the defense of contributory negligence.  Management of this class action at trial will present no particular difficulties.  Jury charges and verdict forms can be tailored to fit this relatively simple set of facts and legal questions.  The Court has available to it many management techniques, including special interrogatory verdicts and, if needed, bifurcation of the trial proceedings.

## CLASS DEFINITION

38.     Upon certification, the Class will consist of all retail gasoline distribution facilities in the United States and Puerto Rico where any generation of TCI primary flex pipe is, or was, installed and used for the conveyance of petroleum products.

## NEGLIGENCE

39.     Plaintiff adopts and incorporates the facts and allegations of the prior paragraphs.

40.     Each defendant had a duty to ensure that TCI flex pipe was designed, manufactured, tested, inspected and certified in a manner that rendered the pipe safe for its intended use and each defendant failed in their duty.

41.     As a proximate result of the defendants' negligence, the TCI flex pipe is defective and has failed to operate as it was intended.  To prevent the ongoing permeation of gas and gas vapors from the primary pipe, Plaintiff and the Class must replace the defective TCI flex pipe, and will suffer damages as a result.  These damages include the cost of parts and labor for the replacement of the TCI flex pipe, and lost profits and other costs associated with being forced to close the retail operation for the repiping.  Each member of the class has suffered injury in that, the pipe in question has failed because it is inherently defective.

WHEREFORE, the premises considered, Plaintiff demands judgment against defendants for such compensatory damages as the evidence supports, costs of suit and such other and further relief as may be equitable.

### PLAINTIFF DEMANDS TRIAL BY STRUCK JURY

Respectfully Submitted,

Counsel for Plaintiff and the Putative Class

**OF COUNSEL:**

Lynn Jinks
Christy Crow
JINKS, DANIEL & CROW, LLC
Post Office Box 350
Union Springs, Alabama  36089

Russell Jackson Drake
Nicola Thompson Drake
WHATLEY DRAKE & KALLAS, L.L.C.
2323 Second Avenue North
P.O. Box 10647
Birmingham, AL  35202-0647
(205) 328-9576
Facsimile (205) 328-9669

Wesley L. Laird (LAI005)
LAIRD, BAKER & BLACKSTOCK, LLC
501 North Main Street
Opp, Alabama 36467

L. Cooper Rutland, Jr. (RUT010)
RUTLAND AND BRASWELL, LLC
208 North Prairie Street
Union Springs, AL  36089

## CERTIFICATE OF SERVICE

I certify that a copy of the above and foregoing has been served upon the following counsel by email and by placing a copy in the U.S. Mail on this the 13th day of July, 2006.

Attorneys for Ticona Polymers, Inc.
Alan T. Rogers, Esq.
BALCH & BINGHAM, LLP
Post Office Box 306
Birmingham, AL 35201-0306
arogers@balch.com

Paul A. Clark, Esq.
BALCH & BINGHAM, LLP
Post Office Box 78
Montgomery, AL 36101
pclark@balch.com

Paul M. O'Connor III, Esq.
Seth A. Moskowitz, Esq.
Jon Avins, Esq.
KASOWITZ, BENSON, TORRES & FRIEDMAN
1633 Broadway
New York, NY  10019-6799
poconnor@kasowitz.com
smoskowitz@kasowitz.com

Walter B. Calton, Esq.
Post Office Box 696
Eufaula, AL  36072-0696
wcalton@bellsouth.net

8

Attorneys for Cleveland Tubing, Inc.
James H. McLemore, Esq.
CAPELL & HOWARD, P.C.
150 South Perry Street (36104)
Post Office Box 2069
Montgomery, Alabama 36102-2069
jhm@chlaw.com

T. Harold Pinkley, Esq.
MILLER & MARTIN, LLP
1200 First Union Tower
150 Fourth Avenue North
Nashville, TN 37219
hpinkley@millermartin.com

Lynda M. Hill, Esq.
James Williams, Esq.
MILLER & MARTIN, PLLC
Suite 1000, Volunteer Bldg.
832 Georgia Avenue
Chattanooga, TN 37402
lhill@millermartin.com
jwilliams@millermartin.com

Attorneys for Dayco Products, Inc.
and Mark IV Industries, Ltd.
Joseph T. Carpenter Esq. (CAR038)
Nathan C. Prater, Esq.
Brian Mosholder, Esq.
John DeShazo, Esq.
CARPENTER, PRATER, INGRAM
& MOSHOLDER LLP
303 Sterling Centre
4121 Carmichael Road
Montgomery, AL 36106
jccarpenter@carpenterfirm.com
nprater@carpenterfirm.com
bmosholder@carpeterfirm.com
jdeshazo@carpenterfirm.com

Kimberly W. Sayoc, Esq.
LIPPES SILVERSTEIN MATHIAS &
WEXLER 700 Guaranty Building
28 Church Street
Buffalo, NY 14202-3950
ksayoc@lippes.com

L. Shane Seaborn, Esq.
Myron C. Penn, Esq.
PENN & SEABORN, LLC
Post Office Box 688
Clayton, AL 36106

Attorneys for Underwriters
Laboratories, Inc.
Walter E. McGowan, Esq.
GRAY, LANGFORD, SAPP,
MCGOWAN, GRAY &
NATHANSON
P.O. Box 830239
Tuskegee, AL 36083-0239
wem@glsmgn.com

Charles Donald, Marshall, III, Esq.
John Olinde, Esq.
Brent Arnold Talbot, Esq..
Robert S. Rooth, Esq.
CHAFFE McCALL, PHILLIPS, TOLER &
SARPY
2300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
(504) 585-7000
talbot@chaffe.com
olinde@chaffe.com
marshall@chaffe.com
rooth@chaffe.com

James E. Blazek
Adams & Reese, LLP
One Shell Square
701 Poydras Street, Suite 4500
New Orleans, LA  70139

OF COUNSEL

IN THE CIRCUIT COURT OF BULLOCK COUNTY **FILED IN OFFICE**

STATE OF ALABAMA

MAR 0 3 2006

CLERK-REGISTER, BULLOCK CO., ALA.

| | |
|---|---|
| MAYS DISTRIBUTING CO., INC.,     ) | |
|      ) | |
|     Plaintiff,      ) | |
|      ) | |
| vs.      ) | CIVIL ACTION NO. CV-03-002 |
|      ) | |
| TOTAL CONTAINMENT, INC.,     ) | |
| OIL EQUIPMENT COMPANY, INC.,     ) | |
| DAYCO PRODUCTS, INC.,     ) | |
| MARK IV INDUSTRIES, LTD.,     ) | |
| PARKER HANNIFIN CORPORATION,     ) | |
| TICONA POLYMERS, INC., SHELL     ) | |
| CHEMICAL, LP, CLEVELAND     ) | |
| TUBING, INC., et al.,     ) | |
|      ) | |
|     Defendants.      ) | |

## MOTION FOR SUMMARY JUDGMENT

Come now defendants Dayco Products, L. L. C., and Mark IV Industries, LTD, and pursuant to Rule 56 of the *Alabama Rules of Civil Procedure*, move this Court for a summary judgment in their favor and in support thereof say as follows:

## STATEMENT OF FACTS

1. Defendant May's Distributing Company, Inc. ("May's"), owns and operates three convenience stores/gas stations among other things. (Depo. of David May, attached hereto as Exhibit 1, p. 17, line 21 - p. 18, line 6). Two of the gas stations are in Union Springs, Alabama and one is located in Montgomery, Alabama. (Id.) According to the allegations herein the complaint was filed as a result of problems it has experienced with some of its underground fuel piping. According to the discovery responses and Mr. May's deposition, only the Montgomery gas station has experienced any leaks or other problems

with its pipes.    (Id. at 65:1 - 68:12; 159:17-18; 213:7-11; Exhibit 2 is Plaintiff's

Supplemental Responses to Defendant Ticona Polymers, Inc.'s Interrogatories, see

response number 4.)

2.    Specifically, the lawsuit claims that the underground piping system sold by

Total Containment, Inc. ("TCI"), was defective and failed.  TCI incorporated several

generations of primary pipe into its system over time. (Exhibit 3, Affidavit of Tom Martin)

It is undisputed that Dayco Products, L. L. C. ("Dayco"), manufactured a portion of some

of the early generations of primary pipe incorporated by TCI into its system. (Id.)

Defendant Mark IV Industries is a holding company that owns defendant Dayco.

Specifically the complaint alleges that Mark IV directly or indirectly does business in the

state of Alabama by and through it's affiliation with and control of Dayco. The complaint

does not allege any specific act or omission on the part of Mark IV, other than it's control

or ownership of Dayco.

3.    It is undisputed that all of the TCI primary pipes that were initially installed at

the Montgomery station have been removed and are stored at the May's warehouse in

Union Springs. (Exhibit 1, 109:7-16; 116:4-12; 125:13 - 127:1; 135:18 - 136:9.)

4.    On January 24, 2006, counsel for Dayco met with a representative of

plaintiff and plaintiff's counsel in Union Springs. There were a total of twenty-one pipes in

the Union Springs warehouse on that day.  It is undisputed that all twenty-one of these

pipes came from the Montgomery station.  Again, the Montgomery station is the only

station owned by plaintiff to have experienced any leaks or other failures of the TCI primary

pipe. (Id. at 65:1-69:12; 159:7-18; 216:10-15.)

-2-

5.    Counsel for Dayco photographed all of the pipes and couplings in the warehouse and provided those photographs to Mr. Tom Martin, a senior process engineer at Dayco, who is familiar with the various hoses and pipes Dayco has produced over the last twenty-five years.  Mr. Martin reviewed the photographs of the pipes and couplings at the May's Warehouse and has determined that Dayco did not produce any of the pipes that were installed at the Montgomery facility.  Although there are some TCI pipes in the ground at the Martin Luther King Boulevard May's gas station, none of those pipes has leaked or otherwise failed.  (Id. at 65:1 - 68:12; 68:16 - 69:20; 158:8-15.)

Therefore, the evidence is undisputed that Dayco did not produce any of the pipes that have failed at plaintiff's gas stations in this case.


## APPLICABLE LAW AND ARGUMENT

6.    It is axiomatic that in order to sustain a claim for negligence under Alabama law, a plaintiff must prove (1) an obligation owed by the defendant to the plaintiff, (2) a breach of the standard of care applicable to that obligation, (3) causation, and (4) damage. Scott v. ABF Freight Sys., Inc., 306 F. Supp. 2d 1169 (M.D. Ala. 2004); Teitel v. Wal-Mart Stores, Inc., 287 F. Supp. 2d 1268 (M.D. Ala. 2003) ; Norman v. S. Guar. Ins. Co., 191 F. Supp. 2d 1321 (M.D. Ala. 2002) ; Ison Logging, L.L.C. v. John Deere Constr. Equip. Co., 2000 U.S. Dist. LEXIS 18250 (S.D. Ala. Oct. 12, 2000).  In the case at bar it is undisputed that Dayco did not produce any of the pipe that leaked or otherwise failed.  Therefore, with respect to the pipe failures that form the basis of plaintiff's claims, Dayco owed no duty to the plaintiff as it did not manufacture the pipe in question.  Without a duty their can be no breach and no damages proximately caused by these defendants.

-3-

7.    In addition, strict liability claims under the Alabama Extended Manufacturer's Liability Doctrine (hereinafter AEMLD) require proof that a plaintiff actually suffered injury or damages to himself or his property. <u>Casrell v. Altec Indus.</u>, 335 So. 2d 128, 132-133 (Ala. 1976); *see e.g.,* <u>Pfizer, Inc. v. Farsian</u>, 682 So. 2d 405 (Ala. 1996) . The plaintiff in <u>Pfizer, Inc.</u> couched his claim so as to allege that Pfizer, a heart valve manufacturer, fraudulently induced him to receive a valve implant by concealing risks and defects, based on evidence that other similar heart valves had failed. The valve in plaintiff's heart, however, was working properly and as intended by the manufacturer. The court held that his claim, regardless of the pleadings, was in substance a product liability/personal injury claim. The court held that recovery is not allowed based on a product that is and has been working properly. His fear that the valve could fail in the future is not, without more, a legal injury sufficient to support his claim. <u>Id</u>.

8.    With regard to all potential counts and claims proffered by the plaintiff, the defendants Mark IV and Dayco respectfully assert that because they did not manufacture or contribute to the manufacture of the malfunctioning product(s), none of the claims asserted herein can stand against these two defendants.

9.    The case law is clear that when a Court considers a motion to dismiss a party in a putative class action, the Court should consider only the claims of the named plaintiffs when the class has not yet been certified. <u>Barth v. Firestone Tire & Rubber Co.</u>, 673 F. Supp. 1466, 1467 (N.D. Cal. 1987) ("[C]ourts also generally consider only the claims of a named plaintiff in ruling on a motion to dismiss a class action complaint prior to class certification"); <u>Geraghty v. United States Parole Comm'n</u>, 445 U.S. 388, 406-407 (1980); <u>Deposit Guaranty National Bank v. Roper</u>, 445 U.S. 326, 340 (1980). The Geraghty Court

-4-

recognized the obligation of the Trial Court to dismiss a defendant from a putative class action prior to class certification where the evidence justifies such a dismissal with respect to the named class representative. Geraghty, supra. at 407.

10.    Since MARK IV Industries, LTD., and Dayco Products, LLC, did not in any manufacture or contribute to the manufacture of the primary pipe that has failed in this case, neither can be liable under any theory of liability in this matter.  Further, since the pipe that is still in the ground has not failed, the mere fact that it may fail in the future and may have been manufactured by Dayco can not serve as the basis for a claim of liability under any theory pled by plaintiff.

11.    This summary judgment motion is based on all of the pleadings, plaintiff's discovery responses, the deposition of Mr. David May submitted herewith and the affidavit of Mr. Tom Martin.

WHEREFORE, the defendants, Dayco Products, L. L. C., and Mark IV Industries move this Court for a summary judgment pursuant to Rule 56 of the *Alabama Rules of Civil Procedure* and request that it be dismissed with prejudice from this matter.

Respectfully submitted this ___ day of March, 2006.

 

BRIAN MOSHOLDER (MOS-018)
JOSEPH T. CARPENTER (CAR-038)
Attorneys for Mark IV, LTD and Dayco Products, LLC

OF COUNSEL:
Carpenter, Prater, Ingram & Mosholder, LLP
303 Sterling Centre
4121 Carmichael Road
Montgomery, AL 36106
Telephone: (334) 213-5600
Fax: (334) 213-5650

-5-

*L. Shane Seab*

MYRON PENN (PEN-0  )
L. SHANE SEABORN (SEA-027)

Penn & Seaborn, LLC
P. O. Box 688
Clayton, AL 36016

## CERTIFICATE OF SERVICE

This is to certify that a copy of the above and foregoing was served upon the below listed counsel of record by placing a copy of same in the U.S. mail, postage prepaid and properly addressed this 2nd day of March, 2006.

Wesley L. Laird, Esq.
Laird, Baker & Blackstock, LLC
501 North Main Street
Opp, AL 36467

L. Cooper Rutland, Jr., Esq.
Rutland and Braswell, LLC
208 North Prarie Street
Union Springs, AL 36089

Nicola Thompson Drake, Esq.
Russell Jackson Drake, Esq.
Whatley Drake, LLC
P. O. B. 10647
Birmingham, AL 3520

Walter Calton, Esq.
P. O. Box 696
Eufaula, AL 36103

Paul A. Clark, Esq.
Balch & Bingham
P. O. Box 78
Montgomery, AL 36101

Alan T. Rogers, Esq.
Balch & Bingham
1710 6th Avenue North
P. O. Box 306
Birmingham, AL 35201-0306

James H. McLemore, Esq.
Capell & Howard
150 South Perry Street
P. O. Box 2069
Montgomery, AL 36102-2069

James M. Cawley, Jr., Esq.
DeHay & Elliston, LLP
3700 Buffalo Speedway, Ste. 1000
Houston, TX 77098

Paul M. O'Connor, III, Esq.
Kasowitz, Benson, Torres & Friedman, LLP
1633 Broad Way
New York, NY 10019

T. Harold Pinkley, Esq.
Miller & Martin
1200 1 Nashville Place
150 4th Avenue North
Nashville, TN 37219-2433

Lynda M. Hill, Esq.
James Williams, Esq.
Miller & Martin
832 Georgia Ave., Ste. 100
Chattanooga, TN 37402

-6-

# FREEDOM COURT REPORTING

## Page 17

1 and bought our trucks and trailers and
2 hired our drivers, and right at the last
3 minute they pulled out of the deal. We
4 were left with no trucks, no trailers,
5 no drivers. And we lost some business
6 because of that.
7   Q.  When did all of that occur?
8   A.  I can't tell you; I don't
9 remember.
10   Q.  Do you know where the lawsuit
11 was filed?
12   A.  Bullock County.
13   Q.  Now, tell me what the current
14 business of May's Distributing -- let me
15 say this: When I say "May's", we agree
16 that you all understand that to mean,
17 unless I tell you otherwise, May's
18 Distributing Incorporated or the
19 plaintiff in this lawsuit?
20   A.  Yes, sir.
21   Q.  What is the business of May's?
22   A.  We operate -- own and operate
23 three convenience stores. Two being

## Page 18

1 located in Bullock County and one in
2 Montgomery County. We have an
3 automotive center, have a wrecker
4 service, and we have a wholesale
5 distributing business. We wholesale
6 distribute gasoline and diesel fuel.
7   Q.  I am familiar with one of your
8 operations in Bullock County. What is
9 the other station -- service station
10 that you have?
11   A.  It's just a convenience store.
12   Q.  Just a convenience store?
13   A.  Yes, sir.
14   Q.  But it sells gas; correct?
15   A.  That's correct.
16   Q.  Where is it located?
17   A.  It is at 404 Conecuh Avenue.
18   Q.  And then you have an operation
19 located on MLK?
20   A.  That's correct.
21   Q.  When was the convenience store
22 located at 404 -- did you say
23 "Connecticut Avenue"?

## Page 19

1   A.  Conecuh.
2   Q.  Conecuh. Conecuh Avenue. When
3 was the Conecuh Avenue convenience store
4 built?
5   A.  Approximately three years ago.
6   Q.  Is it the newest store that
7 May's has?
8   A.  It is.
9   Q.  What is your current position
10 with May's?
11   A.  We -- I am vice president of
12 May's Distributing Company.
13   Q.  What are your job duties?
14   A.  I manage the wholesale and
15 distributing of May's Distributing
16 Company. We distribute gasoline, diesel
17 fuel all over the State of Alabama. And
18 I am responsible for taking orders and
19 making sure the trucks get routed to
20 those locations. I am also -- my
21 brother manages the convenience stores,
22 but I am also -- I am not going to say I
23 am above him, because we are equally --

## Page 20

1 but I also help him with major decisions
2 that have to be made at those
3 convenience stores.
4   Q.  What is your brother's name?
5   A.  Brad.
6   Q.  Brad. Where do you work?
7 Where is your office?
8   A.  It is at the Martin Luther King
9 Boulevard location.
10   Q.  Is that what you call the home
11 office -- your home base?
12   A.  That's correct.
13   Q.  Where does Brad work?
14   A.  Same location.
15   Q.  What about your dad?
16   A.  Same  location.
17   Q.  What is your dad's title with
18 the company?
19   A.  He runs our automotive center.
20   Q.  Where's the automotive center?
21   A.  It's at 102 Martin Luther King
22 Boulevard.
23   Q.  So the automotive center -- is

5  (Pages 17 to 20)

EXHIBIT
1

# FREEDOM COURT REPORTING

| Page 69 |
|---|
| 1  used at the MLK facility? |
| 2  A. Yes. |
| 3  Q. And what -- where is fiberglass |
| 4  pipe used in connection with your |
| 5  underground system? |
| 6  A. It comes from our foot plant |
| 7  and goes over to our freestanding diesel |
| 8  island. |
| 9  Q. And the TCI pipe that was |
| 10 originally installed it's the same TCI |
| 11 pipe that is in the ground today? |
| 12 A. That's correct. |
| 13 Q. Okay. Who installed the flex |
| 14 pipe -- excuse me. Who installed the |
| 15 fiberglass pipe leading out to your |
| 16 diesel? |
| 17 A. Ernest Equipment Company. |
| 18 Q. And have there been any |
| 19 problems with the fiberglass pipe? |
| 20 A. No. |
| 21 Q. How many dispensers do you have |
| 22 at the MLK facility? |
| 23 A. One, two, three, four, five, |

| Page 71 |
|---|
| 1  A. TCI did. I am assuming it's |
| 2  been changed out. |
| 3  Q. Well, we'll get to that. |
| 4  A. Okay. |
| 5  Q. I am sorry I didn't clarify. |
| 6  Originally -- let's go back to when it |
| 7  was originally built. |
| 8  A. Okay. |
| 9  Q. And that was in the 1998 time |
| 10 frame; correct? |
| 11 A. '97-'98, yes. |
| 12 Q. '97-'98. And the underground |
| 13 pipe system that was installed -- |
| 14 originally installed, was that entirely |
| 15 TCI pipe? |
| 16 A. Yes. |
| 17 Q. Did OEC -- just for the record, |
| 18 OEC installed that system; correct? |
| 19 A. Correct. |
| 20 Q. At the Montgomery store? |
| 21 A. That's correct. |
| 22 Q. Did OEC utilize any parts or |
| 23 components from other -- manufacturers |

| Page 70 |
|---|
| 1  six, seven. |
| 2  Q. And how many of those are |
| 3  diesel? |
| 4  A. Two -- correction. I have a -- |
| 5  one dispenser is gas and diesel. But |
| 6  freestanding, only fiberglass pipe I |
| 7  have two dispensers. |
| 8  Q. Okay. And those are both |
| 9  diesel? |
| 10 A. Right. |
| 11 Q. But all of the pipes going to |
| 12 gasoline dispensers is the TCI flex |
| 13 pipe? |
| 14 A. That's correct. |
| 15 Q. All right. Going to the |
| 16 Montgomery location, how many gas |
| 17 dispensers are at that site? |
| 18 A. Ten. Oh, gasoline dispensers? |
| 19 There's eight. |
| 20 Q. Okay. And then two -- |
| 21 A. Two diesels. |
| 22 Q. What type of pipe system |
| 23 connects to the diesel dispensers? |

| Page 72 |
|---|
| 1  other than TCI in connection with the |
| 2  flex pipe system and the sump system? |
| 3  A. I don't know. |
| 4  Q. The -- Mr. Mays, it appears |
| 5  from your discovery responses -- did you |
| 6  recall responding to some |
| 7  interrogatories that were submitted to |
| 8  May's? |
| 9  A. I do. |
| 10 Q. Did you provide the information |
| 11 that went to providing the answers to |
| 12 your interrogatories on behalf of May's? |
| 13 A. If I knew the answers, yes. |
| 14 Q. Okay. Did you also participate |
| 15 or provide information in connection |
| 16 with some supplemental interrogatory |
| 17 responses that were just recently |
| 18 provided by May's counsel? |
| 19 A. I'm assuming so, yes. |
| 20 Q. I think -- well, let me ask you |
| 21 this way. When did your first problems |
| 22 arise at the Montgomery location with |
| 23 respect to the TCI pipe system? |

18  (Pages 69 to 72)

# FREEDOM COURT REPORTING

|  |  |
|---|---|
| Page 65 | Page 67 |

**Page 65**

1  Q. And when you say "the Union
2  Springs location", do --
3  A. Martin Luther King.
4  Q. MLK location. Okay. So first
5  it was -- I'm sorry --
6  A. Ernest Equipment Company.
7  Q. Ernest Equipment Company.
8  A. Then Barber Equipment Company
9  and then Oil Equipment Company.
10  Q. And that represents
11  chronologically how -- how it happened?
12  A. That's correct.
13  Q. And so you've been told that
14  Ernest Equipment Company installed TCI
15  pipe?
16  A. That's correct.
17  Q. From the time that pipe was
18  installed in, I believe it was the --
19  did you say '94?
20  A. Some time in '94, right.
21  Q. Up until the upgrade from
22  Barber Equipment Company in the late
23  90s, had there been any problems with

**Page 66**

1  underground pipe system?
2  A. No.
3  Q. Again, if there had been,
4  that's something that you would know
5  about?
6  A. When you say problems with
7  underground pipes, are you talking about
8  the pipe itself or are you talking about
9  sumps and all?
10  Q. Well, I want to talk about just
11  any problems first. Problems with the
12  sump and the pipe.
13  A. Yeah. We always got water in
14  our sump.
15  Q. What about with the flex pipe
16  system itself?
17  A. No problem with the flex
18  piping, no.
19  Q. Did you know what specific type
20  of flex pipe system was installed at the
21  MLK location initially?
22  A. No.
23  Q. Do you know what type of flex

**Page 67**

1  -- TCI Flex Pipe was installed by Barber
2  Equipment Company at the time the
3  upgrade was done in the late 1990s?
4  A. No.
5  Q. Did OEC, when they came on to
6  service the MLK facility, did they
7  install any pipe?
8  A. No.
9  Q. Have there been any problems
10  with the TCI pipe system that was
11  installed by Barber Equipment Company?
12  A. No.
13  Q. And again I am asking about the
14  sump itself and the pipe. Let me strike
15  that. Have there been any leaks or
16  other problems with the flex pipe
17  installed by Barber Equipment Company?
18  A. No.
19      MR. WILLIAMS: Take a
20  break.
21      (A short break was
22      taken.)
23

**Page 68**

1      (The deposition resumed at
2      10:40 a.m.)
3
4  Q. (By Mr. Williams) Mr. Mays, I
5  just want to clear up and confirm a
6  couple of things so I can move on.
7      The Conecuh Avenue store in Union
8  Springs has no TCI pipe; correct?
9  A. That's correct.
10  Q. And it never has had any;
11  correct?
12  A. That is correct.
13  Q. It has OPW Pisces flex pipe;
14  correct?
15  A. Correct.
16  Q. Now, the MLK store in Union
17  Springs it still has TCI pipe in it;
18  correct?
19  A. Correct.
20  Q. Has it ever had any OPW Pisces
21  parts or flex pipe system?
22  A. Not that I'm aware of.
23  Q. Is there any fiberglass pipe

17 (Pages 65 to 68)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| Page 113 |
|---|
| 1 afternoon, might've been Sunday around |
| 2 lunch. I go up there. We go through |
| 3 the same tests with the tech as before |
| 4 and he says, "Yes, you got sudden loss |
| 5 alarm again. You probably got some more |
| 6 pipe that's busted." A -- one of their |
| 7 guys came out, isolated it to a side, |
| 8 then took the pipe loose and capped that |
| 9 side of the pump, so that I could still |
| 10 use four dispensers on one side, but I |
| 11 had four dispensers on the other side -- |
| 12 I had eight fueling positions out of |
| 13 order for the rest of the day Sunday and |
| 14 into Monday morning. Well, until they |
| 15 fixed it Monday night sometime. |
| 16    Q.  But you were still at least |
| 17 able to sell some gasoline? |
| 18    A.  I was at half capacity, yes. |
| 19    Q.  It says here on this Exhibit -- |
| 20 this is the document that's attached to |
| 21 your supplemental interrogatories, a one |
| 22 page document, is that what you are |
| 23 referring to? |

| Page 114 |
|---|
| 1    A.  That's correct. |
| 2    Q.  It's dated January 9, 2006? |
| 3    A.  That's right. |
| 4    Q.  It says OEC replaced two |
| 5 sections of piping. Were you there when |
| 6 they did this repair? |
| 7    A.  I was there when they pulled it |
| 8 out. I didn't wait on them to re -- |
| 9 redo everything. |
| 10    Q.  What did the pipe look like |
| 11 that was pulled out? |
| 12    A.  I can't -- I can't remember. I |
| 13 want to say that they could not isolate |
| 14 it to exactly whether it was between one |
| 15 dispenser or the other. So they pulled |
| 16 two sections to be sure, and I think one |
| 17 of them was white and the other was the |
| 18 original -- the blue pipe they had |
| 19 replaced already. |
| 20    Q.  You said it was the blue pipe |
| 21 that was installed back in -- |
| 22    A.  I can't say. |
| 23    Q.  '02? |

| Page 115 |
|---|
| 1    A.  Yeah, but I can't -- if that's |
| 2 the only blue pipe I have and if that's |
| 3 what they replaced, I can't say with |
| 4 certainty, but I'm almost positive that |
| 5 they replaced the blue section that they |
| 6 had just replaced plus a section of the |
| 7 white pipe. And I do know when the |
| 8 white was pulled out -- when it was |
| 9 pulled out you could see a little stream |
| 10 of gas just coming through a little |
| 11 pinhole in the pipe. |
| 12    Q.  Where was that pinhole located |
| 13 in relation to the ends of the pipe? |
| 14    A.  I'd be scared to tell you, you |
| 15 know, I'm trying to be truthful. I |
| 16 don't -- |
| 17    Q.  Oh, I know. But I guess my |
| 18 question was -- |
| 19    A.  It was not dead center. |
| 20    Q.  -- it was middle or closer to |
| 21 the end? |
| 22    A.  It was not dead center. It |
| 23 would be closer to the end. |

| Page 116 |
|---|
| 1    Q.  When you say "closer to the |
| 2 end", within 4 feet? |
| 3    A.  I don't know. |
| 4    Q.  All right. What was done with |
| 5 the pipe that was removed? |
| 6    A.  We took it and put it in our |
| 7 warehouse. |
| 8    Q.  And again there was one section |
| 9 of white pipe and one section of blue |
| 10 pipe? |
| 11    A.  You can't hold me to that, but |
| 12 that's what I'm recalling, yes. |
| 13    Q.  When was the next instance of a |
| 14 pipe failure at the Montgomery location? |
| 15    A.  It looks like March the 2nd of |
| 16 2004. |
| 17    Q.  And what happened on that day? |
| 18    A.  On that date the blue pipe that |
| 19 they had replaced actually grew. It was |
| 20 the first pipe that comes from the sump |
| 21 to the first dispenser. Under the |
| 22 dispensers you have what we call shear |
| 23 valves. If somebody drives off with a |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

<table>
<tr><td>

Page 109

1    Q.  Do you recall what specific TCI
2  model it was?
3    A.  No -- the section they replaced
4  it with? I'm sorry. I didn't listen to
5  your question. I was reading the date.
6    Q.  I didn't ask a good question.
7  Let me break it down. They removed one
8  length of TCI Flex Pipe?
9    A.  That's correct.
10    Q.  And this was the blue pipe?
11    A.  No. It was white.
12    Q.  It was white. What was done
13  with the white pipe that was removed by
14  OEC at the Montgomery facility?
15    A.  We took it from them. Put it
16  in our warehouse.
17    Q.  Have any tests been conducted
18  on that pipe to determine why it failed?
19    A.  Not that I'm aware of.
20    Q.  Have you had any discussions
21  with persons outside of -- that are not
22  your lawyers about testing the pipe to
23  determine why it failed?

</td><td>

Page 111

1    Q.  What did they tell you?
2    A.  They said it's not good pipe.
3    Q.  Did they give you any
4  explanation as to why it might have
5  failed?
6    A.  No. They said they're having
7  problems everywhere?
8    Q.  Do you know what the specific
9  TCI model was of the white pipe that
10  they removed?
11    A.  No.
12    Q.  You testified today OEC
13  replaced it with a kind of blue pipe;
14  correct?
15    A.  Correct.
16    Q.  Do you recall the specific
17  model of the blue pipe that was
18  installed by OEC?
19    A.  No.
20    Q.  Did it have -- do you recall
21  whether it had a hard shell around --
22  well, strike that. Was it similar --
23  other than the color, was it similar to

</td></tr>
<tr><td>

Page 110

1    A.  No.
2    Q.  Do you have any idea why the
3  pipe failed?
4    A.  Cause it is crap.
5    Q.  I'm sorry what did you say?
6    A.  Cause it's crap.
7    Q.  Well, did the failure occur?
8    A.  In the pipe.
9    Q.  Where in proximity to the ends
10  of the pipe?
11    A.  I don't know.
12    Q.  In the middle, the end --
13    A.  I can't remember.
14    Q.  What did the pipe look like
15  when it was pulled out of the ground?
16    A.  Like a piece of white pipe. I
17  mean it's -- I got it in the warehouse
18  if you want to look at it. It's just --
19  it's pipe.
20    Q.  Did OEC -- did you have any
21  discussions with OEC about what caused
22  the pipe to fail?
23    A.  Yes.

</td><td>

Page 112

1  the white pipe that you removed in
2  appearance?
3    A.  Similar -- I mean they were a
4  little different in texture I guess.
5  Seems like the blue pipe's smooth and
6  the white pipe's got a ridge on it.
7    Q.  Kind of -- the white pipe had
8  sort of a braided appearance?
9    A.  That's the best I can recall,
10  yeah.
11    Q.  And the blue pipe that was put
12  in did not have that -- it was a smooth
13  surface?
14    A.  Correct.
15    Q.  The next failure with respect
16  to the TCI piping at the Montgomery
17  location, when was that, Mr. Mays?
18    A.  It appears to be 10/19 of 2003.
19    Q.  All right. What happened at
20  that time?
21    A.  The best I can recall on this,
22  I got another call of a sudden loss.
23  Seems like this was on a Sunday

</td></tr>
</table>

28  (Pages 109 to 112)

# FREEDOM COURT REPORTING

| Page 125 |
|---|
| 1 So I don't know. I don't know where it |
| 2 was. |
| 3    Q. Who at May's would have dealt |
| 4 with that? |
| 5    A. Spooky would have dealt with |
| 6 that one. |
| 7    Q. Have you had any discussions |
| 8 with him about what happened in November |
| 9 of 2004, when this failure occurred? |
| 10    A. Other than just general had a |
| 11 pipe failure. |
| 12    Q. So how many -- strike that. |
| 13 OEC came in and they removed all the TCI |
| 14 pipe? |
| 15    A. That's what I'm told, yes. |
| 16    Q. That's been told to you by your |
| 17 dad? |
| 18    A. Right. |
| 19    Q. How many pieces of pipe would |
| 20 that be? |
| 21    A. I don't know. |
| 22    Q. Have you seen the pipe that's |
| 23 been removed? |

| Page 126 |
|---|
| 1    A. It's in the warehouse. |
| 2    Q. What color is it? |
| 3    A. I've got some white and some |
| 4 blue down there. |
| 5    Q. Has any -- has any testing been |
| 6 done with respect to any of the pipe |
| 7 we've talked about that's been removed? |
| 8    A. No. |
| 9    Q. And has it been stored |
| 10 exclusively in that warehouse? Has it |
| 11 been taken anywhere else? |
| 12    A. No. |
| 13    Q. Have you ever had occasion to |
| 14 keep the pipe outside for any length of |
| 15 time? |
| 16    A. No. |
| 17    Q. Have you taken any photographs |
| 18 of the pipe? |
| 19    A. Myself, personally, no. |
| 20    Q. Do you know of anyone who has |
| 21 photographed besides some of the defense |
| 22 lawyers here? |
| 23    A. I know it's been photographed; |

| Page 127 |
|---|
| 1 I don't know who did it. |
| 2    MR. WILLIAMS: Do you want |
| 3 to take -- we can stop now. |
| 4 |
| 5    (A break was taken for |
| 6    lunch at 11:40 a.m.) |
| 7 |
| 8    (The deposition resumed |
| 9    at 12:20 p.m.) |
| 10 |
| 11    Q. (By Mr. Williams) Mr. May's, |
| 12 before we broke for lunch we were |
| 13 talking about the four failures that |
| 14 occurred at the Montgomery facility; |
| 15 correct? |
| 16    A. Correct. |
| 17    Q. I want to go back quickly to |
| 18 the failure that occurred in October of |
| 19 2002 and in that regard I want to mark |
| 20 this as the next -- Exhibit 6, what |
| 21 appears to be another invoice from Oil |
| 22 Equipment Company. |
| 23 |

| Page 128 |
|---|
| 1    (Whereupon, Defendants' |
| 2    Exhibit No. 6 was marked |
| 3    for identification.) |
| 4 |
| 5    Q. (By Mr. Williams) Whenever |
| 6 you're ready. |
| 7    A. I'm ready. |
| 8    Q. Okay. Mr. Mays, you have been |
| 9 handed what's been marked as Exhibit 6. |
| 10 That is an invoice from Oil Equipment |
| 11 Company. It looks like the invoice is |
| 12 dated November 30, 2002. Is that |
| 13 correct? |
| 14    A. That's correct. |
| 15    Q. But the order date appears to |
| 16 be October 22nd, 2002. |
| 17    A. That is correct. |
| 18    Q. Do you recognize this invoice |
| 19 as the one that was generated as a |
| 20 result of the October 2002 failure that |
| 21 you spoke about earlier? |
| 22    A. Okay. I've got my -- to my |
| 23 previous statements, I have them -- if |

32 (Pages 125 to 128)

# FREEDOM COURT REPORTING

| Page 133 | Page 135 |
|---|---|
| 1 did you know of other persons or<br>2 entities in business similar to May's<br>3 that it had similar problems?<br>4    A. No.<br>5    Q. As you sit here today do you<br>6 know of persons or entities -- specific<br>7 persons or entities, businesses similar<br>8 to May's that have had problems with<br>9 their pipe? I know you mentioned -- you<br>10 mentioned earlier McKenzie?<br>11    A. That's right.<br>12    Q. McKenzie Oil. Are there any<br>13 others?<br>14    A. No.<br>15    Q. Has your father -- has Spooky<br>16 mentioned to you about any other<br>17 distributors or businesses similar to<br>18 May's that have had this problem?<br>19    A. No, he has not. No.<br>20    Q. Has anyone in May's at all<br>21 mentioned other distributors that are in<br>22 similar businesses to May's that have<br>23 had problems with TCI pipe? | 1 -- I have heard it is a major problem in<br>2 Florida with several people -- several<br>3 people like myself having problems with<br>4 TCI pipe.<br>5    Q. Have you heard of any names in<br>6 the State of Alabama --<br>7    A. No.<br>8    Q. -- of having problems with TCI<br>9 pipe?<br>10    A. Other than Dan McKenzie, no.<br>11    Q. And if you could, as we go<br>12 forward -- I know when I ask a question,<br>13 you seem to be able to anticipate an<br>14 answer, but will you let me finish the<br>15 question?<br>16    A. Yes.<br>17    Q. Just before the break we were<br>18 actually talking about the fourth<br>19 incident, the one that occurred in<br>20 November -- on or about November 8,<br>21 2004. Is that correct?<br>22    A. Correct.<br>23    Q. Okay. What was the color of |
| **Page 134** | **Page 136** |
| 1    A. No. The first question you<br>2 asked leading up to that -- could you<br>3 repeat that question? Do you remember<br>4 what it was? Do I have any knowledge of<br>5 any other distributors --<br>6    Q. Yes. We talked this morning<br>7 and you mentioned you had heard, I think<br>8 second hand, of McKenzie Oil having<br>9 problems with their TCI system.<br>10    A. Correct.<br>11    Q. Now, we don't know what those<br>12 problems were. Do you know what those<br>13 problems were?<br>14    A. First-hand knowledge -- I have<br>15 no first-hand knowledge of anyone having<br>16 problems.<br>17    Q. I'm not asking for first-hand<br>18 knowledge. You've made that clear.<br>19    A. Hearsay?<br>20    Q. Right. Who have you heard has<br>21 had problems with their TCI --<br>22    A. I can't call them by names, but<br>23 I know it's a major problem in Florida | 1 the pipe that failed at that time?<br>2    A. I don't know. I was not -- I<br>3 was not there at that time.<br>4    Q. That was handled by your<br>5 father?<br>6    A. That was handled by Spooky.<br>7    Q. Do you know what was done with<br>8 the pipe that was pulled out?<br>9    A. It was taken to the warehouse.<br>10    Q. Did May's have any contract --<br>11 direct contract or agreement with TCI?<br>12    A. No.<br>13    Q. What is your understanding of<br>14 TCI or Total Containment and what kind<br>15 of business that is?<br>16    A. They made or produced flex<br>17 piping for gasoline stores.<br>18    Q. Have you had any communications<br>19 case with anyone from TCI?<br>20    A. No.<br>21    Q. Has anyone -- let me state that<br>22 again. Has anyone from May's had any<br>23 communication with anyone from TCI? |

34  (Pages 133 to 136)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 157

1 view?
2 MRS. DRAKE: Objection to
3 the form.
4 A. Cleveland Tubing should have
5 verified and known that what they were
6 producing would stand up to gasoline and
7 diesel fuel.
8 Q. What is your understanding of
9 the testing that was done with respect
10 to this pipe and the manufacturing?
11 A. I have no understanding of
12 that.
13 Q. If you would, sir, if you would
14 refer to -- go to Paragraph 24. I am
15 not sure what page -- I think it is on
16 Page 4. Do you see there down where it
17 says Section A where it says, "Whether
18 defendants made an express warranty
19 concerning TCI Flex Pipe"?
20 A. I see it.
21 Q. We talked a little bit about
22 warranties. I just want to confirm.
23 Did any of the defendants named in this

Page 158

1 lawsuit make any express warranty to you
2 --
3 MRS. DRAKE: Objection to
4 the form.
5 Q. (By Mr. Williams) -- or to
6 anyone at May's?
7 A. No.
8 Q. Mr. Mays, just to confirm -- I
9 think you've done this, but I just want
10 to make it absolutely clear. On the --
11 going back to the Union Springs
12 facility, there have not been any leaks
13 or breaches in the TCI flex pipe to your
14 knowledge; correct?
15 A. Correct.
16 Q. Okay. With respect to the
17 Montgomery facility, has there been any
18 -- in connection with any of the
19 failures, has there been any sort of
20 leak outside of the system itself into
21 the soil?
22 A. Not that I'm aware of.
23 Q. Has there been any testing in

Page 159

1 that regard to confirm that?
2 A. No.
3 Q. Did you have any discussions
4 with OEC about the possibility of leaks
5 outside of the system?
6 A. No.
7 Q. Mr. Mays, what damages is May's
8 seeking in this lawsuit to recover?
9 A. We are looking out for everyone
10 who has this piping and we want all this
11 piping replaced at no expense to the
12 actual dealer who has the piping.
13 Q. Did May's incur any expense to
14 repair and the replacement of this pipe?
15 A. Yes.
16 Q. Again, we are speaking of the
17 Montgomery facility; correct?
18 A. Correct.
19 Q. What expense did May's incur?
20 A. It's immeasurable. We had, of
21 course, the down time. We were not able
22 to sell product for several hours each
23 time we had a problem. We don't know of

Page 160

1 the customers who may have come up and
2 seen us pumping water out of the sump
3 before they could get in there and fix
4 it thinking that we had water in our
5 system. Asking me, "What happened? Did
6 y'all get a bunch of water in your
7 tank?" So they don't shop with us
8 anymore. I mean, the expenses and
9 damages are immeasurable.
10 ·Q. Right. But we would have to
11 speculate as to what those damages are;
12 correct?
13 MRS. DRAKE: Objection to
14 the form.
15 A. I guess you would.
16 Q. Well, do you have any number?
17 Have you all been able to calculate with
18 respect to the damages you've --
19 A. No.
20 Q. -- just spoken about?
21 A. No.
22 Q. Now, it's true, isn't it,
23 Mr. May's, that OEC in terms of the cost

40 (Pages 157 to 160)

# FREEDOM COURT REPORTING

Page 213

1 not bringing any claims at all in this
2 lawsuit for any pipe at the Union
3 Springs; correct?
4        MR. RUTLAND: Object to the
5 form.
6    A.  I don't know.
7    Q.  (By Mr. Mosholder) There hasn't
8 been any leaks from any of the pipes in
9 the Union Springs station; correct?
10    A.  Up until this point, no, not
11 yet.
12    Q.  And the Conecuh Street station
13 doesn't have flex pipe -- doesn't have
14 TCI Flex Pipe; correct?
15    A.  Does not have TCI Flex Pipe.
16    Q.  We were in the warehouse and --
17 you're familiar in the warehouse where
18 the pipe is stored; correct?
19    A.  That's correct.
20    Q.  And there is -- within the
21 warehouse there is a small room where
22 there is, I believe, three pieces of
23 pipe stored; correct?

Page 214

1    A.  I'm not sure.
2    Q.  You're not sure?
3    A.  Right.
4    Q.  Do you know if the pipe that is
5 alleged to have leaked at the Montgomery
6 station is stored separately from the
7 pipe that didn't leak in that warehouse?
8    A.  I cannot answer that. Spooky
9 would have to answer that question for
10 you.
11    Q.  Okay. When the addition was
12 done to the Union Springs station where
13 those four dispensers were installed,
14 was that down by Barber Equipment?
15    A.  That's correct. We only
16 installed two dispensers though.
17    Q.  Oh, that's right. You had
18 three and now you've got five; correct?
19    A.  Correct.
20    Q.  All right. And Barber
21 equipment did that?
22    A.  That's correct.
23    Q.  Where are they from?

Page 215

1    A.  They're from somewhere in
2 Georgia. Albany, Georgia, I believe.
3    Q.  Do you know if they're still in
4 business?
5    A.  I've been trying to find that
6 out and I can't find out.
7    Q.  Okay.
8        MR. MOSHOLDER: I think
9 that's all I got.
10
11 RE-EXAMINATION BY MR. WILLIAMS:
12    Q.  Mr. May -- I got it right. We
13 talked a lot this morning about water
14 getting into the sump at the Montgomery
15 store; correct?
16    A.  Correct.
17    Q.  I want to ask you about the
18 Union Springs MLK store. Was there a
19 problem with water getting into the sump
20 at that facility?
21    A.  There is.
22    Q.  Can you compare the extent of
23 that problem with the problems you all

Page 216

1 were having with water in the sumps at
2 the Montgomery facility?
3    A.  There basically the same. I --
4 you can go industry wide to just about
5 any gas station you want to, pull the
6 sump lids there's going to be water in
7 the sumps. It's an industry wide --
8 it's standard operating procedure.
9 There's going to be water in the sumps.
10    Q.  Do you know or have any reason
11 to account for why you have no failure,
12 no problems or leaks at the Union
13 Springs MLK store and that you have had
14 these problems at the Montgomery store?
15    A.  I guess we've just been lucky.
16    Q.  Well, has anyone from OEC
17 offered you any explanation as to why
18 you've had problems in this facility and
19 why you've not had problems at Union
20 Springs?
21    A.  No one's given me any
22 explanation, no, sir.
23    Q.  Directing your attention --

54  (Pages 213 to 216)

## IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

MAY'S DISTRIBUTING COMPANY,    )
INC., et al.,    )
     )
     Plaintiff,    )
     )
v.    )      **CIVIL ACTION NO.**
     )
TOTAL CONTAINMENT, INC., et al.,    )      CV-03-02
     )
     Defendants.    )
     )

### PLAINTIFF'S FIRST SUPPLEMENTAL RESPONSES TO DEFENDANT TICONA POLYMERS, INC.'S FIRST SET OF INTERROGATORIES

Come now the Plaintiff, May's Distributing Company, Inc., by and through its attorney, and submits these Supplemental Responses to Defendant Ticona Polymers, Inc.'s First Set of Interrogatories.

### GENERAL OBJECTIONS

A.      Plaintiff objects to each and every interrogatory on the grounds that it would require Plaintiff to respond by disclosing its attorneys' or other of its representatives' mental impressions, conclusions, opinions, computations, calculations, projections, reasons, legal theories, other work product.

B.      Plaintiff objects to each and every interrogatory on the basis that it, whether standing along or taken in conjunction with any and all interrogatories, is calculated or would operate to annoy, embarrass, oppress, unduly burden, or unduly cause expenses to Plaintiff, or would be unduly vexatious or unduly burdensome to respond to, or would require Plaintiff to engage in investigative efforts burdensome to the point of oppression and on the ground that said request for production exceeds the permissible scope of discovery under the *Alabama Rules of Civil Procedure*.


EXHIBIT
2

C.     Plaintiff objects to each and every interrogatory on the basis that the same requires it to respond by acquiring or supplying information which would be irrelevant to the subject matter or issues of this action, and not reasonably calculated to lead to the discovery of admissible evidence.

D.     Plaintiff objects to each and every interrogatory on the grounds that same requires it to respond by waiving Plaintiff's attorney/client privilege and the work product doctrine, which privileges are hereby expressly asserted.

E.     Plaintiff objects to the caption or preface to the interrogatory and request for admission on the basis that the same purports to place any obligation or requirement on Plaintiff which is not specified by the *Alabama Rules of Civil Procedure*.

F.     Plaintiff objects to each interrogatory on the basis that the same seeks or purports to seek a legal conclusion.

G.     Plaintiff objects to Defendant's interrogatory on the grounds that they are premature. As investigation and discovery proceed, Plaintiff will supplement the responses in accordance with the *Alabama Rules of Civil Procedure* and any applicable orders of this Court.

Subject to the above objections, and without waiving any objection or admitting the relevance or materiality of any of the information sought, Plaintiff hereby responds to said interrogatory as follows, incorporating into each response the above-stated objections. Plaintiff further reserves the right to supplement these responses if appropriate.

2

## INTERROGATORIES

Interrogatory No. 3

State whether you have had the product replaced, and if so, state who replaced the product,

the date and cost of the replacement, and the materials used for the replacement.

**RESPONSE:**
**Yes. Product was replaced in Montgomery by Oil Equipment Company at their expense. Unknown as to what they replaced it with.**

**SUPPLEMENTAL RESPONSE:**
**The product was replaced four different times by Oil Equipment Company, who did not charge us. No property damage was sustained as a result of the leaks that precipitated these replacements. The dates of pipe replacement are: 1) 10/22/02; 2) 10/20/03; 03/02/04 and 11/08/04. We do not know what model, but flex pipe was used as replacement.**

Interrogatory No. 4

State the number, date, and cost of repair of any and all alleged leaks experienced in the

product, including, but not limited to: (1) who conducted the repair, (2) where each leak occurred in

the product, (3) when each alleged leak occurred, (4) the address of the motor fuel dispensing facility

where the alleged leak occurred, (5) what, if any property was damaged by leaks experienced in the

product, and (6) the cost of repair or estimated cost of repair of such damage and your factual basis

therefore.

**RESPONSE:**
**Plaintiff has had four leaks. All were replaced by Oil Equipment Company of Birmingham at no cost to Plaintiff except for down time. All occurred at Montgomery 66. No damage to property.**

**SUPPLEMENTAL RESPONSE:**
**There were four leaks which caused us to request repair work, which was done on the following dates: 1) 10/22/02; 2) 10/20/03; 03/02/04 and 11/08/04. Without saying to a scientific certainty the moment of inception for every leak and pipe failure, we respond generally that leaks were noticed just prior to the pipe replacement dates. All the leaks occurred at the Montgomery 66 Station and none caused property damage. Plaintiff recalls that they were pinhole leaks but cannot say where, specifically in each product line, each leak occurred. Oil Equipment performed the repairs at no charge. Plaintiff is producing a recent memo from**

3

OEC providing some detail about the work performed.

Interrogatory No. 10

State the number of motor fuel dispensing facilities located throughout the United States containing the product, and state the factual basis for your answer.

**RESPONSE:**
**Plaintiff is unaware of the exact number of motor fuel dispensing facilities located throughout the United States containing the product. This information is available in the public domain and is equally available to the Defendant Ticona as it is to the Plaintiff. Without knowing the exact number of the motor fuel dispensing facilities in the United States, Plaintiff is informed and believes the number would be in the hundreds if not thousands.**

**SUPPLEMENTAL RESPONSE:**
**Plaintiff is not required at this stage of the litigation to ascertain the precise number of motor fuel dispensing facilities using TCI pipe. Based on general knowledge that TCI pipe was a leader in flexpipe sales, the numerosity requirement is satisfied.**

Interrogatory No. 14

State, in the event that the Court certifies this action, your proposed trial plan, including, but not limited to, how you propose to try individual issues (e.g., causation, liability, and damages) and the length of time required to try this action.

**RESPONSE:**
**Plaintiff has not been required by the Court to propose a trial plan. If the Court makes such a requirement, then Plaintiff will propose a specific trial plan and may do so on its own volition at some time prior to the class certification hearing.**

**SUPPLEMENTAL RESPONSE:**
**There is no requirement in the rules that Plaintiff submit a trial plan.**

Interrogatory No. 19

Identify all your motor fuel dispensing facilities which you allege contain a component which is made, in whole or in part, from a raw material supplied by Ticona, and state how you made that determination.

# A F F I D A V I T

**STATE OF LOUISIANA**
**PARISH OF ORLEANS**

BEFORE ME, the undersigned authority, on this day personally appeared

**THOMAS MARTIN**

who, after being first duly sworn, did depose and say:

1.

I am the Senior Process Engineer at Dayco Products, LLC, Ocala, Florida.  I am

familiar with the various hoses Dayco has produced over the past 25 years.

2.

Dayco has made some of the primary pipe for TCI's system.

3.

There were several generations of this pipe sold by TCI.  I have reviewed the 44

photographs of the 21 different hoses that I am told came from the Mays' Montgomery,

Alabama, station and can state that these are not hoses that Dayco manufactured, to

the best of my knowledge, information and belief.  I attach a copy of the 44 pictures

which I have reviewed and make them a part of this Affidavit.

_____
**THOMAS MARTIN**

Sworn to and Subscribed before me
this 22 day of February, 2006.

_____
NOTARY PUBLIC
My Commission Expires On: Lifetime
JAMES E. BLAZEK - LA. 3154
Print Notary Name and ID Number

EXHIBIT
3



156



157



158



159



160



161



162



163



164



165



166



167



168



169



170



171



172



173



174



175



M76



177



178



179



180



181



182



183



184



185



186



187



1-88



189



190



191



192



193



194



195



196



197



198



199



200



201



202



203



204

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | |
|---|---|
| MAY'S DISTRIBUTING CO. INC., | \* |
| | \* |
| Plaintiff, | \* |
| | \* |
| vs. | \* |
| | \* |
| TOTAL CONTAINMENT, INC., ET AL., | \* |
| | \* |
| Defendants | \* |

Civ. Action No. 2:06CV 702

Judge_____

JURY TRIAL REQUESTED

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## CERTIFICATE OF FILING NOTICE
## OF REMOVAL IN STATE COURT

The undersigned counsel for Defendants, Dayco Products, LLC, and Mark IV Industries, Ltd., hereby certify that they will file with the Clerk of the Circuit Court of Bullock County, Alabama, a Notice of Filing Notice of Removal, along with a copy of Defendant's Notice of Removal, and the original Citation and Petition in the Action in said court.

Respectfully submitted,

Brian Mosholder
Carpenter, Ingram & Mosholder, LLP