UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| MAY'S DISTRIBUTING CO. INC., | \* | |
| | \* | Civ. Action No. 2:06-CV-702 |
| **Plaintiff,** | \* | |
| | \* | **Judge Fuller** |
| **vs.** | \* | |
| | \* | |
| TOTAL CONTAINMENT, INC., ET AL | \* | |
| | \* | |
| Defendants | \* | **JURY TRIAL REQUESTED** |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

Defendants, Dayco Products, LLC and Mark IV Industries, Ltd. (hereinafter "Dayco"), oppose Plaintiff's Motion to Remand. Federal jurisdiction is appropriate under the Class Action Fairness Act ("CAFA"). Plaintiff seeks certification of a nationwide class, precisely the type of case over which CAFA provides federal jurisdiction. There is complete diversity on the face of the complaint. Plaintiff does not dispute this fact. The aggregate amount in controversy exceeds $5 million dollars. Plaintiff does not dispute this fact either. Plaintiff's only argument is that the Class Action Fairness Act does not apply because the Plaintiff's amended complaint, which radically alters the case, should not be considered to "commence" a new suit after the CAFA enactment date. The majority of federal courts who have considered this issue have concluded that a new suit can be commenced through an amendment to the pleadings. The purpose behind CAFA was to expand the scope of federal jurisdiction over class actions, especially nationwide class actions as is proposed in this case. As the Fourth Amended Complaint is so dramatically

different from the original and prior amended complaints, such a conclusion is warranted here as well. The original and prior amended complaints involved allegedly leaking hoses at a gas station in Montgomery, Alabama. The Fourth Amended Complaint departs from these facts and alleges that every version of every hose designed and manufactured by Dayco over a seven-year period was defective, regardless of whether it actually leaked. In addition, it vastly expands the proposed class. A new case has been commenced and CAFA applies. Accordingly, Plaintiff's Motion to Remand should be denied.

## BACKGROUND/PROCEDURAL HISTORY

Plaintiff, May's Distributing Company, originally brought this suit alleging damages due to a defective underground gas storage system at a gas station in Montgomery. Plaintiff sought certification of a class of gas station owners who were similarly situated. Plaintiff, May's Distributing Company, Inc. ("May's") filed an original Petition and then the First, Second and Third Amended Petitions in which it added and deleted various new parties, eventually naming Dayco Products, LLC, and Mark IV Industries, Ltd. Plaintiff, in his First, Second and Third Amended Complaints set forth identical facts, contained in Paragraphs 18, 19 and 20. *See* Exhibits B, C and D to Plaintiff's Motion to Remand. Paragraph 18 of each of these petitions stated:

### "STATEMENT OF FACTS"

"In 1997, May's contracted with OEC to install underground thermoplastic flexible pipe and sump systems distributed by TCI and designed and manufactured by one or more of the following defendants: Dayco; Mark IV, ..."

In Paragraph 20 of the original three amended complaints, Plaintiff stated:

"OEC installed the TCI flexible pipe as specified by the contract. On or about September 5, 2002, May's discovered that the TCI flexible pipe is defective ... "

The 30(b)(6) deposition of Plaintiff was taken on January 26, 2006, at which time David May, on behalf of the corporation, testified that *the only* hoses that failed were hoses installed in the Montgomery, Alabama, station in 1998. *See* Deposition of David May,  Page 5, Line 1; Page 68, Line 12; Page 159, Lines 17-18; Page 213, Lines 7-11; attached as Defendant's Exhibit 1; *see also* Plaintiff's Supplemental Responses to Defendant Ticona Polymers, Inc. Interrogatories, Response No. 4; attached as Defendant's Exhibit 2.  The 30(b)(6) representative further testified that Plaintiff owned two other stations, one station that did not have any flexible pipe, and one station in Union Springs which did have flexible pipe but had no failure or leak. *See*  May Deposition, Page 66, Line 17-18; Page 158, Line 15., attached as Defendant's Exhibit 1.

Dayco stopped manufacturing hoses for TCI in October, 1997.  The Plaintiff's hoses were installed in 1998.  Dayco was informed that the failed Montgomery flexible hoses were sent to a warehouse in Union Springs, Alabama, and an inspection was conducted of the hoses. Shortly thereafter, Dayco filed a Motion for Summary Judgment based upon the fact that the allegedly leaking hoses owned by May's Distributing Company were not manufactured by Dayco. *See* Affidavit of Tom Martin, February, 2006, attached as Defendant's Exhibit 3.

In July, 2006, Plaintiff filed a Fourth Amended Complaint and Class Definition.  For the first time, Plaintiff alleges that ***all Dayco flexible hoses ever manufactured were defective***. *See* Exhibit E to Plaintiff's Motion to Remand.  For the first time, Plaintiff set forth in his Statement of Facts found in Paragraphs 11-29 the following new facts:

Paragraph 11,

"In 1988, defendants TCI and Dayco began developing the flexible hose at issue here to be used in TCI's Enviroflex retractable double wall system ("Enviroflex System"), Omniflex direct bury co-axial piping system ("Omniflex System"), and the Monoflex piping System (Monoflex) for

conveying gasoline from underground storage tanks to the customer at the gasoline dispenser. These systems were different from the steel pipe ..."

Paragraph 12,

"...Dayco was responsible for the design and material selection of a number of similar primary pipes and manufactured them as well until ending the relationship in 1997. The three systems, Enviroflex, Monoflex and Omniflex, employ a variety of sizes and thicknesses of primary pipe, but the materials of the pipe are the same and **each is defective."** (emphasis added).

In Paragraph 18,

"Dayco continued to be heavily involved in the development of various generations of various sizes of the TCI primary pipe used to convey the gasoline—each generation based on the same design. Dayco contracted with Cleveland Tubing, Inc. to manufacture the inner part of the defective primary pipe at issue in this case. CTI relied heavily on Dayco in setting up its manufacturing process for the TCI primary pipe. Dayco provided CTI with supervision, advice, and tips on the manufacturing process. Furthermore, CTI manufactured the TCI primary inner pipe for Dayco through 1997. CTI provided Dayco with defective inner pipes and experienced ongoing problems with quality assurance and performance. Dayco accepted the poor quality inner pipes and incorporated them in the primary hose nonetheless. Dayco failed to adequately supervise CTI to ensure that CTI was providing an inner pipe that would be free of defects and safe for the environment. CTI continued to manufacture TCI primary pipe through 1999."

In Paragraph 19,

"Between 1990 and 1997 the plastics and polymers Dayco selected varied, but each was defective from its inception because the materials chosen were highly permeable and unsuitable for the application of carrying gasoline. The reason for these plastics variations was that Dayco and TCI were in the business of selling a product that they knew was defective, yet, they continued to pocket profits as they attempted to find a design and materials that would ..."

*See also* Paragraphs 20, 21, 23, 26 and 27.

The Fourth Amended Complaint drastically expands the size of the proposed class from "thousands" to "tens of thousands." *See* Third Amended Complaint, pg. 4 at ¶23; *see also* Fourth Amended Compl., pg. 5, ¶31. Plaintiff also enlarges the class definition to include class members in Puerto Rico. *See* Fourth Amended Compl., pg. 7, ¶ 38. Additionally, Plaintiff has added claims relating to Monoflex hose, which was only sold in Europe and South America. *See* Affidavit of Tom Martin, September 2006, ¶9, attached as Defendant's Exhibit 3.

4

The Fourth Amended Complaint abandoned the previous facts based upon the specific hose installed at a gas station in Montgomery, Alabama in 1997-98 which allegedly leaked. Based upon this dramatic change, Dayco and Mark IV removed the case to this Court pursuant to the Class Action Fairness Act. Plaintiff has filed a Motion to Remand.

## ARGUMENT

### CAFA Provides Federal Jurisdiction When a New Suit is Commenced Through the Filing of an Amended Complaint Which Does Not Relate Back to Prior Pleadings

The Fourth Amended Complaint commenced a brand new lawsuit involving a multitude of different products which were not part of the Plaintiff's earlier complaints. Plaintiff does not contest the existence of diversity of the parties, nor does Plaintiff contest that the amount in controversy exceeds $5 million dollars, as required for jurisdiction under the Class Action Fairness Act. Although Plaintiff's Complaint does not include a damage estimate, a similar class action seeking damages for Florida gas station owners only alleges more than $5 million dollars in controversy. *See* Complaint, *City of St. Petersburg, et al. v. Total Containment, Inc., et al*, Docket #06-20953 (S.D. Fl.), excerpt attached as Defendant's Exhibit 4. Moreover, as plaintiff alleges, the proposed class is tens of thousands of gas station owners which collectively would have claims well in excess of $5,000,000. The sole basis for Plaintiff's motion to remand is the argument that CAFA does not apply because the initial lawsuit was filed prior to the enactment of CAFA. Under both the jurisprudence interpreting the Class Action Fairness Act and the traditional legal theories of relation back of amendments, the Fourth Amended Complaint has commenced a new suit.

**A.    CAFA's purpose was to expand federal jurisdiction over class actions, especially nationwide class actions**

The purpose of the Class Action Fairness Act is to expand federal court jurisdiction over class action litigation, especially nationwide class actions. *See Aquilino v. Home Depot, U.S.A., Inc.*, 2006 U.S. Dist. LEXIS 48554 n. 1 (D.N.J. July 17, 2006). CAFA provides a basis for removal of class actions "commenced" after February 18, 2005. *See* 28 U.S.C. §1453. Under CAFA, a class action can be removed to federal court where there is minimal diversity (not complete diversity) and the amount in controversy is aggregated to $5,000,000. *See* 28 U.S.C. §1332(d)(2). The language of CAFA "favors federal jurisdiction over class actions" and indicates that close cases should be "resolved in favor of exercising jurisdiction over the case." *See Evans v. Walter Indus., Inc.*, 449 F.3d 1159 (11th Cir. 2006).

CAFA contemplates that cases may be removed long after the original filing of the lawsuit. CAFA abolishes the rule that cases cannot be removed more than one year after filing of the case. *See* 28 U.S.C. §1453(b).

CAFA's purpose is especially relevant where, as here, there is another proposed class action which overlaps and includes many of the same defendants for the same injuries. Dayco is simultaneously defending a proposed class action in federal court in Florida where the claims overlap. In *City of St. Petersburg, et al. v. Total Containment, Inc., et al*, Docket #06-20953 (S.D. Fl.), the plaintiffs seek certification of a class of all persons and entities in the state of Florida who own underground piping systems. This is precisely the situation of competing class actions with overlapping claims that Congress envisioned when it passed CAFA.

6

**B.      The Majority of Courts Have Held that an Amendment to Pleadings Can "Commence" a New Suit for Purposes of CAFA Application**

The majority of Courts interpreting CAFA have concluded that amendments to the pleadings can commence a new suit such that CAFA is applicable to the amended pleading. *See Prime Care of Northeast Kansas, LLC v. Humana Ins. Co.*, 447 F.3d 1284 (8th Cir. 2006); *Knudsen v. Liberty Mut. Ins. Co.*, 435 F.3d 755 (7th Cir. 2006); *Braud v. Transport Serv. Co. of Ill.*, 445 F.3d 801 (5th Cir. 2006); *Senterfitt v. SunTrust Mort., Inc.*, 385 F. Supp. 2d 1377 (S.D. Ga. 2005); *Werner v. KPMG LLP*, 415 F. Supp. 2d 688 (S.D. Tex. 2006). These Courts have analyzed the amended pleadings using the "relation back" doctrine embodied in state laws or in F.R.C.P. 15. *See Eufaula Drugs, Inc. v. Scripsolutions*, No. 2:05CV370-A, 2005 WL 2465746, *2-3 (M.D. Ala. 10/6/2005). In *Eufaula*, the court concluded that "commencement of an action can be particular to a defendant and is not based solely on when the complaint is filed." *Id.*

Courts have permitted removal under CAFA in the following situations:

- Amended complaint adds a new defendant. See *Braud v. Transport Serv. Co. of Ill.*, 445 F.3d 801 (5th Cir. 2006); *Werner v. KPMG LLP*, 415 F. Supp. 2d 688 (S.D. Tex. 2006); *Adams v. Federal Materials Co.*, 2005 WL 1862378, *4 (W.D. Ky. 7/28/2005); *Tiffany v. Hometown Buffet, Inc.*, 2006 WL 1749557, *8 (N.D. Cal. 6/22/2006).

- Amended complaint changes significantly the class definition. *Senterfitt v. SunTrust Mort., Inc.*, 385 F. Supp. 2d 1377 (S.D. Ga. 2005).

- Amended complaint adds new claims. See *Knudsen v. Liberty Mut. Ins. Co.*, 435 F.3d 755 (7th Cir. 2006).

The cases cited by Plaintiff suggesting that a case can only be commenced one time for purposes of CAFA are in the minority and several have been overruled by later opinions holding that an amendment to a complaint can trigger a right to removal under CAFA. *See Prime Care of Northeast Kansas, LLC v. Humana Ins. Co.*, 447 F.3d 1284 (8th Cir. 2006) (decision overrules *Comes v. Microsoft Corp.*, 403 F. Supp. 2d 897 (S.D. Iowa 2005)); *Knudsen v. Liberty Mut. Ins.*

7

*Co.*, 435 F.3d 755 (7th Cir. 2006) (Later decision by 7th Circuit holding that an amendment can commence a new suit for purposes of CAFA removal). Moreover, an opinion from this district has held that the relation back doctrine can be used to determine whether an amended complaint commences a new case for purposes of CAFA. *See Eufaula Drugs, Inc. v. Scripsolutions*, No. 2:05CV370-A, 2005 WL 2465746, *2-3 (M.D. Ala. 10/6/2005). Although the body of law interpreting CAFA is an evolving one, the doctrine of "relation back" of amended pleadings is well developed and permits the right to remove for an amendment to a complaint.

Two recent cases with facts very similar to this one have concluded that CAFA applies when an amended pleading expands the time frame for liability or adds additional products not previously part of the lawsuit. In *Knudsen v. Liberty Mutual Ins. Co*, the Seventh Circuit determined that " a novel claim tacked on to an existing case commences new litigation for purposes of the Class Action Fairness Act." *See Knudsen*, 435 F.3d at 757. In *Knudsen*, the plaintiffs originally sought damages under workers' compensation and casualty insurance contracts with defendant Liberty Mutual Fire Insurance Company but only sued parent company Liberty Mutual Insurance Company. Plaintiffs later sought an amendment adding claims against Liberty Mutual Insurance Company for all policies issued by any subsidiary or affiliate of Liberty Mutual, greatly expanding the class. The state trial court certified this new class, and defendant removed the case to federal court. Although it was the second time that the defendants had removed the case to federal court (as is the case here), the Seventh Circuit concluded that the additional claims were sufficiently distinct to warrant the conclusion that a new class action had been commenced and therefore CAFA could apply.

The Southern District of Georgia reached a similar result in *Senterfitt v. SunTrust Mortgage, Inc.* In *Senterfitt*, the plaintiff originally sought certification of a class of mortgagors

8

who paid off their loans over a four year time period and who allegedly were charged unreasonable fees. *See Senterfitt*, 385 F. Supp. 2d at 1378. Plaintiff amended his complaint to expand the class to mortgagors who paid off their loans over an additional sixteen-year period. *Id.* Defendant removed and the court denied remand. The Court concluded that the prior complaint did not provide adequate notice of the size of the new prospective class and would unfairly prejudice the defendant to allow the amendment to relate back. Accordingly, the Court determined a new class action was commenced under CAFA and permitted removal to federal court.

In these cases, with strikingly similar facts, the federal courts both looked to the well-established body of law of relation back to analyze whether the amended complaint commenced a new suit under CAFA. In both cases, the factual changes expanding the case either through adding additional products alleged defective or expanding the number of years for liability, the Courts held that a new case was commenced and federal jurisdiction under CAFA was proper. The same result is warranted here.

**C.    The Fourth Amended Complaint Adds New Claims and Therefore has Commenced a New Suit Warranting Application of CAFA**

The Fourth Amended Complaint does not involve the same transaction or occurrence as the original and prior amended complaints. Rather than building upon the previous suit relating to a specific hose installed in 1998 in Plaintiff's gas station, it alleges defects in every type of hose designed or manufactured by Dayco between 1990 and 1997. Employing the law on relation back to determine whether a new suit has been commenced, as the Courts addressing this precise issue have done, it is overwhelmingly clear that the Fourth Amendment does not relate back and indeed commences a new class action. Plaintiff's Motion to Remand should be denied on this basis.

Courts sitting in diversity apply the state law on relation back. The Alabama law and the federal law are the same. *See Eufaula Drugs*, 2005 WL 2465746, at n. 3. The test is whether the amended claim arises out of the same "conduct, transaction or occurrence as the original claim." *See* Al. R. of Court 15(c); *see also* F.R.C.P. 15(c). Alabama courts have held that a claim in an amended complaint does not relate back where it arises from a different factual situation. *See Con-Agra Inc. v. Adams*, 638 So. 2d 752, 753-54 (Ala. 1994); *Carter v. Liberty Nat. Life Ins. Co.*, 849 So. 2d 977 (Ct. Civ. App. Ala. 2002); *see also Gulf States Steel, Inc. v. White*, 582 So. 2d 487, 492 (Ala. 1991). In *Carter*, the Court determined an amendment which added a claim relating to a different product (an insurance policy) did not relate back to the previous complaint alleging damages based upon another insurance policy. *See Carter*, 849 So. 2d at 982. Although both complaints were brought by an estate seeking damages for alleged wrongful acts relating to insurance policies of the decedent, the amended complaint added allegations about a new product, an insurance policy not previously named. Similarly, in *Con-Agra*, the Alabama Supreme Court held that a claim for retaliatory discharge in an amended complaint did not relate back to the workers' compensation claim contained in the original complaint. *Con-Agra*, 638 So. 2d at 753. Although both claims related to employment issues, the Court reasoned that amendments which attempt to state a cause of action that did not arise out of the same events or facts from the original complaint could not relate back. *Id.* Finally, in *Gulf States Steel*, the Alabama Court of Civil Appeals held that an amendment to a complaint by an employee adding an additional work related injury did not relate back. In each of these cases, the Court held that the amendment did not relate back even because the new claims, although generally related to the subject matter of the original complaint, arose at a different time period or from a different product than what was alleged in the original complaint. The same conclusion is warranted here.

10

Similarly, the Eleventh Circuit has held that analysis of whether an amendment to the pleadings will relate back turns on considerations of notice and prejudice. *See Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113 (11th Cir. 2004). In *Cliff*, the Court held that an amended complaint which changed the size of the proposed class did not relate back. *Id.* at 1132-33. The Court reasoned that the original complaint did not put the defendant on notice of the subject matter and size of the proposed class. *Id.* The Court determined that relation back must be assessed on a case-by-case basis to ascertain whether the amended complaint represents a "minor modification" or something more.

As in the previous cases, the Fourth Amended Complaint does not relate back to the prior pleadings. The original complaints and amendments alleged a defect in a piping system contracted for in 1997 and installed in Plaintiff's Montgomery gas station in 1998. *See* Third Am. Compl. at ¶18. According to the Third Amended Complaint and the discovery taken in connection with it, this system was removed in 2002 because it allegedly leaked. *Id.* at 20-21. As has been established, this alleged defective hose was not manufactured by Dayco (See Tom Martin's Affidavit, Exhibit 3.) In contrast, the Fourth Amended Complaint alleges defects in every type of hose manufactured or designed by Dayco over the period 1990-97. *See* Fourth Am. Compl. at ¶19. The Fourth Amended Complaint alleges that three different product lines were defective, rather than the one specific system discussed in the Third Amended Complaint. *See* Fourth Am. Compl. at ¶11-12. One product line alone has thirteen different types of hoses. *See* Tom Martin Affidavit, Sept. 2006, at ¶4, attached as Defendant's Exhibit 3. The Fourth Amended Complaint alleges that the defective systems were located in Montgomery (the location discussed in the Third Amended Complaint) and Union Springs. *See* Fourth Am. Compl. at ¶26. The Third Amended Complaint contains four paragraphs of factual allegations

relating to a specific product located in a specific place at a specific time. The Fourth Amended Complaint contains nineteen paragraphs relating to every product designed or manufactured by Dayco over a seven-year period. *See* Fourth Am. Compl. at ¶¶11-29; *see also* Third Amended Compl. at ¶¶18-21.

A simple reading of the factual allegations in the Fourth Amended Complaint proves how many new allegations there are. The Fourth Amended Complaint alleges problems with one version of product which was "not compatible with alcohol" and another product which was "subject to degradation from water in the environment and also microbial attack." *See* Fourth Am. Compl. at ¶¶20-21. Even Plaintiff concedes that there were numerous "variations in the plastics chosen for various generations." *See* Fourth Am. Compl. at ¶23.

The new case involves a dizzying addition of products beyond what was previously involved. Dayco designed and manufactured at least fifteen different sizes and styles of hoses during this time frame, manufactured at different locations, and utilizing different couplings and fittings. *See* Affidavit of Thomas Martin, September 2006, attached as Defendant's Exhibit 3. Each version or generation of hose is comprised of different layers, designed, manufactured and supplied by different companies. *See* Affidavit of Thomas Martin, at ¶4-6, attached as Defendant's Exhibit 3. The three product lines of hoses discussed in the Fourth Amended Complaint—Omniflex, Monoflex and Enviroflex, were used for different purposes. *See* Affidavit of Thomas Martin, at ¶7, attached as Defendant's Exhibit 3. Thus, the allegations in this case changed from allegations regarding a specific product placed at Plaintiff's gas station in 1998 to a case involving many different products designed and produced over a seven-year period and used for different purposes with many different types of materials from different

12

suppliers. The Fourth Amended Complaint was not simply a beefed up version of its predecessor. It represents a brand new suit.[1]

In order to defend the Fourth Amended Complaint, Dayco will need to commence discovery anew. For instance, Dayco will need to locate additional corporate representatives to testify in 30(b)(6) depositions, including those with knowledge of European and South American operations and foreign listing procedures/regulations. Additionally, it will require investigation into at least two different manufacturing plants, a new deposition of the named Plaintiff, and will require location of new experts. There will be additional document discovery necessitated by the addition of two product lines and several versions of hose and the extended time frame. Far from simply presenting the same case with "more specificity" as Plaintiff contends in his Motion to Remand, the Fourth Amended Complaint presents a new theory of liability (permeation of fluids from the hose, as opposed to actual leaking), a host of new products (from the specific hose buried underground at the gas station in Union Springs, Alabama, to every version, product line and size of hose manufactured by Dayco over a seven-year period, including Omniflex and Monoflex hoses and many versions of Enviroflex) and a brand new class (from the "thousands" of gas station owners nationwide to "tens of thousands" nationwide and in Puerto Rico).

From the discussion of the jurisprudence cited above, a host of courts have concluded that CAFA applies to amended complaints that relate specifically to adding new claims, adding new insurance policies, and expanding the time period. Consistent with this jurisprudence, the Plaintiff's attempts to add completely different product lines over seven more years through the

---

[1]     It is important to note that this Plaintiff has no claim for these other types of products. Moreover, the Plaintiff has not demonstrated any basis for including the period of years involved (1990-97). Plaintiff is certainly not representative of the proposed new class.

Fourth Amended Complaint, clearly brings this matter within the intent of CAFA. Therefore, the matter belongs in this Court.

In addition to the factual changes in the case, allowing the new complaint to relate back to the prior complaint would unfairly prejudice Dayco. The parties have conducted extensive discovery under the previous complaints related to the specific product at issue. Discovery disclosed that no Dayco hose was the defective hose at issue in the prior amended complaints. *See* Dayco's Motion for Summary Judgment. Now that Plaintiff has added every possible product manufactured or designed by Dayco between 1990 and 1997 to the suit, extensive additional discovery will need to be done. In fact, very little of the work done previously will be relevant—a fact underscoring how different this new complaint is. It is truly unfair to allow relation back where the case has been transformed from one based upon a single product to one that challenges every single product designed or manufactured by Dayco during a seven-year period sold in the United States, Puerto Rico, Europe and South America. By Plaintiff's logic, every case against a product manufacturer would relate back to any prior case. Plaintiff should not be allowed to use a prior complaint to file a new class action without being subject to the current law.

This case simply does not arise out of the same transaction or occurrence litigated over the past three years under the original and three amended complaints. The Fourth Amended Complaint cannot be deemed to relate back to the previous filings. Under both the CAFA jurisprudence and the traditional relation back doctrine, a new case has been commenced. Accordingly, federal jurisdiction is proper under the Class Action Fairness Act. Thus, Plaintiff's Motion to Remand should be denied.

14

## CONCLUSION

This case no longer seeks relief for a class of people with the same allegedly defective underground piping system as the one at Plaintiff's Montgomery gas station. The new case includes potentially any gas station owner with any type of hose manufactured by Dayco during a seven-year period. It would include different products from different time periods used for different purposes. It cannot be said that Dayco was on notice of the nature and size of this proposed class based upon any of the previous pleadings. The Fourth Amended Complaint does not relate back to the prior complaint. Accordingly, a new class action was commenced with the filing of the Fourth Amended Complaint and CAFA therefore applies. Since this is an evolving area of the law involving a complex set of facts, Dayco believes oral argument would assist the Court in resolving this issue.

Respectfully submitted,

/s/ James E. Blazek
JAMES E. BLAZEK (LA 3154)
RICHARD B. EASON (LA 5248)
DONNA M. BORRELLO (LA 16817)
Adams and Reese LLP
4500 One Shell Square
New Orleans, LA 70139
Telephone: (504) 581-3234
Facsimile: (504) 566-0210
jim.blazek@arlaw.com
*Attorneys for Defendants, Dayco Products,*
*LLC, and Mark IV Industries, Ltd.*

OF COUNSEL:
BRIAN MOSHOLDER (MOS-018)
Carpenter, Ingram & Mosholder, LLPO
4121 Carmichael Road, Suite 303
Montgomery, AL 36106
Telephone: (334) 213-5600
bmosholder@carpenterfirm.com

15

MYRON PENN
Penn & Seaborn, LLC
P. O. Box 688
Clayton, AL  36106
Telephone:  (3334) 738-4486
myronpenn28@hotmail.com

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing on all counsel of record by United States Mail and electronic mail on September 13, 2006.


_____/s/ James E. Blazek_____
James E. Blazek

1          IN THE CIRCUIT COURT OF

2         BULLOCK COUNTY, ALABAMA

3

4    CIVIL ACTION NO:  CV-03-02

5                                    COPY

6    MAY'S DISTRIBUTING COMPANY, INC.,

7    individually and as class representative

8    of all those gasoline station owners

9    similarly situated,

10

11          Plaintiffs,

12   vs.

13   TOTAL CONTAINMENT, INC.; OIL EQUIPMENT

14   COMPANY, INC.; DAYCO PRODUCTS, INC.;

15   MARK IV INDUSTRIES, LTD.; PARKER

16   HANNIFAN CORPORATION; TICONA POLYMERS;

17   INC.; SHELL CHEMICAL, LP; CLEVELAND

18   TUBING, INC.; et al.

19

20          Defendants.

21

22

23

**EXHIBIT**

**1**

1  and bought our trucks and trailers and
2  hired our drivers, and right at the last
3  minute they pulled out of the deal. We
4  were left with no trucks, no trailers,
5  no drivers. And we lost some business
6  because of that.
7  　　Q.　When did all of that occur?
8  　　A.　I can't tell you; I don't
9  remember.
10 　　Q.　Do you know where the lawsuit
11 was filed?
12 　　A.　Bullock County.
13 　　Q.　Now, tell me what the current
14 business of May's Distributing -- let me
15 say this: When I say "May's", we agree
16 that you all understand that to mean,
17 unless I tell you otherwise, May's
18 Distributing Incorporated or the
19 plaintiff in this lawsuit?
20 　　A.　Yes, sir.
21 　　Q.　What is the business of May's?
22 　　A.　We operate -- own and operate
23 three convenience stores. Two being

1  located in Bullock County and one in
2  Montgomery County. We have an
3  automotive center, have a wrecker
4  service, and we have a wholesale
5  distributing business. We wholesale
6  distribute gasoline and diesel fuel.
7  　　Q.　I am familiar with one of your
8  operations in Bullock County. What is
9  the other station -- service station
10 that you have?
11 　　A.　It's just a convenience store.
12 　　Q.　Just a convenience store?
13 　　A.　Yes, sir.
14 　　Q.　But it sells gas; correct?
15 　　A.　That's correct.
16 　　Q.　Where is it located?
17 　　A.　It is at 404 Conecuh Avenue.
18 　　Q.　And then you have an operation
19 located on MLK?
20 　　A.　That's correct.
21 　　Q.　When was the convenience store
22 located at 404 -- did you say
23 "Connecticut Avenue"?

1  　　A.　Conecuh.
2  　　Q.　Conecuh. Conecuh Avenue. When
3  was the Conecuh Avenue convenience store
4  built?
5  　　A.　Approximately three years ago.
6  　　Q.　Is it the newest store that
7  May's has?
8  　　A.　It is.
9  　　Q.　What is your current position
10 with May's?
11 　　A.　We -- I am vice president of
12 May's Distributing Company.
13 　　Q.　What are your job duties?
14 　　A.　I manage the wholesale and
15 distributing of May's Distributing
16 Company. We distribute gasoline, diesel
17 fuel all over the State of Alabama. And
18 I am responsible for taking orders and
19 making sure the trucks get routed to
20 those locations. I am also -- my
21 brother manages the convenience stores,
22 but I am also -- I am not going to say I
23 am above him, because we are equally --

1  but I also help him with major decisions
2  that have to be made at those
3  convenience stores.
4  　　Q.　What is your brother's name?
5  　　A.　Brad.
6  　　Q.　Brad. Where do you work?
7  Where is your office?
8  　　A.　It is at the Martin Luther King
9  Boulevard location.
10 　　Q.　Is that what you call the home
11 office -- your home base?
12 　　A.　That's correct.
13 　　Q.　Where does Brad work?
14 　　A.　Same location.
15 　　Q.　What about your dad?
16 　　A.　Same　location.
17 　　Q.　What is your dad's title with
18 the company?
19 　　A.　He runs our automotive center.
20 　　Q.　Where's the automotive center?
21 　　A.　It's at 102 Martin Luther King
22 Boulevard.
23 　　Q.　So the automotive center -- is

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877·**

Page 69

1  used at the MLK facility?
2      A.  Yes.
3      Q.  And what -- where is fiberglass
4  pipe used in connection with your
5  underground system?
6      A.  It comes from our foot plant
7  and goes over to our freestanding diesel
8  island.
9      Q.  And the TCI pipe that was
10  originally installed it's the same TCI
11  pipe that is in the ground today?
12      A.  That's correct.
13      Q.  Okay.  Who installed the flex
14  pipe -- excuse me.  Who installed the
15  fiberglass pipe leading out to your
16  diesel?
17      A.  Ernest Equipment Company.
18      Q.  And have there been any
19  problems with the fiberglass pipe?
20      A.  No.
21      Q.  How many dispensers do you have
22  at the MLK facility?
23      A.  One, two, three, four, five,

Page 70

1  six, seven.
2      Q.  And how many of those are
3  diesel?
4      A.  Two -- correction.  I have a --
5  one dispenser is gas and diesel.  But
6  freestanding, only fiberglass pipe I
7  have two dispensers.
8      Q.  Okay.  And those are both
9  diesel?
10      A.  Right.
11      Q.  But all of the pipes going to
12  gasoline dispensers is the TCI flex
13  pipe?
14      A.  That's correct.
15      Q.  All right.  Going to the
16  Montgomery location, how many gas
17  dispensers are at that site?
18      A.  Ten.  Oh, gasoline dispensers?
19  There's eight.
20      Q.  Okay.  And then two --
21      A.  Two diesels.
22      Q.  What type of pipe system
23  connects to the diesel dispensers?

Page 71

1      A.  TCI did.  I am assuming it's
2  been changed out.
3      Q.  Well, we'll get to that.
4      A.  Okay.
5      Q.  I am sorry I didn't clarify.
6  Originally -- let's go back to when it
7  was originally built.
8      A.  Okay.
9      Q.  And that was in the 1998 time
10  frame; correct?
11      A.  '97-'98, yes.
12      Q.  '97-'98.  And the underground
13  pipe system that was installed --
14  originally installed, was that entirely
15  TCI pipe?
16      A.  Yes.
17      Q.  Did OEC -- just for the record,
18  OEC installed that system; correct?
19      A.  Correct.
20      Q.  At the Montgomery store?
21      A.  That's correct.
22      Q.  Did OEC utilize any parts or
23  components from other -- manufacturers

Page 72

1  other than TCI in connection with the
2  flex pipe system and the sump system?
3      A.  I don't know.
4      Q.  The -- Mr. Mays, it appears
5  from your discovery responses -- did you
6  recall responding to some
7  interrogatories that were submitted to
8  May's?
9      A.  I do.
10      Q.  Did you provide the information
11  that went to providing the answers to
12  your interrogatories on behalf of May's?
13      A.  If I knew the answers, yes.
14      Q.  Okay.  Did you also participate
15  or provide information in connection
16  with some supplemental interrogatory
17  responses that were just recently
18  provided by May's counsel?
19      A.  I'm assuming so, yes.
20      Q.  I think -- well, let me ask you
21  this way.  When did your first problems
22  arise at the Montgomery location with
23  respect to the TCI pipe system?

18 (Pages 69 to 72)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 65

```
 1     Q.  And when you say "the Union
 2  Springs location", do --
 3     A.  Martin Luther King.
 4     Q.  MLK location.  Okay.  So first
 5  it was -- I'm sorry --
 6     A.  Ernest Equipment Company.
 7     Q.  Ernest Equipment Company.
 8     A.  Then Barber Equipment Company
 9  and then Oil Equipment Company.
10     Q.  And that represents
11  chronologically how -- how it happened?
12     A.  That's correct.
13     Q.  And so you've been told that
14  Ernest Equipment Company installed TCI
15  pipe?
16     A.  That's correct.
17     Q.  From the time that pipe was
18  installed in, I believe it was the --
19  did you say '94?
20     A.  Some time in '94, right.
21     Q.  Up until the upgrade from
22  Barber Equipment Company in the late
23  90s, had there been any problems with
```

Page 66

```
 1  underground pipe system?
 2     A.  No.
 3     Q.  Again, if there had been,
 4  that's something that you would know
 5  about?
 6     A.  When you say problems with
 7  underground pipes, are you talking about
 8  the pipe itself or are you talking about
 9  sumps and all?
10     Q.  Well, I want to talk about just
11  any problems first.  Problems with the
12  sump and the pipe.
13     A.  Yeah.  We always got water in
14  our sump.
15     Q.  What about with the flex pipe
16  system itself?
17     A.  No problem with the flex
18  piping, no.
19     Q.  Did you know what specific type
20  of flex pipe system was installed at the
21  MLK location initially?
22     A.  No.
23     Q.  Do you know what type of flex
```

Page 67

```
 1  -- TCI Flex Pipe was installed by Barber
 2  Equipment Company at the time the
 3  upgrade was done in the late 1990s?
 4     A.  No.
 5     Q.  Did OEC, when they came on to
 6  service the MLK facility, did they
 7  install any pipe?
 8     A.  No.
 9     Q.  Have there been any problems
10  with the TCI pipe system that was
11  installed by Barber Equipment Company?
12     A.  No.
13     Q.  And again I am asking about the
14  sump itself and the pipe.  Let me strike
15  that.  Have there been any leaks or
16  other problems with the flex pipe
17  installed by Barber Equipment Company?
18     A.  No.
19        MR. WILLIAMS:  Take a
20  break.
21        (A short break was
22        taken.)
23
```

Page 68

```
 1        (The deposition resumed at
 2        10:40 a.m.)
 3
 4     Q.  (By Mr. Williams) Mr. Mays, I
 5  just want to clear up and confirm a
 6  couple of things so I can move on.
 7     The Conecuh Avenue store in Union
 8  Springs has no TCI pipe; correct?
 9     A.  That's correct.
10     Q.  And it never has had any;
11  correct?
12     A.  That is correct.
13     Q.  It has OPW Pisces flex pipe;
14  correct?
15     A.  Correct.
16     Q.  Now, the MLK store in Union
17  Springs it still has TCI pipe in it;
18  correct?
19     A.  Correct.
20     Q.  Has it ever had any OPW Pisces
21  parts or flex pipe system?
22     A.  Not that I'm aware of.
23     Q.  Is there any fiberglass pipe
```

17 (Pages 65 to 68)

Page 113

1  afternoon, might've been Sunday around
2  lunch. I go up there. We go through
3  the same tests with the tech as before
4  and he says, "Yes, you got sudden loss
5  alarm again. You probably got some more
6  pipe that's busted." A -- one of their
7  guys came out, isolated it to a side,
8  then took the pipe loose and capped that
9  side of the pump, so that I could still
10 use four dispensers on one side, but I
11 had four dispensers on the other side --
12 I had eight fueling positions out of
13 order for the rest of the day Sunday and
14 into Monday morning. Well, until they
15 fixed it Monday night sometime.
16     Q.  But you were still at least
17 able to sell some gasoline?
18     A.  I was at half capacity, yes.
19     Q.  It says here on this Exhibit --
20 this is the document that's attached to
21 your supplemental interrogatories, a one
22 page document, is that what you are
23 referring to?

Page 115

1      A.  Yeah, but I can't -- if that's
2  the only blue pipe I have and if that's
3  what they replaced, I can't say with
4  certainty, but I'm almost positive that
5  they replaced the blue section that they
6  had just replaced plus a section of the
7  white pipe. And I do know when the
8  white was pulled out -- when it was
9  pulled out you could see a little stream
10 of gas just coming through a little
11 pinhole in the pipe.
12     Q.  Where was that pinhole located
13 in relation to the ends of the pipe?
14     A.  I'd be scared to tell you, you
15 know, I'm trying to be truthful. I
16 don't --
17     Q.  Oh, I know. But I guess my
18 question was --
19     A.  It was not dead center.
20     Q.  -- it was middle or closer to
21 the end?
22     A.  It was not dead center. It
23 would be closer to the end.

Page 114

1      A.  That's correct.
2      Q.  It's dated January 9, 2006?
3      A.  That's right.
4      Q.  It says OEC replaced two
5  sections of piping. Were you there when
6  they did this repair?
7      A.  I was there when they pulled it
8  out. I didn't wait on them to re --
9  redo everything.
10     Q.  What did the pipe look like
11 that was pulled out?
12     A.  I can't -- I can't remember. I
13 want to say that they could not isolate
14 it to exactly whether it was between one
15 dispenser or the other. So they pulled
16 two sections to be sure, and I think one
17 of them was white and the other was the
18 original -- the blue pipe they had
19 replaced already.
20     Q.  You said it was the blue pipe
21 that was installed back in --
22     A.  I can't say.
23     Q.  '02?

Page 116

1      Q.  When you say "closer to the
2  end", within 4 feet?
3      A.  I don't know.
4      Q.  All right. What was done with
5  the pipe that was removed?
6      A.  We took it and put it in our
7  warehouse.
8      Q.  And again there was one section
9  of white pipe and one section of blue
10 pipe?
11     A.  You can't hold me to that, but
12 that's what I'm recalling, yes.
13     Q.  When was the next instance of a
14 pipe failure at the Montgomery location?
15     A.  It looks like March the 2nd of
16 2004.
17     Q.  And what happened on that day?
18     A.  On that date the blue pipe that
19 they had replaced actually grew. It was
20 the first pipe that comes from the sump
21 to the first dispenser. Under the
22 dispensers you have what we call shear
23 valves. If somebody drives off with a

29 (Pages 113 to 116)

1    Q.  Do you recall what specific TCI
2  model it was?
3    A.  No -- the section they replaced
4  it with?  I'm sorry.  I didn't listen to
5  your question.  I was reading the date.
6    Q.  I didn't ask a good question.
7  Let me break it down.  They removed one
8  length of TCI Flex Pipe?
9    A.  That's correct.
10    Q.  And this was the blue pipe?
11    A.  No.  It was white.
12    Q.  It was white.  What was done
13  with the white pipe that was removed by
14  OEC at the Montgomery facility?
15    A.  We took it from them.  Put it
16  in our warehouse.
17    Q.  Have any tests been conducted
18  on that pipe to determine why it failed?
19    A.  Not that I'm aware of.
20    Q.  Have you had any discussions
21  with persons outside of -- that are not
22  your lawyers about testing the pipe to
23  determine why it failed?

1    Q.  What did they tell you?
2    A.  They said it's not good pipe.
3    Q.  Did they give you any
4  explanation as to why it might have
5  failed?
6    A.  No.  They said they're having
7  problems everywhere?
8    Q.  Do you know what the specific
9  TCI model was of the white pipe that
10  they removed?
11    A.  No.
12    Q.  You testified today OEC
13  replaced it with a kind of blue pipe;
14  correct?
15    A.  Correct.
16    Q.  Do you recall the specific
17  model of the blue pipe that was
18  installed by OEC?
19    A.  No.
20    Q.  Did it have -- do you recall
21  whether it had a hard shell around --
22  well, strike that.  Was it similar --
23  other than the color, was it similar to

1    A.  No.
2    Q.  Do you have any idea why the
3  pipe failed?
4    A.  Cause it is crap.
5    Q.  I'm sorry what did you say?
6    A.  Cause it's crap.
7    Q.  Well, did the failure occur?
8    A.  In the pipe.
9    Q.  Where in proximity to the ends
10  of the pipe?
11    A.  I don't know.
12    Q.  In the middle, the end --
13    A.  I can't remember.
14    Q.  What did the pipe look like
15  when it was pulled out of the ground?
16    A.  Like a piece of white pipe.  I
17  mean it's -- I got it in the warehouse
18  if you want to look at it.  It's just --
19  it's pipe.
20    Q.  Did OEC -- did you have any
21  discussions with OEC about what caused
22  the pipe to fail?
23    A.  Yes.

1  the white pipe that you removed in
2  appearance?
3    A.  Similar -- I mean they were a
4  little different in texture I guess.
5  Seems like the blue pipe's smooth and
6  the white pipe's got a ridge on it.
7    Q.  Kind of -- the white pipe had
8  sort of a braided appearance?
9    A.  That's the best I can recall,
10  yeah.
11    Q.  And the blue pipe that was put
12  in did not have that -- it was a smooth
13  surface?
14    A.  Correct.
15    Q.  The next failure with respect
16  to the TCI piping at the Montgomery
17  location, when was that, Mr. Mays?
18    A.  It appears to be 10/19 of 2003.
19    Q.  All right.  What happened at
20  that time?
21    A.  The best I can recall on this,
22  I got another call of a sudden loss.
23  Seems like this was on a Sunday

28 (Pages 109 to 112)

Page 125

1  So I don't know. I don't know where it
2  was.
3     Q.  Who at May's would have dealt
4  with that?
5     A.  Spooky would have dealt with
6  that one.
7     Q.  Have you had any discussions
8  with him about what happened in November
9  of 2004, when this failure occurred?
10    A.  Other than just general had a
11 pipe failure.
12    Q.  So how many -- strike that.
13 OEC came in and they removed all the TCI
14 pipe?
15    A.  That's what I'm told, yes.
16    Q.  That's been told to you by your
17 dad?
18    A.  Right.
19    Q.  How many pieces of pipe would
20 that be?
21    A.  I don't know.
22    Q.  Have you seen the pipe that's
23 been removed?

Page 126

1     A.  It's in the warehouse.
2     Q.  What color is it?
3     A.  I've got some white and some
4  blue down there.
5     Q.  Has any -- has any testing been
6  done with respect to any of the pipe
7  we've talked about that's been removed?
8     A.  No.
9     Q.  And has it been stored
10 exclusively in that warehouse? Has it
11 been taken anywhere else?
12    A.  No.
13    Q.  Have you ever had occasion to
14 keep the pipe outside for any length of
15 time?
16    A.  No.
17    Q.  Have you taken any photographs
18 of the pipe?
19    A.  Myself, personally, no.
20    Q.  Do you know of anyone who has
21 photographed besides some of the defense
22 lawyers here?
23    A.  I know it's been photographed;

Page 127

1  I don't know who did it.
2        MR. WILLIAMS: Do you want
3  to take -- we can stop now.
4
5        (A break was taken for
6        lunch at 11:40 a.m.)
7
8        (The deposition resumed
9        at 12:20 p.m.)
10
11    Q.  (By Mr. Williams) Mr. May's,
12 before we broke for lunch we were
13 talking about the four failures that
14 occurred at the Montgomery facility;
15 correct?
16    A.  Correct.
17    Q.  I want to go back quickly to
18 the failure that occurred in October of
19 2002 and in that regard I want to mark
20 this as the next -- Exhibit 6, what
21 appears to be another invoice from Oil
22 Equipment Company.
23

Page 128

1        (Whereupon, Defendants'
2        Exhibit No. 6 was marked
3        for identification.)
4
5     Q.  (By Mr. Williams) Whenever
6  you're ready.
7     A.  I'm ready.
8     Q.  Okay. Mr. Mays, you have been
9  handed what's been marked as Exhibit 6.
10 That is an invoice from Oil Equipment
11 Company. It looks like the invoice is
12 dated November 30, 2002. Is that
13 correct?
14    A.  That's correct.
15    Q.  But the order date appears to
16 be October 22nd, 2002.
17    A.  That is correct.
18    Q.  Do you recognize this invoice
19 as the one that was generated as a
20 result of the October 2002 failure that
21 you spoke about earlier?
22    A.  Okay. I've got my -- to my
23 previous statements, I have them -- if

32 (Pages 125 to 128)

**Page 133**

1  did you know of other persons or
2  entities in business similar to May's
3  that it had similar problems?
4     A. No.
5     Q. As you sit here today do you
6  know of persons or entities -- specific
7  persons or entities, businesses similar
8  to May's that have had problems with
9  their pipe? I know you mentioned -- you
10  mentioned earlier McKenzie?
11     A. That's right.
12     Q. McKenzie Oil. Are there any
13  others?
14     A. No.
15     Q. Has your father -- has Spooky
16  mentioned to you about any other
17  distributors or businesses similar to
18  May's that have had this problem?
19     A. No, he has not. No.
20     Q. Has anyone in May's at all
21  mentioned other distributors that are in
22  similar businesses to May's that have
23  had problems with TCI pipe?

**Page 134**

1     A. No. The first question you
2  asked leading up to that -- could you
3  repeat that question? Do you remember
4  what it was? Do I have any knowledge of
5  any other distributors --
6     Q. Yes. We talked this morning
7  and you mentioned you had heard, I think
8  second hand, of McKenzie Oil having
9  problems with their TCI system.
10     A. Correct.
11     Q. Now, we don't know what those
12  problems were. Do you know what those
13  problems were?
14     A. First-hand knowledge -- I have
15  no first-hand knowledge of anyone having
16  problems.
17     Q. I'm not asking for first-hand
18  knowledge. You've made that clear.
19     A. Hearsay?
20     Q. Right. Who have you heard has
21  had problems with their TCI --
22     A. I can't call them by names, but
23  I know it's a major problem in Florida

**Page 135**

1  -- I have heard it is a major problem in
2  Florida with several people -- several
3  people like myself having problems with
4  TCI pipe.
5     Q. Have you heard of any names in
6  the State of Alabama --
7     A. No.
8     Q. -- of having problems with TCI
9  pipe?
10     A. Other than Dan McKenzie, no.
11     Q. And if you could, as we go
12  forward -- I know when I ask a question,
13  you seem to be able to anticipate an
14  answer, but will you let me finish the
15  question?
16     A. Yes.
17     Q. Just before the break we were
18  actually talking about the fourth
19  incident, the one that occurred in
20  November -- on or about November 8,
21  2004. Is that correct?
22     A. Correct.
23     Q. Okay. What was the color of

**Page 136**

1  the pipe that failed at that time?
2     A. I don't know. I was not -- I
3  was not there at that time.
4     Q. That was handled by your
5  father?
6     A. That was handled by Spooky.
7     Q. Do you know what was done with
8  the pipe that was pulled out?
9     A. It was taken to the warehouse.
10     Q. Did May's have any contract --
11  direct contract or agreement with TCI?
12     A. No.
13     Q. What is your understanding of
14  TCI or Total Containment and what kind
15  of business that is?
16     A. They made or produced flex
17  piping for gasoline stores.
18     Q. Have you had any communications
19  case with anyone from TCI?
20     A. No.
21     Q. Has anyone -- let me state that
22  again. Has anyone from May's had any
23  communication with anyone from TCI?

34 (Pages 133 to 136)

## FREEDOM COURT REPORTING

### 367 VALLEY AVENUE
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 157

```
 1  view?
 2       MRS. DRAKE: Objection to
 3  the form.
 4    A.  Cleveland Tubing should have
 5  verified and known that what they were
 6  producing would stand up to gasoline and
 7  diesel fuel.
 8    Q.  What is your understanding of
 9  the testing that was done with respect
10  to this pipe and the manufacturing?
11    A.  I have no understanding of
12  that.
13    Q.  If you would, sir, if you would
14  refer to -- go to Paragraph 24. I am
15  not sure what page -- I think it is on
16  Page 4. Do you see there down where it
17  says Section A where it says, "Whether
18  defendants made an express warranty
19  concerning TCI Flex Pipe"?
20    A.  I see it.
21    Q.  We talked a little bit about
22  warranties. I just want to confirm.
23  Did any of the defendants named in this
```

Page 158

```
 1  lawsuit make any express warranty to you
 2  --
 3       MRS. DRAKE: Objection to
 4  the form.
 5    Q.  (By Mr. Williams) -- or to
 6  anyone at May's?
 7    A.  No.
 8    Q.  Mr. Mays, just to confirm -- I
 9  think you've done this, but I just want
10  to make it absolutely clear. On the --
11  going back to the Union Springs
12  facility, there have not been any leaks
13  or breaches in the TCI flex pipe to your
14  knowledge; correct?
15    A.  Correct.
16    Q.  Okay. With respect to the
17  Montgomery facility, has there been any
18  -- in connection with any of the
19  failures, has there been any sort of
20  leak outside of the system itself into
21  the soil?
22    A.  Not that I'm aware of.
23    Q.  Has there been any testing in
```

Page 159

```
 1  that regard to confirm that?
 2    A.  No.
 3    Q.  Did you have any discussions
 4  with OEC about the possibility of leaks
 5  outside of the system?
 6    A.  No.
 7    Q.  Mr. Mays, what damages is May's
 8  seeking in this lawsuit to recover?
 9    A.  We are looking out for everyone
10  who has this piping and we want all this
11  piping replaced at no expense to the
12  actual dealer who has the piping.
13    Q.  Did May's incur any expense to
14  repair and the replacement of this pipe?
15    A.  Yes.
16    Q.  Again, we are speaking of the
17  Montgomery facility; correct?
18    A.  Correct.
19    Q.  What expense did May's incur?
20    A.  It's immeasurable. We had, of
21  course, the down time. We were not able
22  to sell product for several hours each
23  time we had a problem. We don't know of
```

Page 160

```
 1  the customers who may have come up and
 2  seen us pumping water out of the sump
 3  before they could get in there and fix
 4  it thinking that we had water in our
 5  system. Asking me, "What happened? Did
 6  y'all get a bunch of water in your
 7  tank?" So they don't shop with us
 8  anymore. I mean, the expenses and
 9  damages are immeasurable.
10    Q.  Right. But we would have to
11  speculate as to what those damages are;
12  correct?
13       MRS. DRAKE: Objection to
14  the form.
15    A.  I guess you would.
16    Q.  Well, do you have any number?
17  Have you all been able to calculate with
18  respect to the damages you've --
19    A.  No.
20    Q.  -- just spoken about?
21    A.  No.
22    Q.  Now, it's true, isn't it,
23  Mr. May's, that OEC in terms of the cost
```

40 (Pages 157 to 160)

Page 213

1  not bringing any claims at all in this
2  lawsuit for any pipe at the Union
3  Springs; correct?
4          MR. RUTLAND:  Object to the
5  form.
6      A.  I don't know.
7      Q.  (By Mr. Mosholder) There hasn't
8  been any leaks from any of the pipes in
9  the Union Springs station; correct?
10     A.  Up until this point, no, not
11 yet.
12     Q.  And the Conecuh Street station
13 doesn't have flex pipe -- doesn't have
14 TCI Flex Pipe; correct?
15     A.  Does not have TCI Flex Pipe.
16     Q.  We were in the warehouse and --
17 you're familiar in the warehouse where
18 the pipe is stored; correct?
19     A.  That's correct.
20     Q.  And there is -- within the
21 warehouse there is a small room where
22 there is, I believe, three pieces of
23 pipe stored; correct?

Page 215

1      A.  They're from somewhere in
2  Georgia.  Albany, Georgia, I believe.
3      Q.  Do you know if they're still in
4  business?
5      A.  I've been trying to find that
6  out and I can't find out.
7      Q.  Okay.
8          MR. MOSHOLDER:  I think
9  that's all I got.
10
11 RE-EXAMINATION BY MR. WILLIAMS:
12     Q.  Mr. May -- I got it right.  We
13 talked a lot this morning about water
14 getting into the sump at the Montgomery
15 store; correct?
16     A.  Correct.
17     Q.  I want to ask you about the
18 Union Springs MLK store.  Was there a
19 problem with water getting into the sump
20 at that facility?
21     A.  There is.
22     Q.  Can you compare the extent of
23 that problem with the problems you all

Page 214

1      A.  I'm not sure.
2      Q.  You're not sure?
3      A.  Right.
4      Q.  Do you know if the pipe that is
5  alleged to have leaked at the Montgomery
6  station is stored separately from the
7  pipe that didn't leak in that warehouse?
8      A.  I cannot answer that.  Spooky
9  would have to answer that question for
10 you.
11     Q.  Okay.  When the addition was
12 done to the Union Springs station where
13 those four dispensers were installed,
14 was that down by Barber Equipment?
15     A.  That's correct.  We only
16 installed two dispensers though.
17     Q.  Oh, that's right.  You had
18 three and now you've got five; correct?
19     A.  Correct.
20     Q.  All right.  And Barber
21 equipment did that?
22     A.  That's correct.
23     Q.  Where are they from?

Page 216

1  were having with water in the sumps at
2  the Montgomery facility?
3      A.  There basically the same.  I --
4  you can go industry wide to just about
5  any gas station you want to, pull the
6  sump lids there's going to be water in
7  the sumps.  It's an industry wide --
8  it's standard operating procedure.
9  There's going to be water in the sumps.
10     Q.  Do you know or have any reason
11 to account for why you have no failure,
12 no problems or leaks at the Union
13 Springs MLK store and that you have had
14 these problems at the Montgomery store?
15     A.  I guess we've just been lucky.
16     Q.  Well, has anyone from OEC
17 offered you any explanation as to why
18 you've had problems in this facility and
19 why you've not had problems at Union
20 Springs?
21     A.  No one's given me any
22 explanation, no, sir.
23     Q.  Directing your attention --

54  (Pages 213 to 216)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

12-1-05

## IN THE CIRCUIT COURT OF BULLOCK COUNTY, ALABAMA

MAY'S DISTRIBUTING COMPANY,   )
INC., et al.,                  )
                               )
    **Plaintiff,**            )
                               )
v.                             )    CIVIL ACTION NO.
                               )
TOTAL CONTAINMENT, INC., et al.,  )    CV-03-02
                               )
    **Defendants.**           )
                               )

RECEIVED
DEC 2 9 2005

### PLAINTIFF'S RESPONSES TO
### DEFENDANT TICONA POLYMERS, INC.'S
### FIRST SET OF INTERROGATORIES

Come now the Plaintiff, May's Distributing Company, Inc., by and through its attorney, and hereby responds to Defendant Ticona Polymers, Inc.'s First Set of Interrogatories propounded as follows:

### GENERAL OBJECTIONS

A.    Plaintiff objects to each and every interrogatory on the grounds that it would require Plaintiff to respond by disclosing its attorneys' or other of its representatives' mental impressions, conclusions, opinions, computations, calculations, projections, reasons, legal theories, other work product.

B.    Plaintiff objects to each and every interrogatory on the basis that it, whether standing along or taken in conjunction with any and all interrogatories, is calculated or would operate to annoy, embarrass, oppress, unduly burden, or unduly cause expenses to Plaintiff, or would be unduly vexatious or unduly burdensome to respond to, or would require Plaintiff to engage in investigative efforts burdensome to the point of oppression and on the ground that said request for production exceeds the permissible scope of discovery under the *Alabama Rules of Civil Procedure*.

EXHIBIT

tabbies

**2**

**RESPONSE: 1) Montgomery 66, 5705 Taylor Road, Montgomery, Alabama 36116; Union Springs 66, 102 Martin Luther King Blvd. Union Springs, Alabama 36089.**

<u>Interrogatory No. 2</u>

State whether you were told anything about the product prior to its installation at any of your motor fuel dispensing facilities, and if so, state what were you told, by whom and when.

**RESPONSE: Plaintiff was told by Bill Wood of Oil Equipment Company in Birmingham, Alabama that this piping and sumps were "top of the line." This occurred before construction of the Montgomery, Alabama location.**

<u>Interrogatory No. 3</u>

State whether you have had the product replaced, and if so, state who replaced the product, the date and cost of the replacement, and the materials used for the replacement.

**RESPONSE: Yes. Product was replaced in Montgomery by Oil Equipment Company at their expense. Unknown as to what they replaced it with.**

<u>Interrogatory No. 4</u>

State the number, date, and cost of repair of any and all alleged leaks experienced in the product, including, but not limited to: (1) who conducted the repair, (2) where each leak occurred in the product, (3) when each alleged leak occurred, (4) the address of the motor fuel dispensing facility where the alleged leak occurred, (5) what, if any property was damaged by leaks experienced in the product, and (6) the cost of repair or estimated cost of repair of such damage and your factual basis therefore.

**RESPONSE: Plaintiff has had three leaks. All were replaced by Oil Equipment Company of Birmingham at no cost to Plaintiff except for down time. All occurred at Montgomery 66. No damage to property.**

3

# A F F I D A V I T

**STATE OF FLORIDA**
**COUNTY OF MARION**

BEFORE ME, the undersigned authority, on this day personally appeared

**THOMAS B. MARTIN**

who, after being first duly sworn, did depose and say:

1.

I am the Senior Process Engineer at Dayco Products, LLC, Ocala, Florida. I am familiar with the various hoses Dayco has produced over the past 25 years.

2.

Enviroflex, Omniflex and Monoflex are the three categories of hoses that plaintiff now claims for the first time in their Fourth Amended Petition were defective.

3.

Each hose was designed, tested and manufactured for a specific application that was different and distinct from each other.

4.

**ENVIROFLEX**

Enclosed is a brochure by TCI (Exhibit A), which describes some of the Enviroflex hoses. Dayco actually manufactured thirteen different hoses in the Enviroflex category. They are as follows:

- 1 ½" Inside Diameter (ID) Zytel ST811HS tube, polyester cover;
- 2 ½" (ID) Zytel ST811HS tube, polyester cover;
- 1 ½" (ID) Kynar tube polyester cover;
- 2 ½" (ID) Kynar tube polyester cover;
- 1 ½" (ID) Shell Carilon tube, polyester cover;
- 1 ½" (ID) Zytel ST811 tube and polyether cover;
- 2 ½" (ID) Zytel ST811 tube and polyether cover;



EXHIBIT
3

- 1 ½" (ID) Carilon tube polyether cover;
- 2 ½" (ID) Carilon tube polyether cover;
- 1 ½" (ID) Carilon tube polyethylene cover,
-  2 ½" (ID) Carilon tube polyethylene cover
- 1 ½" (ID) Carilon tube polyethylene cover and polyethylene outer jacket;
- 2 ½" (ID) Carilon tube polyethylene cover and polyethylene jacket.

The TCI brochure (See Exhibit A) was limited to a specific time period and, thus, only describes four of the thirteen Enviroflex hoses that Dayco made for TCI. None of the Enviroflex hoses manufactured by Dayco were found at the Montgomery station.

5.

**OMNIFLEX**

Plaintiff now claims for the first time that the Dayco's Omniflex hose is allegedly defective. Attached to this Affidavit is a brochure from TCI on Dayco's Omniflex coaxial hose, which was totally different in design, testing and material from the Enviroflex hose (See Exhibit B). This Omniflex hose manufactured by Dayco did not require the outer hose that was utilized in the Enviroflex system, but was described as a direct burial hose. Again, this was a unique and different hose. TCI designated this Dayco hose as 1 ½" CP1501.

6.

**MONOFLEX**

The third category of Dayco hose that plaintiff alleges for the first time was defectively made was the Monoflex hose. This hose was a suction hose and again was totally different in construction, material and design than the two prior hose types. It was a 1 ½" Zytel ST811 HS polyester cover, again used for a totally different purpose and could not be used by May's Distributor since it was a suction hose and the May's stations used pressure hoses. (See Exhibit C)

2

7.

These three different types and varieties of hoses, the Omniflex, the Monoflex and the Enviroflex, were all made during different time periods using different materials, different designs, and, in fact, some of the hoses were made in different manufacturing plants utilizing different engineers and employees. The design engineers and the test engineers together with Quality Control personnel were different for many of these different hoses. As previously set forth, the purpose and usage of each of these hoses were totally different and distinct. The Enviroflex Dayco hose was to be used in a TCI system. The Omniflex was a direct burial hose. Finally, the Monoflex was a suction hose. (See Exhibit D)

8.

Each of the numerous Enviroflex and Omniflex hoses manufactured by Dayco was sent to Underwriters Laboratories and Underwriters of Canada for listing. In order to obtain these listings, these hoses had to undergo rigorous testing before they were permitted to use the UL label. Each of the hoses in the Enviroflex and Omniflex categories was subjected to the UL testing and, in fact, was approved and each hose given a separate UL listing.

9.

The Monoflex, on the other hand, was not sent to UL, but was sent to KIWA, a European listing agency. This hose was not sold in the United States, but in Europe and South America. This hose was a suction hose and had no application in the United States.

10.

None of the Dayco hoses listed above, whether they were Enviroflex, Monoflex or Omniflex, were in plaintiff's Montgomery, Alabama, station.  I have provided an Affidavit in support of Dayco's Motion for Summary Judgment in the State Court case supporting the fact that the Montgomery, Alabama, hoses were not Dayco manufactured hoses (Exhibit E).  As of the writing of this Affidavit, I am unaware of any facts disputing this.

11.

Dayco stopped manufacturing hoses for TCI in 1997.  The allegedly defective hoses, which were the subject of the Third Amended Complaint, were installed in Montgomery in 1998.

**THOMAS B. MARTIN**

Sworn to and Subscribed before me
this ⟍2⟋ day of September, 2006.

NOTARY PUBLIC
My Commission Expires On ⟍2⟍-24-2007

Print Notary Name and Number

JESSICA LEIGH MASH
Comm# DD304285
Bonded thru (800)432-4254
Florida Notary Assn., Inc

4

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 06-20953-CIV-LENARD**

FILED BY _____ D.C.

2006 MAY 19  PM 2: 34

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA - MIA

CITY OF ST. PETERSBURG, a Florida municipality;
TWIN OIL COMPANY, a Florida corporation; JEFF
MONTGOMERY ASSOCIATES, a sole proprietor in
the State of Florida; and FIVE GROUP CORP., a
Florida corporation, on behalf of themselves and all
other Florida residents similarly situated,

        Plaintiffs,

        -vs-

TOTAL CONTAINMENT, INC., a Pennsylvania
corporation; TC FUEL COMPONENTS, LLC., a
Pennsylvania corporation; DAYCO PRODUCTS, INC.;
a Delaware corporation (and subsidiary of PARKER
HANNIFIN CORP.); DAYCO PRODUCTS, LLC, a
Delaware corporation CLEVELAND TUBING, INC., a
Tennessee corporation; MARK IV INDUSTRIES,
INC., a US based company;  MARK IV INDUSTRIES,
LTD., a Delaware corporation, MIV HOLDINGS, S.A.,
a Luxemborg company (and parent of Mark IV
Industries, Inc.); CANAM GROUP, INC., a Canadian
corporation; CANAM MANAC GROUP, INC., a
former Canadian corporation; CANAM STEEL CORP.;
a subsidiary of Canam Manac Group, Inc.; FINLOC,
INC., a Canadian corporation; FINLOC US., a
Delaware corporation; POLYFLOW, INC., a
Pennsylvania Corporation; and UNNAMED
DEFENDANTS 1-100, inclusive,

        Defendants.





<u>**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF AND FOR DAMAGES**</u>

    1.    This action is brought by individual and representative Plaintiffs City of

St. Petersburg, Florida, Twin Oil Company, Jeff Montgomery Associates, and Five Group Corp.

The Canam Group Inc. through its control of TCI transferred all of TCI's business operations and equipment to PolyFlow.

j.  The Canam Group Inc. through its predecessor and its subsidiaries and affiliated companies founded TC Fuel Components, LLC which was incorporated as a limited liability corporation in the state of Pennsylvania.  In or about 2004, TC Fuel Components, LLC purchased the assets of TCI and represents to the public that it is the successor to TCI.

## JURISDICTION AND VENUE

78.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because (a) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (b) the Plaintiffs and Class members in this proposed class action are citizens of Florida, and the Defendants are citizens of Pennsylvania, Delaware, Tennessee, New York, and Canada.

79.    This Court has general personal jurisdiction over the Defendants because each conducted systematic and continuous business activities in and throughout the State of Florida by advertising, marketing, distributing, warranting and selling thermoplastic flexible piping and fittings to Plaintiffs and Class members.  Alternatively, because each has purposefully availed itself of the privilege of doing business in Florida through the advertising, marketing, distributing, warranting and selling of thermoplastic flexible piping and fittings to Plaintiffs and Class members, either directly or through their wholly-owned or controlled subsidiaries or authorized agents, each is subject to this Court's limited personal jurisdiction for lawsuits arising out of its actions in Florida.

80.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the acts and transactions complained of herein occurred in this District, and pursuant to 28 U.S.C. § 1391(a)(1) because the Defendants have at all relevant times conducted business in this District and throughout Florida by advertising, marketing, distributing,



# TOTAL CONTAINMENT® INC

... the industry's first choice for secondary containment.

# ENVIROFLEX®
# FLEXIBLE DOUBLE-WALL PIPING SYSTEMS



## . . . more than just flexible underground piping

EXHIBIT
A

# *Enviroflex®* – the flexible piping that offers you choices to suit a variety of job specifications

Wat system provides flexible piping that absorbs ground movement and pump surges without affecting product flow? What system addresses the environmental concerns of today and tomorrow? The answer to these and other questions is *Enviroflex*—the most environmentally safe underground piping system in the industry.

Total Containment supports the Enviroflex system from specification stage through completed installation with a network of trained instructors and installers.

Why not make the *right* choice and choose a proven product with over 5,000 successful installations world-wide.



## System Advantages



Enviroflex piping is run in a series layout, sloping at a rate of 1/8" per foot towards the tank sumps, connecting one access chamber to the next.

✓ All connections secured inside containment sumps so pipe joints are accessible from surface

✓ Quick and easy installation allows owner/operator shorter downtime—up to 75% savings

✓ Network of trained instructors and installers to insure quality installation

✓ Primary pipe can be removed for inspection and reinserted without excavation

✓ 5-year "total" warranty (Enviroflex plus TCI Tank Sumps, Dispenser Sumps and associated fittings)



### *Enviroflex II®* (PP1501 or PP2501)
No matter what fuel you dispense now . . . or in the future, TCI's second generation Enviroflex piping will contain them all. For petroleum marketers planning their marketing strategies around oxygenated and reformulated fuels (including MTBE, and Ethanol and Methanol up to 100%), choose the pipe that insures security. Enviroflex II is offered in two pipe diameters, 1-1/2" (PP1501) and 2-1/2" (PP2501), suitable for both pressure and suction systems.

### *Enviroflex®* (PP1500 or PP2500)
This first generation flexible piping is a proven design with over 5,000 successful installations worldwide. It is manufactured to the highest quality standards and is UL and ULC approved for petroleum fuels. Enviroflex is offered in two pipe diameters, 1-1/2" (PP1500) and 2-1/2" (PP2500), suitable for both pressure and suction systems.

### *Enviroflex®* Suction (SP1501 or SP1500)
For petroleum marketers preferring an economical pipe for suction applications, TCI offers a 1-1/2" diameter suction pipe in two varieties:  SP1501 and SP1500.

**UL LISTED**
PP1500, PP1501
PP2501

**ULC LISTED**
PP1500, PP1501
PP2500, PP2501
SP4500

# New pipe diameters introduced for fuel oil waste oil, and diesel generator applications

### 1/2" & 3/4" Enviroflex® (PP0500 & PP0750)



The ULC listed 1/2" and 3/4" piping was designed as a complete system called the *Enviroflex System Design (ESD)*. This system offers everyone, from design engineer to installer, a more user friendly system by combining a TCI 500 or 1,000 gallon tank complete with factory installed tank sump, and the 1/2" and 3/4" Enviroflex Double-Wall Piping System. Both the supply and return lines can be contained in one secondary pipe to allow integrity testing during and after installation. ESD piping can be specified, purchased and installed without ESD tanks.



## An inside look at Enviroflex— the superior flexible double-wall piping system

Total Containment sells all the products for a total engineered system from tank to dispenser. The widest variety of tank sumps and dispenser sumps, coupled with the most chemically compatible line of reducers and bulkheads, puts TCI ahead of its competition.



TCI Tank Sumps protected by patent nos. 5,040,408, 5,060,509 and 5,333,490



TCI Dispenser Sumps

## System Components/Tools



Brass components of the system: tees, 90's, Y's, adaptors, couplings and coupling washers.



The Enviroflex Coupling Machine allows easy assembly of the primary pipe and coupling.

Tank sumps are an important piece of the system puzzle that contain all the pipe and conduit connections. Shown below is a 1-1/2" piping application utilizing a "Y" fitting and Enviroflex bulkhead fitting on an uncuffed tank sump.



Bulkhead Fittings and reducers to customize pipe and conduit entries.



Connections inside the dispenser sumps are made using tee fittings in intermediate sumps and 90's in termination sumps.



# Total Containment markets high quality environmental protection products for your secondary containment needs


Bulkhead Fittings


Dispenser Sumps and Pans


Liquid-tight Tank Sumps


Double-Wall Underground Storage Tanks

## Guide Specifications

### Short Form
The contractor shall provide the Enviroflex® Double-Wall piping system, as manufactured by Total Containment, Inc. Both the primary and secondary piping systems shall be installed and integrity tested in accordance with the manufacturer's published installation instructions.

### Long Form
**Design:** The Double-Wall Piping System shall consist of a UL/ULC listed flexible inner primary pipe contained within a ULC listed flexible outer containment pipe, each making connection within a series of surface access containment chambers. All piping runs shall be continuous, whereby there shall be no fittings or piping connections, for either the primary or secondary containment pipe which are not visible or accessible from aboveground. The secondary containment piping shall be sized to allow complete removal of the primary piping without excavation. The secondary containment system shall provide watertight containment of the tank's piping and its associated fittings, and the shear valve assembly located below each aboveground fuel dispenser unit.

**Product Compatibility:** All the components of the Double-Wall Piping System shall be compatible with the products to be stored.

**Corrosion Resistance:** All components of the Double-Wall Piping System shall be made of non-corrosive materials, or if metallic, such as the fittings and couplings, isolated from corrosion causing agents.

**Structural Integrity:** The outer secondary containment system shall be of such design and materials to have sufficient strength to withstand the maximum underground burial loads and tested in accordance with AASHTO M294. The flexible inner primary piping system shall be capable of withstanding liquid pressure five times greater than the designed operating pressures.

**Integrity Testing:** The outer secondary containment systems shall undergo an air pressure hold test (3 to 5 psi) after installation and before the final backfill. The flexible inner primary piping system shall be subject to 60 psi air pressure hold test prior to final backfill.

**Monitoring Capability:** The design of the secondary containment system shall permit any leak in the primary piping system to be detected by a leak detection system.

**Access Chambers:** Surface access containment chambers shall be located at the tank containing the tank's submersible pump and under each aboveground fuel dispenser. These access chambers shall meet the following requirements:

1. Provide product-tight tank or island connection.
2. Provide product-tight pipe and conduit exits.
3. Provide sufficient strength to keep out surrounding backfill material.
4. Made of non-corrosive, product compatible and dielectric materials.

Contact your local petroleum distributor or Total Containment, Inc. for additional information on TCI's environmental protection products designed for a total system approach to secondary containment:

Double-Wall Tanks    Dispenser Sumps
Enviroflex           Dispenser Pans
Sump/Risers          Pipe Jacket



Designs and specifications are subject to change without notice.
U.S. & Worldwide Patents
© 1993 TOTAL CONTAINMENT, INC.
Printed in the U.S.A. on Recycled Paper





TOTAL CONTAINMENT INC

422 Business Center • A130 North Drive • P.O. Box 939 • Oaks, PA 19456 • 610-666-7777 • Fax: 610-666-5321

EFB491
REV1094J

# Total Cont

## Omniflex II™

Publication No.: CP400
Effective Date:  9-01-94
Supersedes:   NEW



Total Containment welcomes a new addition to its piping family, Omniflex II coaxial pipe. The primary pipe carries a UL listing for use with gasoline and alcohol blends up to 100%. Its polyethylene outer wall provides secondary containment that can be monitored easily in compliance with federal regulations.

Omniflex II piping is designed and manufactured with the same degree of engineering excellance that has proven successful in over 5,000 Enviroflex® Double-Wall piping installations worldwide.

## Product Advantages

- Primary pipe UL listed for gasoline, gasohol, ethanol, methanol, M85
- Utilizes technology successfully installed at over 5,000 Enviroflex® sites worldwide
- Compatible with Enviroflex fittings and tools
- All fittings visible and accessible from aboveground
- 50% fewer joints than fiberglass single wall pipe
- Easy to install in all temperatures
- Enviroflex warranties applicable

Interstitial Space

Corrugated Inner Primary Pipe

Fiber Reinforcement

Stand-off Containment Pipe

## Omniflex Cross-section

*Omniflex II is composed of exceptionally strong layers of advanced thermoplastic composites, surrounded by a protective polyester braid bonded to polyurethane. The outer polyethylene containment pipe stands off from the inner pipe by ribs to create interstitial space for continuous monitoring.*

OMMITMENT TO AND INTEREST IN OUR CUSTOMERS IS THE DRIVING FORCE IN ACHIEVING OUR POSITION AS "THE INDUSTRY'S FIRST CHOICE FOR SECONDARY CONTAINMENT."

**TOTAL CONTAINMENT**
I N C O R P O R A T E D

EXHIBIT
B

# Omniflex II™
## Coaxial Double Wall Piping

Guide Specifications



*1-1/2" Omniflex II coaxial pipe with uncuffed tank sumps and dispenser sumps*

Dispenser Sump

Multisided Tank Sump

### Short Form
The contractor shall provide the Omniflex II Coaxial Piping System, as manufactured by Total Containment, Inc. The system shall be installed and tested in accordance with the manufacturer's published installation instructions.

### Long Form
The coaxial primary piping shall be UL listed for use with gasoline, gasohol, ethanol, methanol and M85. It shall be contained within a polyethylene outer wall that can be tested to 5 psi at installation and periodically thereafter at the owner's discretion. All piping runs shall be continuous whereby all connections for both the primary and secondary piping are visible and accessible from aboveground. The flexible primary pipe shall be subject to a 60 psi air pressure hold test prior to final backfill.

| *New Omniflex II Components* | Part No. |
|---|---|
| A ... Omniflex II Coaxial Pipe | CP1501 |
| B ... Omniflex II Test Boot | CS2019 |
| C ... Nylon Test Tube Kit | FT1151 |
| D ... Nylon Flow Tube Kit | FT1150 |
| *Standard Enviroflex® Parts* | Part No. |
| E ... Enviroflex 1-1/2" to 2" Adaptor | SA4000 |
| F ... Enviroflex 1-1/2" Primary Coupling | FC1500 |
| ... and Copper Washer | WS1000 |
| G ... Enviroflex 1-1/2" Primary Tee | TE1500 |
| H ... Enviroflex 1-1/2" Primary Elbow | EL1500 |
| *Miscellaneous Parts* | Part No. |
| I ... 4" Mounting Flange | MF0004 |
| J ... Bulkhead Fitting | FB2030 |

## Utilizes standard
## Enviroflex® brass fittings

Omniflex coaxial pipe uses standard Enviroflex fittings (shown left to right) tee, 90° elbow, coupling washer, primary coupling, and single adaptor.





## TOTAL
## CONTAINMENT
I N C O R P O R A T E D

422 Business Center • A130 North Drive
Post Office Box 939 • Oaks, PA 19456
610-666-7777 • FAX 610-666-5321
Designs and specifications are subject to changes without notice.
© TCI 1994, U.S. & Worldwide Patents

Distributed by:

# MONOFLEX

Publication No.: MDF710
Effective Date: 6-01-91
Supersedes: NEW



Monoflex is composed of three exceptionally strong layers of nylon, polyurethane and polyethylene.

## Features

- No underground joints
- Flexibility
- Major savings on installation cost and time
- Thermoplastic construction with no possible corrosion
- Du Pont virgin resin used to construct pipe
- Patented design
- Compatible with all fuels

## Benefits

- All joints visible and accessible from above-ground; reduced maintenance cost
- Quick installation allows more immediate cash flow
- Not affected by ground movements
- Quality product with years of engineering behind it
- State-of-the-art thermoplastic processing and testing

## Application



Monoflex is a single-wall system designed to carry and be compatible with all fuels.

## Typical Layout



Monoflex piping is run in a series layout, connecting one access chamber to the other.

CONFIDENTIAL

EXHIBIT
C

## Total Containment® Components

| Total Containment® Components | UL | | | ULC | |
|---|---|---|---|---|---|

### I. Piping

| Part Number | Description | Listing Status | File No. | Listing Specs. | Listing Status | File No. |
|---|---|---|---|---|---|---|
| **a.) Primary** | | | | | | |
| PP0500 | 1/2" Enviroflex®, Petroleum | Listed | MH16395 | 971 | Listed | CMH1385 |
| PP0750 | 3/4" Enviroflex®, Petroleum | Listed | MH16395 | 971 | Listed | CMH1385 |
| PP1000 | 1" Enviroflex®, Petroleum | Listed | MH16395 | 971 | Listed | CMH1385 |
| PP1500 | 1-1/2" Enviroflex®, Petroleum | Listed | MH16395 | 971 | Listed | CMH1385 |
| PP1501 | 1-1/2" Enviroflex®, Alcohol | Listed | MH16395 | 971 | Listed | CMH1385 |
| PP2500 | 2-1/2" Enviroflex, Petroleum | NS(1) | - | - | Listed | CMH1385 |
| PP2501 | 2-1/2" Enviroflex®, Alcohol | Listed | MH16395 | 971 | Listed | CMH1385 |
| **b.) Secondary** | | | | | | |
| SP4500 | Enviroflex® Secondary | Listed | MH16395 | 971 | Listed | CMH1422 |
| TP0200 | A Pipe Jacket | NS | - | - | Listed | CMH1322 |
| TP0300 | B Pipe Jacket | NS | - | - | Listed | CMH1322 |
| TP0400 | C Pipe Jacket | NS | - | - | NS | - |
| **c.) Coaxial** | | | | | | |
| CPS501 | 1-1/2" Omniflex® Coaxial Primary | Listed | MH16395 | 971 | Listed | CMH1385 |
| CPS150 | 1-1/2" Omniflex® Coaxial Secondary | Listed | MH16395 | 971 | Listed | CMH1385 |
| CP1502 | 1-1/2" Omniflex® Coaxial Primary | Listed | MH16395 | 971 | Listed | CMH1385 |
| **d.) Suction, Vent, Vapor and Secondary** | | | | | | |
| SP2501 | 2-1/2" Monoflex™ Primary | Listed | MH16395 | 971 | Listed | CMH1385 |

### II. Bulkheads

| | | | | | | |
|---|---|---|---|---|---|---|
| ALL | Rubber Compression Seals | Listed | MH14270 | 157 | Listed | CMH1422 |
| ALL | Bulkheads-Plastic | Listed | MH14270 | 157 | Listed | CMH1422 |

### III. Sumps

| | | | | | | |
|---|---|---|---|---|---|---|
| ALL | Tank & Dispenser Sumps, Pans | Listed | MH14270 | - | Listed | CMH1422 |
| ALL | Dispenser Frames | Listed | MH17669 | - | Listed | CMH1422 |
| ALL | Fiberglass Sumps | IP | MH17669 | - | IP | CMH1422 |

### IV. Tanks

| | | | | | | |
|---|---|---|---|---|---|---|
| ALL | Tank Jacket® to 12' -50,000 | Listed | MH14270 | 58, 1746 | Listed | CMH1322 |
| ALL | Embossed Tank Jacket® | Listed | MH14270 | 58, 1746 | NS | CMH1322 |
| ADD | Flexible Monitor Column | Listed | MH14270 | 58, 1746 | NS | - |

Legend: IP - In Process, NS-Not Submitted, PP-Postponed

II Not be Submitted


EXHIBIT
D

# **A F F I D A V I T**

**STATE OF LOUISIANA**
**PARISH OF ORLEANS**

BEFORE ME, the undersigned authority, on this day personally appeared

**THOMAS MARTIN**

who, after being first duly sworn, did depose and say:

1.

I am the Senior Process Engineer at Dayco Products, LLC, Ocala, Florida. I am familiar with the various hoses Dayco has produced over the past 25 years.

2.

Dayco has made some of the primary pipe for TCI's system.

3.

There were several generations of this pipe sold by TCI. I have reviewed the 44 photographs of the 21 different hoses that I am told came from the Mays' Montgomery, Alabama, station and can state that these are not hoses that Dayco manufactured, to the best of my knowledge, information and belief. I attach a copy of the 44 pictures which I have reviewed and make them a part of this Affidavit.

_____
**THOMAS MARTIN**

Sworn to and Subscribed before me
this 2-3 day of February, 2006.

_____
NOTARY PUBLIC
My Commission Expires On: _____
_JAMES E. BLAZER_
Print Notary Name and ID Number

